UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CONDRON<br>JESSICA METIVIER<br><br>Defendants | CRIMINAL No. 17-10243-IT |

## UNITED STATES' PRE-TRIAL MEMORANDUM

The United States respectfully submits the following pre-trial memorandum of law and fact for the trial beginning March 4, 2019.

## FACTUAL SUMMARY

Between 2009 and 2012, a Massachusetts couple in Acton, Massachusetts, the defendants, CHRISTOPHER CONDRON and JESSICIA METIVIER, submitted a series of false, fictitious and fraudulent applications to the U.S. Treasury Department requesting more than $51 million in tax-free grants and by doing so engaged in an elaborate scheme to defraud.

The grants were for energy projects including "gasifiers" (equipment that turns bio-waste/bio-mass into bio-fuel) and a wind-farm project in Cape Cod, Massachusetts. By submitting fraudulent documents and information through an attorney (the "Attorney") who submitted the applications to the U.S. Treasury Department ("Treasury") of their behalf, CONDRON and METIVIER fraudulently obtained more than $8 million in government funds and attempted to fraudulently obtain another $42 million before the fraud was detected.

**Background of Section 1603 of the Recovery Act**

On February 17, 2009, President Obama signed *the American Recovery and Reinvestment Act of 2009* also known as the "Recovery Act" or "the Stimulus," the purpose of which was to promote economic recovery and infrastructure investment. Under Section 1603 of the Recovery Act, entitled "Grants for Specified Energy Property in Lieu of Tax Credits," those who put a certain types of "Specified Energy Property" into service could apply to Treasury for a grant to offset the cost of the property. "In service" meant . . .

As Treasury made clear:

> The purpose of the 1603 payment is to reimburse eligible applicants for a portion of the cost of installing specified energy property used in a trade or business or for the production of income. A 1603 payment is made after the energy property is placed in service; a 1603 payment is <u>not</u> made prior to or during construction of the energy property.[1]

In this case, the applications were for two "open-loop biomass facilities," a "trash facility" and "wind facility," terms defined in the Internal Revenue Code ("IRC") and the text of the applications. Put simply, an open-loop biomass facility converted "cellulosic waste material" (waste from trees, wood chips) into biofuel. Similarly, a trash facility converted municipal solid waste into biofuel. For both types of systems, the defendants claimed that they used a "gasifier" system to convert wood or trash into biofuel. The gasifier itself and the related equipment were called a "gasification system." The trash facility was also called a "trash gasification system." The biofuel could then be used to power a biofuel generator to produce electricity. A "wind

---

[1] https://www.treasury.gov/initiatives/recovery/Pages/1603.aspx (emphasis added).

facility," also called a "small wind energy property" used small wind turbines to generate electricity. For each of these projects, the Treasury offered grants covering 30 percent of the cost basis for the property.

## A.    The 1603 Application Process

Applications were submitted online through a web portal. Among other things, the applicant was required to state, under the penalty of perjury, the following:

- **Section 2B. Property Identification** – Where the property was located.

- **Section 2C. Property Placed in Service** – The date on which the property was placed into service.

    o  Further, the fact that the property was placed into service had to be further supported by a "**Signed and dated commissioning report . . .** from the installer or engineer stating that the property has been placed in service." See Sec. 6A.

- **Section 4A. Specified Energy Property** – The type of eligible property, here the defendant claimed an "open-loop biomass facility," a "trash facility," or a "wind facility."

- **Section 5A. Cost Basis and Applicable Percentage** – The qualified cost basis of the property and the applicable percentage to calculate the request for payment;

    o  In support of the cost basis for any property that was $500,000 or more, the applicant was also required to submit an "**Independent Accountant's Certification**" including "a detailed cost breakdown or cost segregation report for the review team to see both eligible and non-qualifying costs." See Sec 6A.

- **Section 7. Signature of Applicant –** Which stated: "Under penalties of perjury, I declare that I have examined this application, which includes any application submitted using the same Treasury Identification Number for the purpose of demonstrating that construction began on the property in 2009-2011, and to the best of my knowledge and belief, it is true, correct, and complete. I declare that I am the applicant or an authorized official for the applicant. Further, I agree the information in this application can be disclosed to the Internal Revenue Service."

The application was then given to one of several reviewers at the National Renewable Energy Laboratory ("NREL") in Golden, Colorado, a government-owned, contractor operated facility funded through the U.S. Department of Energy ("DOE"). The project manager for the reviewers was Edward Settle in Colorado. If both NERL and Treasury approved the application, the money was wired from the Federal Reserve to the applicant's bank account.

Through May 8, 2012, the Section 1603 program awarded $11.6 billion to almost 38,000 projects. About $82 million went to projects in Massachusetts. Most of the money went to solar wind-farm projects. Biomass projects were a much rarer, accounting for approximately $216 million out of $11.6 billion in funding and about 60 out of 38,000 projects.[2]

### The Fraudulent 1603 Applications

Between 2009 and 2012, CONDRON and METIVIER caused four separate 1603 applications to be submitted to Treasury for a total $51 million in grants. Each of the applications were in the name of Massachusetts-company of which METIVIER was the principal manager, but were submitted by an attorney that METIVIER knew in Carlisle, Massachusetts ("the Attorney").

As summarized in the chart below, while Treasury ultimately denied the later applications in 2012, Treasury approved two and disbursed more than $8.7 million in tax free government funds to pay CONDRON and METIVIER for gasification systems that were never purchased or put into service:

_____

[2] See *§ 1603 Treasury Grant Expiration: Industry Insight on Financing and Market Implications, NREL* http://www.nrel.gov/docs/fy12osti/53720.pdf.

| Date | Applicant | Energy Property | Purported Cost Basis | Requested Grant Amount | Action by Treasury |
|------|-----------|-----------------|----------------------|------------------------|--------------------|
| 09/29/09 | Acton Bio Energy | Open-Loop Biomass | $2,935,000 | $880,500 | Denied |
| 12/17/09 | Acton Bio Energy | Open-Loop Biomass | $2,935,000 | $880,500 | Granted: $704,454 |
| 04/29/11 | Concord Nurseries | Open-Loop Biomass | $26,787,532 | $8,036,260 | Granted: $8,036,260 |
| 07/10/12 | Kansas Green Energy | Trash Facility | $58,701,305 | $17,610,392 | Denied |
| 09/25/12 | Kansas Green Energy | Trash Facility | $58,701,305 | $17,610,392 | Denied |
| 09/28/12 | Ocean Wave Energy | Wind Facility | $84,015,900 | $25,204,770 | Denied |

In sum, CONDRON and METIVIER fraudulently obtained $8,740,714 in government funds and attempted to fraudulently obtain a total of $51,731,922. The applications were fraudulent, and amounted to a scheme to defraud, because the purported cost basis for the energy property used to support the 30 percent grants were based on the fictitious and fraudulent certifications, bills of sales, and promissory notes/finance agreements that purported to document the transfer (and actual existence) of tens of millions of dollars of energy equipment that never took place.

CONDRON was the driving force behind the applications and concealed his active involvement behind his girlfriend/significant other (METIVIER), the Attorney and a person known as "SB" ("Person A" in the Indictment), CONDRON's mother who acted as the supplier of millions of dollars of energy equipment that she and her companies claimed to have sold and financed. While the investigation revealed that CONDRON had in fact purchased hundreds of thousands of dollars of generators and other equipment related to the production of energy using bio-diesel fuel, CONDRON never purchased or installed the *tens of millions* of dollars in energy

equipment he had claimed in the applications. Instead, the basis for the cost for the purported energy equipment was predicated on bogus documents, bills of sales, and financing agreements.

## A. Acton Bio

The first application was in the name of a company called Acton Bio Energy. In May 2009, METIVIER approached the Attorney about the possibility of her and CONDRON submitting grant applications for the Section 1603 program. While METIVIER introduced CONDRON to the Attorney, and the Attorney considered METIVIER (and not CONDRON) his client, it was CONDRON who provided most of the documents and information to the Attorney.

Through emails and documents, CONDRON informed the Attorney that he had obtained a "gasification system" that converted biomass into "clean, cool, combustible gas." CONDRON claimed that the gasification system had been installed, and was in service, at a business called Acton Sand & Gravel ("Sand & Gravel") in Acton, Massachusetts.[3]

### 1. Acton Sand & Gravel

Around 2009, CONDRON approached Fred Kennedy, the owner of Sand & Gravel, and told Kennedy that he had generators that ran on bio-diesel that could power Kennedy's generator. In exchange for allowing CONDRON to keep the bio-diesel generators at Sand & Gravel, CONDRON told Kennedy that his generators could power his rock-crushing equipment with bio-fuel. In December 2009, CONDRON asked Kennedy to sign a document entitled "Power Purchase Agreement." Kennedy assumed that agreement he signed was just for CONDRON to rent a portion of Kennedy's property to store his generators. Later, even though Kennedy never

---

[3]Sand & Gravel was in the business of pulverizing materials to make sand and gravel for the general public. It had a regular generator that burned about 90 gallons of diesel fuel a day.

dealt with METIVIER, this Power Purchase Agreement was submitted to Treasury with both Kennedy and METIVIER's signatures.

CONDRON transported several large generators (some on trailers) to Kennedy's business. According to Kennedy, CONDRON frequently worked on the generators, but they only continuously generated electricity for a short period of time, at most 4 or 5 days. After a while, CONDRON ended up removing some of the generators, while others remained on the property. While CONDRON mentioned something about a gasifier to Kennedy (that would run on wood chips), according to Kennedy, it never took place at Sand & Gravel. Kennedy never observed any equipment at Sand & Gravel that ran on woodchips or biomass, or converted woodchips or biomass to bio-fuel.

In preparation for the application, on September 3, 2009, the Attorney emailed CONDRON, "*Hi Chris. I am missing the certification from you that the system for the llc has been installed. Please provide that signed certification.*" CONDRON responded by providing the Attorney with a certification that CONDRON signed that claimed that, by September 15, 2009, the "bio-mass gasification system has been installed as the operating site, 960 Main St., Acton, MA."

CONDRON also claimed that he and his company, "C2C, Inc.," (also called "C2C Solutions," hereafter, "C2C")[4] sold a gasification system to METIVIER and her company, Acton Bio Energy, LLC ("Acton Bio") for approximately $2.9 million. Per CONDRON's instructions, even though CONDRON was the driving force behind the plan, the 1603 grant application was

---

[4]While there is no Massachusetts entity called "C2C Solutions," in 2002 CONDRON registered "C2C Beverage, Inc." for the sale of alcoholic and non-alcoholic beverages. It was dissolved in 2007.

submitted on behalf of METIVIER and Acton Bio.  In fact, CONDRON's name never appeared on any of the 1603 grant applications.  Each application was submitted by the Attorney, in the name METIVIER and one of her companies.  Over several months, CONDRON and the Attorney exchanged emails in which CONDRON exhibited a detailed and obsessive understanding of the program and its requirements.

### 2. *Acton Bio Application for $880,500 on September 29, 2009*

Following CONDRON's instructions, on September 29, 2009, the Attorney submitted the first 1603 grant application for Acton Bio for $880,500, 30 percent of purported $2.935 million "open-loop biomass facility" (the gasification system) in service at Sand & Gravel. The application claimed that CONDRON's company, C2C, had sold the gasifier to Acton Bio and financed the sale with a 20-year promissory note.

### 3. *The Independent Accountant's Report*

On October 8, 2009, Treasury denied Acton Bio's application because it did not contain a Certified Accountant's Report or Certification to substantiate the cost of the gasifier.  Thereafter, on October 29, 2009, METIVIER met with a small accounting firm in Concord, Massachusetts, Walsh & Associates, and engaged them to create a financial report for an amended 1603 grant application.  On November 6, 2009, Diana Lambert from Walsh & Associates conducted a site visit of Sand & Gravel and saw what METIVIER represented to be a gasification system.[5]

METVIER then provided Lambert with fraudulent documents to support the cost basis of the purported gasification system including documents, including:

---

[5]After this visit, on November 12, 2009, CONDRON emailed the Attorney and told him that Walsh was making a site visit on Monday, and that his dad was cutting vinyl to install the "Lucky Charm" green machine.

- A <u>Promissory Note</u> between C2C, Inc. and Acton Bio that claimed that CONDRON and C2C had sold and financed a $2.935 million gasification system to Acton Bio and METIVIER.[6]

- A <u>Bill of Sale</u> dated November 4, 2009 that claimed that Acton Bio purchased a gasifier, related generators and equipment from CONDRON d/b/a C2C Solutions for $3.1 million.

Based on a review of this and other documents that METIVIER provided to them, Walsh & Associates produced an "Independent Accountant's Report" that concluded the cost basis of gasification system, $2,935,000, was determined in accordance with the proper accounting rules but made clear that Walsh & Associates "were not engaged to, and did not, conduct an examination of the specified property costs and the eligible cost basis, the objective of which would be the expression of the opinion."

4. *The Amended Acton Bio Application for $880,500 on December 17, 2009*

On December 17, 2009, the Attorney resubmitted the application with the Independent Accountant's Report. In April 2010, Treasury granted Acton Bio's amended application and wired $704,454 to Acton Bio. While not required by the program, a review of financial records revealed that the funds were not used to pay for a purported gasification system. Instead, the funds were used to pay business related expenses for METIVIER's nursery business in Concord.[7]

---

[6]The promissory note was a 20-year note to CONDRON d/b/a C2C Solutions for $2.8 million with a 4% interest rate (i.e., Acton Bio made a promise pay $2.8 million to CONDRON with 4 % interest). Per the bill of sale, Acton Bio was required to pay C2C Solutions $311,843.75 when power production began and make monthly payments of $16,054.65 to C2C over a period of 20 years. However, based on a review of financial records, these payments never took place

[7]The funds were wired to one an account that METIVIER and CONDRON opened - among four other bank accounts - in the name of Acton Bio ending in 0602 ("CITZ-0602"). Prior to the April 21, 2010 transfer of $704,454 to CITZ-0602, the account balance was $54.00. After the transfer, on April 27, 2010, METIVIER wrote two checks from CITZ-0620 payable to cash - one for $350,000 and a second one for $300,000. The same day, two deposits of $300,000 were made into a second account under the name of Acton Bio, Citizens Bank account ending in 4002 ("CITZ-4002"). A further analysis of the books and records revealed that in 2010, Acton Bio paid a total of $123,526 to METIVIER; $100,000 to Sand &

**B.     Concord Nurseries**

The second application was in the name of Concord Nurseries, an agricultural retail business in Concord, Massachusetts.  METIVIER and CONDRON, along with other employees, worked at the business growing and selling plants and vegetables.  In July 2010, the Attorney registered Concord Nurseries as a Massachusetts Limited Liability Company ("LLC") with METIVIER as the sole manager.

*1.   The Emerald Group*

Following CONDRON's direction, on April 29, 2011, the Attorney submitted a 1603 application on behalf of Concord Nurseries, LLC for another "open-loop biomass facility" and requested more than $8 million.  This time, instead of claiming that CONDRON and C2C sold the gasification system to METIVIER, the application claimed that a woman named "SB" from a company called the "Emerald Group, LLC" ("Emerald Group") sold the gasification system to Concord Nurseries for more than $26 million.  Based on a purported cost basis of $26 million ($26,787,532), the application requested a 30 percent tax free grant of $8,036,260.

Although listed as an LLC with an address in Osterville, Massachusetts, the Emerald Group was not a real company.  It was a sham.  The Emerald Group was not registered as an LLC in Massachusetts and the principal, SB, was not an energy professional, she was CONDRON's mother and a retired nurse. While the company was in her name, SB simply signed the documents, prepared for her in advance, at CONDRON's direction.  Once signed, these

---

Gravel; $119,495 to Concord Nurseries (a nursery that METIVER and CONDRON operated); $139,421 in payroll expenses; and $153,203 for professional consulting.  In total, in 2010, Acton Bio incurred approximately $635,646 in expenses.  In addition to business related expenses, on July 18, 2011, $40,000 was transferred from CITZ-0620 to one of METIVIER's personal accounts at Middlesex Savings, account ending in 8562 ("MSB-8562") via check.

documents were given the Attorney who submitted them to Treasury. The fraudulent Emerald Group documents included the following:

- A <u>Commissioning Report</u> from the Emerald Group signed by SB and dated November 15, 2010 that claimed "[t]he biomass energy producing system" that Concord Nurseries purchased had been installed and was tested on November 15, 2010."

- A second updated <u>Commissioning Report</u> from the Emerald Group signed by SB and dated June 27, 2011 that again claimed that the "biomass energy producing system purchased by Concord Nurseries has been installed at 874 Barretts rd, Concord, MA."

- A <u>Bill of Sale</u> for a "turn key [sic] gasifier for Bio Mass products" that indicated that Concord Nurseries had purchased from SB and the Emerald Group $26,773,178.55. The bill of sale was signed by SB and METIVIER and dated October 19, 2010. The Bill of Sale also indicated that Concord Nurseries made a good faith deposit of $26,773.18, but that the Emerald Group had financed the remainder with a 20-year promissory note whereby Concord Nurseries promised to pay SB an amount of $26,700,000 with a 2 percent interest rate.[8]

2. *The Emerald Group's Transactions*

To further conceal the fact that SB did not sell and finance a $26 million gasification system, METIVIER wrote a check from a Citizen's Bank (ending in 4002) account under the name of Concord Nurseries dated October 9, 2010 for $26,773.18 payable to the Emerald Group (the amount of the good faith deposit). The money, however, was not a down payment for a $26 million gasification system. Instead, CONDRON was using SB's name and the companies he set up for her to purchase more equipment.

When interviewed by the IRS, SB confirmed that she did not build and sell and $26 million gasifier. SB further confirmed that CONDRON provided her with money, not for the

---

[8]Thus, under the terms of the note, Concord was required to pay SB $1.6 million per year in monthly installments of $135,000 per month. These payments never took place.

payment of a gasifier that she sold him, but for her to purchase other equipment on CONDRON's behalf. SB was not selling energy equipment to CONDRON or METIVIER. In other words, CONDRON was provided SB money and using SB and the Emerald Group to purchase equipment. By doing so, CONDRON's payments to SB gave the appearance that METIVIER was in fact repaying SB pursuant to the finance agreements, when in fact CONDRON's was using the grant money to purchase more equipment through his mother. According to SB, CONDRON or his father (Brewer's ex-husband) provided her with a check, and gave her detailed instructions on where to wire the money.[9]

In July 2011, Treasury granted Concord Nurseries application and wired $8,036,260 to one of Concord Nurseries' account at Bank of America. Thereafter, between July 23, 2011 and July 29, 2011, METIVIER transferred approximately $7.7 million of this money in checks to other Concord Nursery and Acton Bio bank accounts. The money, again, was not used to reimburse METIVIER and CONDRON for the purchase of a $26 million gasifier; it was used to finance their business and other personal expenses.

---

[9]The Emerald Group charade was further concealed in SB's tax returns. Between 2009 and 2011, SB typically reported about $42,000 in wages from her employment in the health care industry. However, in 2012, in addition to about $42,000 in wages, SB also reported more $2.3 million in gross receipts from "equipment sales" from the Emerald Group and more than $1.6 million in (on Schedule C) business income on her 2011 individual income tax return. According to SB's tax preparer, Kimberly Martin of ACT Financial, to report the business income, SB provided her with a spreadsheet containing expenses figures for the equipment and invoices the Emerald Group purportedly sold. As a result, SB owed more than $579,000 in income taxes. While CONDRON provided funds to SB to pay these income taxes, SB also incurred hundreds of thousands of dollars in losses. Because of this SB had to return to the workforce and refinance her home.

## C.    Kansas Green Energy

The third 1603 application that the Attorney submitted for CONDRON was on behalf of a company called Kansas Green Energy, LLC ("KGE"). On October 5, 2011, the Attorney registered KGE as Massachusetts LLC and named METIIVER as the sole manager with a business address in Wareham, Massachusetts.  As part of the application to Treasury, KGE proposed to operate greenhouses for the production and sale of plants and vegetables in a small retail operation in Wareham.[10]

Early the following year, on January 26, 2012, the Attorney registered Industrial Supplies, LLC as a Foreign LLC[11] in Massachusetts to "Produce Green Energy." No managers were listed though SB signed the application and was listed as the registered agent.

On July 10, 2012, again at CONDRON's behest, the Attorney submitted a 1603 application on behalf of KGE for a trash gasification system called a "trash facility" that "uses municipal solid waste to produce electricity." The application claimed that the trash facility was in place at the KGE location in Wareham and that SB of Industrial Supplies had sold and financed the unit to KGE.  The application also claimed—with fraudulent supporting documentation—that the trash facility had a cost basis of more than $58 million and requested a grant of more than $17 million. The sale was a charade and never took place.  When interviewed, SB confirmed that she never sold and financed a $58 million trash facility.[12]

---

[10]This location, 22 Cranberry Hwy, West Wareham, MA is the business location for Morse R F Greenhouse & Nursery ("Morse RF").  According to lease documents, Concord Nurseries leased this location from Morse RF, and KGE leased it from Concord Nurseries.

[11]On December 12, 2011, Industrial Supplies, LLC was registered as a Delaware LLC. No directors or agents were publically listed.

[12]For example, one of the documents included as support was a "Promissory Note and Security Agreement" dated November 16, 2011 between the lender (SB d/b/a the Emerald Group) and the

In addition to bogus transactional documents, the KGE application also included a legitimate engineering report that Raymond Jarvis of R.P. Jarvis Engineering prepared entitled "KGE-BioDiesel Power Generation Project" with detailed technical diagrams.[13] The drawings, however, were for the electrical system and not a trash facility. When CONDRON asked Jarvis to sign an Independent Engineer's report regarding the gasification system, Jarvis refused to sign the report because he had no experience in waste to energy conversion generators.

The $58 million cost-basis was again supported by fraudulent documents signed by METIVIER, including:

- A "Report of Management on Eligible Cost Basis" from KGE dated June 21, 2012 signed by METIVIER on KGE letterhead. In the letter, METIVIER claimed that qualifying property, a "Trash Gasification System" had been assembled and installed at the operational site and had a cost basis of $58,805,237.

- A schedule of costs ("Cost Breakdown for qualifying property") which included $14,280,150 for a "Gasification Reactor."

After the application was submitted, between late July 2012 and early August 9, 2012, Treasury emailed the Attorney about several issues regarding the KGE application and specifically asked for a signed and dated commissioning report "that certifies that the equipment has been installed, tested, and is ready and capable of being used for its intended purpose." On August 13, 2012, the Attorney responded with a letter from Industrial Supplies dated May 30, 2012 with SB's signature. The letter purported to provide *documentation that a trash*

---

borrower (KGE) for $57,951,305 at an interest rate of 2% per year. METIVIER signed the document, but SB did not. The note required annual payments of $3.5 million with monthly installments of $293,000. An analysis of bank records, however, revealed that no payments were made on the note.

[13]CONDRON paid Jarvis $16,640 for the diagrams, and listed this cost as an "Engineering & installation cost" for the gasification systems in the cost break down for the qualifying property."

*gasification system was installed"* for KGE at 20 Cranberry Highway, West Wareham. The letter further claimed that the *"final testing and commissioning [was] completed on December 30, 2011."*

The letter was not true. SB and Industrial Supplies played no role the actual sale and installation of any gasification equipment. While there may been generators on the property at some point, the generators and other equipment never actually converted waste into fuel. Furthermore, while CONDRON in fact was purchasing energy related equipment from several vendors, including one in Missouri known as "Worldwide Recycling," any equipment that was located at the West Wareham location had been removed by the summer of 2012 and was not in service in September 2012. Moreover, and most significantly, the total value of the equipment that CONDRON bought cost far less than the claimed $58 million.

On September 25, 2012, the Attorney submitted a renewed 1603 application for KGE. The application again claimed that trash facility was located at KGE at 22 Cranberry Highway in West Wareham and had been placed into service on December 30, 2011. Among the documents submitted to Treasury, the application also included an independent engineer's report for a waste-to-energy project with a table of costs, including approximately $14.2 million for a "Gasification reactor chamber." The report did not have a purported author and the signature line was blank with no name.[14]

---

[14]Immediately after the last page of the report, the Attorney attached an unsigned letter from Andrew Grant, Biomass Power Projects, LLC. According to Grant, while CONDRON told him that he had several generators and a gasification system would fuel the generators with organic materials, he never saw the gasification system and described the documentation that CONDRON provided to him as "lousy" and "wishful thinking."

**D.      Ocean Wave Energy – Count Two of Indictment**

Days later, on September 28, 2012, at CONDRON's behest, the Attorney submitted a 1603 grant application seeking approximately $25 million for fifty-eight (58) "small wind energy property" units.[15]  The application claimed that applicant (Ocean Wave Energy, LLC)[16] had begun construction on the "multiple energy-generating property turbine project" on December 29, 2011. The application further claimed that the project had a cost basis of more than $84 million.

The deadline for the Section 1603 program was September 30, 2012.  CONDRON and METIVIER submitted applications on September 25 and 28, 2012, two days before the deadline, requesting $42 million.

Among the documents submitted to Treasury was a letter from Industrial Supplies dated March 15, 2012, signed by SB that claimed that Industrial Supplies had installed two small wind turbines for OWE.  The letter further stated that *"IS certifies that as the vender as of December 31, 2011, all the equipment sold to, and installed for, Ocean Wave Energy, LLC is installed at the above listed address[.]"*  The application also included a letter from CLE Engineering, Inc., confirming that they placed two barges (but not the turbines) into the Hyannis Harbor. According to the Vice President of CLE Engineering, Inc., CONDRON hired CLE Engineering

---

[15]This wire forms of the basis of Count 2 of the indictment charging wire fraud and is an overt act of the conspiracy charged in the indictment.  *See* Indictment ¶ 38.

[16]On January 26, 2012, the Attorney registered Ocean Wave Energy, LLC ("OWE") as a foreign LLC in Massachusetts, with a business address of 1 Willow Street, Hyannis, Massachusetts, and listed METIVIER and two of CONDRON's family members (Charles and Samuel Condron) as registered agents.  OCE was registered in Delaware as an LLC on December 16, 2011.  The business address is also the address for the Hyannis Marina. The wind turbines were supposed to be located on a barge docked at the Marina.

to find suitable locations for wind turbines mounted on barges.  While an employee for CLE Engineering saw the barges, he never saw any wind turbines on the barges.

**Concealment of the Scheme**

After receiving and reviewing the applications, NREL reviewers in Colorado asked follow-up questions and asked for more documentation.  Ultimately, the program manager and Senior Advisor at NREL, Edward Settle, became involved and referred the matter to the Treasury Department to investigate a potential fraud. Upon receiving these questions from NREL, the Attorney forwarded the questions to CONDRON and they collaborated on providing answers and documents.  Through the Attorney, CONDRON provided and dictated answers to conceal materials facts and the ongoing fraud.[17]

A.     **Count Three – January 11, 2013 Email to Treasury**

Count Three of the indictment, charging wire fraud, pertains to an email the Attorney sent on CONDRON's behalf to the NREL about the KGE application.  On January 7, 2013, Settle asked the Attorney a number of questions (numbered #1 through #7).  In Question #1, Settle asked for contact information for a number of individuals described in the KGE application including SB and asked for a description of *"the relationship, past and present, between these individuals and with the owners of KGE and Concord Nurseries."*  In Question #7, Settle requested copies of all invoices for all equipment including "[SB] /Industrial Supplies/Emerald Group" as a related party: *"[A]ll invoices from original equipment manufacturers to Shirley Brewer/Industrial Supplies/Emerald Group must be provided for the major equipment with no*

---

[17]*See United States v. Redcorn*, 528 F.3d 727, 741 (10th Cir. 2008) ("transfers, or other wire communications, may constitute wire fraud if they are carried out to conceal an otherwise completed fraud").

*exception."*

In response to this request, on January 10, 2013, the Attorney suggested to CONDRON that Industrial Supplies needed *"to send a letter to KGE refusing to send the cost information stating that was not part of the agreement and that as a separate agreement entities IS (Industrial Suppliers/Brewer) has no obligation to provide that information."* CONDRON agreed and directed his employee, Rebecca Putens,[18] to draft the letter stating the Industrial Supplies was refusing to provide invoices (even though the purported owner of Industrial Supplies was CONDRON's mother, SB). SB signed the letter, faxed it to the Attorney who then emailed the letter and the following answer to NREL on January 11, 2013:

> In the January 11, 2013 submission to NREL, the Attorney described "SB" as:
>
>> Owner of Industrial Suppliers, LLC and is the contractor who sold turnkey operation to KGE. She also sold Turnkey operation to Concord Nurseries. Ms. Brewer has been Involved with alternative energy since the last 70's specializing in thermal solar and biomass.
>
> In response to Question #7, regarding invoices from SB, the Attorney wrote:
>
>> Applicant has no control over [SB]/Industrial Supplies/Emerald Group. She has responded with the attached letter refusing to share the information. We request that her refusal which she has a right to do and applicant has no legal right to force either her or her company to produce is attached in a separate document.

**B.      Count Four – April 17, 2013 Email to Treasury**

Count Four of the indictment, charging wire fraud, pertains to an email the Attorney sent on CONDRON's behalf to the NREL about the OWE application. On March 27, 2013, NREL submitted a series of 11 questions and again asked (Questions #6,

---

[18]Putens resided in Maryland and rented office space in Washington, D.C. for CONDRON's business. For the most part, Puten's ran personal errands for CONDRON but also drafted letters at CONDRON's direction for SB to sign.

#7 and #11) about SB's role in the project, qualifications and background. After consulting and collaborating with CONDRON, the Attorney responded to NREL's questions in an email on April 11, 2013 in which he insisted that SB (CONDRON's mother) had to relationship to OWE (owned by CONDRON's girlfriend, METIVIER) except that as a "vendor" and was refusing to supply invoices for the equipment it sold to OWE (worth more than $84 million).

Following these submissions, on April 26, 2013, Settle notified the Attorney via email that the KGE application had been denied because:

> The documentation submitted does not demonstrate that the property has been placed in service. Operating logs and information provided by the project's engineer show that only two of the engines have actually operated, for a few hours only, and not using syngas from the gasifier. The applicant has also stated that the equipment is currently in storage. Additionally, the documentation does not demonstrate that the project is qualified technology. The application claims that the property is a trash facility which, for the Section 1603 program, is defined as a facility that uses municipal solid waste to produce electricity. However, most of the engines included in the claim will not operate on syngas produced from municipal solid waste, but rather operate only on diesel or biodiesel and thus are not eligible property.

## C.    The IRS Audit

By December 2012, the matter was then referred to the IRS. At first, the IRS focused on the documentation to support the $26.8 million cost of the gasification system for Concord Nurseries. On December 13, 2012, IRS Revenue Agents spoke with Walsh & Associates and took a brief tour of Concord Nurseries where agents observed large machinery on trailers, but no operating gasification system.

Thereafter, between May 2013 and June 2013, IRS Revenue Agents ("RA") Elizabeth Marquez and John Cinkala arranged to tour the various sites associated with the 1603 applications and took photographs. For example, on May 21, 2013, RA's Marquez and Cinkala visited 200 Butterfield Drive in Ashland, the office space for Industrial Supplies, LLC, but found it vacant. On June 4, 2013, the RA's went to Concord Nurseries and the location for KGE, 22 Cranberry Highway, West Wareham. At each site, the RA's observed that space for Concord Nurseries and KGE were occupied by different businesses. While there was equipment on trailers at the Concord Nurseries in December 2012, by June 2013 the equipment was gone. The RA's, furthermore, did not observe any of the previously described equipment (depicted in photographs for the KGE application) at the Wareham location.

On June 19, 2013, the RA's arranged to site visit of the Sand & Gravel at 960 Main Street in Acton. The purpose of the visit was for the IRS to match the gasification equipment that Acton Bio and METIVIER claimed to have acquired with the actual equipment onsite. During the visit and interview, METIVIER said that the gasifier for Acton Bio was small, pointed the agents to a large green generator. However, when asked if the gasifier had been put into place at Action Bio by August 10, 2009 (as claimed in the application), METIVIER said it had never worked. Nevertheless, when asked about "SB," METIIVER maintained that Concord Nurseries had been purchased the gasifier from the Emerald Group and that SB was not only the manufacturer of the equipment but was also the one who provided the note to purchase the $26M gasifier. Later in the interview, after denying any other than a professional/transactional

relationship with SB and CONDRON, METIVIER admitted that SB was the grandmother to the children that she had with CONDRON.

On September 18, 2013, (now retired) IRS Special Agent Lisa Round issued an IRS summons to the Attorney the production of records by October 22, 2013.  The summons requested copies of all records relating to CONDRON and METIVIER as well as SB, Acton Bio, and other entities that CONDRON and METIIVER used to submit 1603 applications.  The Attorney cooperated in the investigation, produced about 10 boxes of documents along with electronic versions of emails, and will be a witness in the case.

<u>LEGAL AND EVIDENTIARY ISSUES</u>

**A.**     **The Charges in the Indictment**

The indictment charges both defendants in identical counts.  Count One charges CONDRON and METIVIER with conspiracy to Defraud the United States with Respect to Claims, in violation of 18 U.S.C. § 286.  The offense they conspired to commit, 18 U.S.C. § 287 (false, fictitious and fraudulent claims), requires the government to prove the defendant: (1) made or presented a false, fictitious, or fraudulent claim to the United States; (2) knew such claim was false, fictitious or fraudulent; and (3) did so with the specific intent to violate the law or with a consciousness that what he was doing was wrong.[19]

---

[19]Although it is clear from the case law that specific intent to defraud is not required for a conviction under 18 U.S.C. § 287, the Courts of Appeals are divided on the issue of whether willfulness is an essential element of the crime. For example, the United Stated Courts of Appeals for the Tenth, Fifth and Second Circuits have held that willfulness is <u>not</u> an essential element of Section 287, while the Ninth, Eighth and Fourth Circuits appear to indicate that willfulness is an essential element of Section 287.  <u>See</u> Criminal Resource Manuel 901-999 (Elements of 18 U.S.C. § 287).  The First Circuit appears to side with the Fifth Circuit.  <u>See</u> <u>United States v. Davis</u>, 717 F.3d 28, 33 (1st Cir. 2013) ("the elements of [§ 287] are: 1) presenting a false or fraudulent claim against the United States; 2) presenting the claim to an agency of the United States; and 3) knowledge that the claim was false or fraudulent") (<u>citing</u> <u>United</u>

The indictment also alleges that both CONDRON and METIVIER participated in a wire fraud scheme to defraud the United States and alleges three specific wires in furtherance of the scheme in Counts Two through Four in violation of 18 U.S.C. § 1343. Under the wire fraud statute, the wires need only be "reasonably foreseeable"[20] and to be in furtherance, be at least be incidental to an essential part of the scheme.[21]

Count Two pertains to the September 28, 2012 submission of a 1603 application for OWE for $25 million. Count Three pertains to the Attorney's email to Treasury on January 11, 2013, in response to a request for information, which falsely claimed that SB had "been involved with alternative energy since the last 70's specializing in thermal solar and biomass." Similarly, Count Four relates to the Attorney's email to Treasury on April 17, 2013, in response to a request for information, which falsely claimed that "SB" was the "vendor" for the windfarm project.

---

States v. Clark, 577 F.3d 273, 285 (5th Cir.2009)). Here, the government's proposed instruction include a willfulness requirement. "To act 'willfully' means to act voluntarily and intelligently and with the specific intent to defraud the United States—that is to say, with bad purpose, either to disobey or to disregard the law—not to act by ignorance, accident or mistake." First Circuit Pattern Jury Instructions, No. 4.18.371(3) (Updated 5/21/16).

[20]"More fundamentally, a wire fraud conviction does not require that [defendant] have had any personal involvement in initiating the wire transfers; instead, the use of the wires need only have been a reasonably foreseeable part of the scheme in which he participated." United States v. Appolon, 715 F.3d 362, 370 (1st Cir. 2013) (internal citations and quotations omitted).

[21]"[U]se of the wires must be 'incident to an essential part of the scheme,'" United States v. Lopez, 71 F.3d 954, 961 (1st Cir. 1995) (internal citations and quotations omitted). The concept is construed broadly, and includes use of the wires to "'lull the victims into a sense of false security, [and] postpone their ultimate complaint to the authorities.'" Lopez, 71 F.3d at 961 (quoting United States v. Lane, 474 U.S. 438, 451-52 (1986) (Lane actually reads "false sense of security")). There is no "strict sequence" between devising and executing a scheme. "What is necessary is that the [wire transmission] be sent 'for the purpose' of fostering that execution." United States v. Potter, 463 F.3d 9, 17 (1st Cir. 2006). "[T]he use of the mails or wires to further the fraudulent scheme need only be 'incidental.'" United States v. Woodward, 149 F.3d 46, 63 (1st Cir. 1998) (quoting United States v. Grandmaison, 77 F.3d 555, 566 (1st Cir. 1996)).

B.  **Summary Charts and Demonstrative Aids**

Rule 1006 allows "[t]he contents of voluminous writings ... which cannot conveniently be examined in court [to] be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006.  Rule 1006 creates an exception to Rule 1002, which requires that originals be used to prove the content of writings, recordings and photographs.

Evidence admitted under Rule 1006 must be otherwise admissible. *United States v. Milkiewicz*, 470 F.3d 390, 396–98 (1st Cir. 2006); *United States v. Davis*, 261 F.3d 1, 42 (1st Cir. 2001) (the prepared chart must be grounded in admissible evidence) and "[b]efore admitting such evidentiary presentations, the court must first ensure that each is grounded upon a sufficient factual basis, *i.e.,* upon independently established evidence in the record, and that possible prejudice or confusion does not outweigh their usefulness in clarifying the evidence." *United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996) (internal citations and quotations omitted).

In addition to Rule 1006, a trial court may also allow use of a chart or other summary tool under Fed.R.Evid. 611(a), which gives the trial court "control over the mode ... [of] presenting evidence." *See, e.g., United States v. Harms,* 442 F.3d 367, 375 (5th Cir.2006); *United States v. Bray,* 139 F.3d 1104, 1111 (6th Cir.1998). Such summaries most typically are used as "pedagogical devices" to "clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury." *Bray,* 139 F.3d at 1111. A summary chart used as a pedagogical device must be linked to evidence previously admitted and usually is not itself admitted into evidence.  *See Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996).

In the case, the government anticipates that it will seek to introduce summaries of complex financial transactions from voluminous bank records as well as demonstrative exhibits that demonstrate and summarize the technical aspects of the gasification procedure and the defendant's 1603 grant applications to Treasury.

## C.      Defendant METIIVER

The government anticipates that the defendant METIIVER will be seeking to file a motion to sever and for a separate trial.  The government will not be objecting to the severance for two reasons.  First, based on undersigned counsel's discussions with counsel for METIVIER, there is a realistic possibility of antagonistic defenses between the two co-defendants.  Second, the government is optimistic that a resolution short of trial is still a real possibility.

### Conclusion

Accordingly, the government respectfully submits the above pre-trial memorandum.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Neil Gallagher*
Neil Gallagher
Assistant U.S. Attorney

Dated Submitted:  January 21, 2019

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By: /s/ *Neil Gallagher*
Neil Gallagher
Assistant U.S. Attorney