UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CONDRON<br><br>Defendants | CRIMINAL No. 17-10243-IT |

## UNITED STATES' PRE-TRIAL MEMORANDUM

The United States respectfully submits the following pre-trial memorandum for the trial beginning on September 8, 2021.

## FACTUAL SUMMARY

Between 2009 and 2012, a couple in Acton, Massachusetts, CHRISTOPHER CONDRON ("CONDRON") and Jessica Metivier ("Metivier") conspired to submit a series of false, fictitious and fraudulent applications to the U.S. Treasury Department ("Treasury") requesting more than $51 million in tax-free grants and engaged in an elaborate scheme to defraud.

The grants applications were for money to off-set the cost of specific energy property including "gasifiers" (equipment that turns biowaste/biomass into fuel for power generators) and a wind-farm project.  By submitting fraudulent documents and information through an attorney (the "Attorney") who submitted the applications to Treasury on their behalf, CONDRON and Metivier fraudulently obtained more than $8 million in government funds and attempted to fraudulently obtain another $42 million before the fraud was detected.

1

**Background of Section 1603 of the Recovery Act**

On February 17, 2009, President Obama signed *the American Recovery and Reinvestment Act of 2009* (the "Recovery Act") the purpose of which was to promote economic recovery and infrastructure investment.   Section 1603 of the Recovery Act, entitled "Grants for Specified Energy Property in Lieu of Tax Credits," provided that those who put a certain type of "Specified Energy Property" into service could apply to Treasury for a grant to offset the cost of the property.

In this case, the applications were for two "open-loop biomass facilities," a "trash facility" and "wind facility," terms defined in the Internal Revenue Code ("IRC") and the text of the applications.  Put simply, an open-loop biomass facility converts "cellulosic waste material" (e.g., waste from trees or wood chips) into a biofuel or syngas that can power an electrical generator.   Similarly, a trash facility converts municipal solid waste into biofuel that can power an electrical generator.  For both types of systems, CONDRON claimed that he was using a "gasifier" system to convert wood or trash into fuel to power electrical generators.  The gasifier itself and the related equipment were called a "gasification system." The trash facility was also called a "trash gasification system." CONDRON also submitted an application for a "wind facility," also called a "small wind energy property" used small wind turbines to generate electricity.

For each of these projects, CONDRON sought tax free grants under the 1603 Program to cover 30 percent of the cost basis for the property.  The purpose Section 1603 payments, however, was:

> . . . to reimburse eligible applicants for a portion of the cost of installing specified energy property used in a trade or business or for the production

of income. A 1603 payment is made <u>after</u> the energy property is placed in service; a 1603 payment is <u>not</u> made prior to or during construction of the energy property.[1]

A.      **The 1603 Application Process**

Applications were submitted online through a web portal.  Among other things, the

applicant was required to state, under the penalty of perjury, the following:

- **Section 2B. Property Identification** – Where the property was located.

- **Section 2C. Property Placed in Service** – The date on which the property was placed into service.

  - Further, the fact that the property was placed into service had to be further supported by a "**Signed and dated commissioning report . . . from the installer or engineer** stating that the property has been placed in service." <u>See</u> Sec. 6A.

- **Section 4A. Specified Energy Property** – The type of eligible property, here the defendants claimed an "open-loop biomass facility," a "trash facility," or a "wind facility."

- **Section 5A. Cost Basis and Applicable Percentage** – The qualified cost basis of the property and the applicable percentage to calculate the request for payment;

  - In support of the cost basis for any property that was $500,000 or more, the applicant was also required to submit an "**Independent Accountant's Certification"** including "a detailed cost breakdown or cost segregation report for the review team to see both eligible and non-qualifying costs." <u>See</u> Sec 6A.

- **Section 7. Signature of Applicant –** Which stated: "Under penalties of perjury, I declare that I have examined this application, which includes any application submitted using the same Treasury Identification Number for the purpose of demonstrating that construction began on the property in 2009-2011, and to the best of my knowledge and belief, it is true, correct, and complete. I declare that I am the applicant or an authorized official for the applicant. Further, I agree the information in this application can be disclosed to the Internal Revenue Service."

---

[1] https://www.treasury.gov/initiatives/recovery/Pages/1603.aspx (emphasis added), now located at https://home.treasury.gov/policy-issues/financial-markets-financial-institutions-and-fiscal-service/1603-program-payments-for-specified-energy-property-in-lieu-of-tax-credits.

The application was then given to one of several reviewers at the National Renewable Energy Laboratory ("NREL") in Colorado, a government-owned, contractor operated facility funded through the U.S. Department of Energy.  The project manager for the reviewers was Edward Settle. NREL evaluated applications and made recommendations to Treasury about whether a project should be approved.  If Treasury approved the application, the money was wired from the Federal Reserve to the applicant's bank account.

### B.  Cost Basis

Section 1603 reimbursed a percentage of the "expense" of putting the renewable energy system into service. Pub. L. No. 111-5, § 1603(a). That expense is measured by the "basis" of such property, *id*., § 1603(b)(1), and "basis" is defined as "the cost of such property," 26 U.S.C. § 1012(a).  According to Treasury, "basis is the amount of a business' investment in property for tax purposes.[2]  In general terms, cost basis includes both direct costs (for the equipment itself) and indirect costs, such as costs for installation freight incurred in construction of the specified energy property.[3]

Courts have consistently adopted the same "cost basis" definition when evaluating the cost basis in Section 1603 grant applications, citing the statutory and administrative guidance described above.  For example, in *California Ridge Wind Energy v. United States*, 959 F.3d 1345, 1349 (Fed. Cir. 2020), the court held that expense is measured by the "basis" of such a

---

[2]Although the paper addresses solar photovoltaic properties specifically, it states that the methods used to evaluate cost basis apply to all types of properties. https://home.treasury.gov/system/files/216/N-Evaluating_Cost_Basis_for_Solar_PV_Properties-final.pdf

[3]*See* https://home.treasury.gov/system/files/216/GUIDANCE.pdf, accessed 7/20/2021, Section V.

property, id., § 1603(b)(1), and "basis" is defined as "the cost of such property," and did not include "development fees" that the applicant paid one of its subsidiaries.  *Id.* at 1348-49.

Courts have also routinely upheld Treasury's denial or reduction of grant funds when fees, leases, or other indirect costs were negotiated between related parties or entities and outside an arm's length business relationship. *California Ridge Wind Energy* 959 F.3d at 1349  ("Here, not only was the amount of the development fee negotiated between related entities, the fee was paid in a round-trip transaction such that neither the payor nor the payee was materially affected by the transaction.").  Similarly, in *LCM Energy Solutions v. United States*, 128 Fed.Cl. 728, 738 (Fed.Cl., 2016), the court rejected the stated cost basis of solar systems in lease agreements because the applicant failed to enforce those lease agreements.  *Id.* at 738.

### The 1603 Applications

CONDRON caused four 1603 applications to be submitted to Treasury that sought a total of $51 million and fraudulently obtained about $8 million.  Even though CONDRON was the driving force behind each of the energy projects, none of the applications bore his name.  Instead, each of the applications were in the name of a Massachusetts-company - Acton Bio Energy, Concord Nurseries, Kansas Green Energy, and Ocean Wave Energy - of which Metivier was the principal manager.  As summarized in the chart below [EX 1][4], while Treasury ultimately denied the later applications in 2012, Treasury approved two and disbursed more than $8.7 million to Metivier and her companies.

---

[4]"EX 1" refers to Government's Exhibit No. 1.

| Date | Applicant | Energy Property | Purported Cost Basis | Requested Grant Amount | Action by Treasury |
|---|---|---|---|---|---|
| 09/29/09 | Acton Bio Energy | Open-Loop Biomass | $2,935,000 | $880,500 | Denied |
| 12/17/09 | Acton Bio Energy | Open-Loop Biomass | $2,935,000 | $880,500 | Granted: $704,454 |
| 04/29/11 | Concord Nurseries | Open-Loop Biomass | $26,787,532 | $8,036,260 | Granted: $8,036,260 |
| 07/10/12 | Kansas Green Energy | Trash Facility | $58,701,305 | $17,610,392 | Denied |
| 09/25/12 | Kansas Green Energy | Trash Facility | $58,701,305 | $17,610,392 | Denied |
| 09/28/12 | Ocean Wave Energy | Wind Facility | $84,015,900 | $25,204,770 | Denied |

### A.    Acton Bio Energy ("ABE")

The first application was in the name of ABE.  In early 2009, both CONDRON and
Metivier approached Colman and asked him to prepare and submit grant applications for the
Section 1603 program for a biomass gasification system.  Colman had known Metivier and her
family for years (she had babysat Colman's children); Condron had done painting work for
Colman.  For more than 30 years, Colman was a tax attorney and financial advisor in Carlisle,
Massachusetts.  Colman told CONDRON and Metivier that he did not know anything about
biomass but could help them fill out and submit the forms.

After this, Colman dealt exclusively with CONDRON.  Metivier knew little to nothing
about biomass and gasification.  Instead, CONDRON was the purported expert but told Colman
that he did not want his name on any of the applications.  CONDRON told Colman that he never
went to college, that no one took him seriously, and asked Colman to help him out.  Colman
agreed but said that CONDRON could get in trouble with the government by not telling them the
truth or withholding important information in the applications.  CONDRON indicated he
understood and agreed.

6

Over several months, CONDRON sent Colman emails in which CONDRON exhibited a detailed understanding of the 1603 program and its requirements [e.g., EX's 18-19] and provided Colman with the information and supporting documentation for the applications.  For example, in an email on August 24, 2009, CONDRON informed Colman that he had obtained a gasification system that converted biomass into *"clean, cool, combustible gas"* that listed a "purchase price" of $2,935,000.[5]  The document further claimed that the system was using between "1,000-1,500 pounds" of biomass (cellulosic waste, i.e., wood chips) per hour to power the system at a business called Acton Sand & Gravel ("Sand & Gravel") in Acton..  [EX 21.2].

On September 3, 2009, Colman asked CONDRON for the signed certification that the system had been installed and was operational. [EX 23].  CONDRON provided Colman with a certification that claimed that, by September 15, 2009, the *"biomass gasification system has been installed at the operating site, 960 Main St., Acton, MA,"* the address for Sand & Gravel. [EX 5.6].  CONDRON also claimed that his company, "C2C, Inc.," (also called "C2C Solutions") had sold the gasification system to Metivier and ABE for price listed on the description document, $2,935,000.

1. *Acton Bio Application for $880,500 on September 29, 2009*

After receiving this document from Condron, on September 29, 2009, Colman submitted the first 1603 grant application for ABE seeking $880,500.  [EX 2-3.1].  The same day, Colman informed CONDRON that *"the government will probably desire more documentation concerning costs, etc., at that time you will need to give me whatever I request."*  [EX 24].  As

_____

[5]Sand & Gravel was in the business of pulverizing materials to make sand and gravel for re-sale. It is referred to was the "Gravel Supplier" in the indictment.

Colman predicted, Treasury denied the ABE application on October 8, 2009 because it did not contain a Certified Accountant's Report or Certification ("Auditor's Report") to substantiate the cost of the gasifier.  [EX 25].

Following the rejection, Colman informed CONDRON that he needed to find an *"accountant to check your numbers as to cost[]"* [EX. 26] and explained that *"the work required is more than a document and less than a full blown audit."*  [EX. 27].  After being unable to locate an accountant, in late October 2009, Metivier approached Diane Lambert, a CPA with a small accounting firm in Concord, Walsh & Associates.  Without CONDRON there, Metivier told Lambert that she had applied for a grant and needed an "accountant's certification attesting to the accuracy of all the costs associated with the equipment." [EX. 67]. Lambert asked for specific documentation. Metivier in turn obtained these documents from CONDRON that Colman drafted including:

- A <u>Promissory Note</u> between C2C, Inc. and ABE that claimed that CONDRON and C2C had sold (and financed) a $2.935 million gasification system to ABE and Metivier.  [EX 69.1]

- A <u>Bill of Sale</u> dated November 4, 2009 that claimed that ABE purchased a gasifier, related generators, and equipment from CONDRON d/b/a C2C Solutions for $3.1 million.  [EX 69.2]

CONDRON worked up the numbers and the specifics for the bill of sale.  In an email on November 3, 2009, CONDRON asked Colman to *"check my math"* on the bill of sale, indicated that the "equipment cost" was "2,935,000" and calculated the payment due to his mother when power production started as $311,843.75."  [EX 30].  The evidence at trial, however, will demonstrate that this transaction never took place.  Furthermore, while there were several bio-diesel generators at Sand & Gravel, a gasification system had never been placed in service.

First, while CONDRON claimed that the "gasification system" was operational and using about 1,000 pounds of cellulosic waste per hour, according to the owner of the business, Fred Kennedy, that was not true. While CONDRON did bring generators onto the property, they never consistently worked and were never powered by woodchips or biomass. In December 2009, CONDRON asked Kennedy to sign a document entitled "Power Purchase Agreement." The agreement provided that Sand & Gravel would purchase energy from ABE, but Sand & Gravel never purchased any energy. Kennedy did not read the document, and just assumed that it was for CONDRON to rent a portion of Kennedy's property to store his generators. Later, even though Kennedy never dealt with Metivier, this Power Purchase Agreement was submitted to Treasury with both Kennedy and Metivier's signatures. [EX 5.3].

Second, while the promissory note that Metivier signed required her to pay C2C $311,843.75 when power production began and then monthly payments of $16,054.65, a review of financial records revealed that these payments never took place. What's more, there was no Massachusetts entity called "C2C Solutions." [EX 16.7]. Instead, in 2002 CONDRON registered "C2C Beverage, Inc." as a company for the sale of alcoholic and non-alcoholic beverages, but it was dissolved in 2007. [EX 16.1].

Relying on the promissory note, bill of sale, and a site visit that Lambert conducted at Sand & Gravel in November 2009 of what CONDRON called the "Lucky Charm green machine" [EX. 32], Walsh & Associates gave Metivier an Auditor's Report that concluded the cost basis of gasification system, $2,935,000, was determined in accordance with the proper accounting rules. The report, however, made clear that Walsh & Associates "were not engaged

to, and did not, conduct an examination of the specified property costs and the eligible cost basis, the objective of which would be the expression of an opinion." [EX 5.2].

Using this report, Colman resubmitted the ABE application on December 17, 2009. [EX 4]. On April 2010, Treasury granted ABE's amended application and wired $704,454 to ABE.

## C.    Concord Nurseries ("CN")

About three months later, around June 2010, CONDRON asked Colman about submitting a 1603 grant application in the name of Concord Nurseries ("CN"), an agricultural retail business in Concord, Massachusetts.  This time, CONDRON claimed that the supplier of the equipment was his mother, "SB."  In one conversation with Colman, CONDRON claimed that his mother had significant energy experience and provided Colman with some documentation about her energy experience.[6]  Based on CONDRON's representations, Colman was under the impression that SB's fulltime job was in the field of alternative energy and energy equipment and that she had the financial means to acquire such equipment.  At the time, though Colman knew SB was CONDRON's mother, Colman was unaware that she worked fulltime as a registered nurse.

Using the ABE bill of sale and promissory note as a template, CONDRON had Colman write up a bill of sale that claimed that his mother's company had sold (and financed) a $26 million "turnkey" gasification system to Metivier and CN.  In an email on October 13, 2010, Colman asked CONDRON to confirm whether the seller was CONDRON or his mother.  [EX 35].  CONDRON identified SB d/b/a "the Emerald Group" as the seller to Metivier and stated that the purchase price for the equipment was $26,773,178.  In private, Colman told Metivier that entering the deal was a bad idea because she would be so highly leveraged.  Metivier nonetheless

---

[6]According to Colman, he did not retain a copy of this document.

signed the bill of sale on the behalf of CN and gave it to Lambert.  [EX 7.4].

    *2.  Concord Nurseries Application for $8,036,260 on April 29, 2011*

Based on these and other documents Metivier gave Lambert, Walsh & Associates gave Metivier an Auditor's Report for CN.  Colman submitted this report to Treasury in support of the CN application he filed with Treasury on April 29, 2011. [EX 6].  In addition to the transactional documents, CONDRON also gave Colman two commissioning reports with SB's signature that claimed that the biomass energy producing system that CN purchased was installed on November 15, 2010 and was operational.  [EX 7.2, 7.7]. The CN application requested a grant of $8,036,260 by claiming that the property had a cost basis of $26,787,532.  [EX 6].

After the initial submission of the application on April 29, 2011, in response to a request from Treasury for additional documentation on cost, Colman asked Metivier *"to prepare a list of costs for Concord Nurseries, llc project."*  [EX. 36].  In response, Metivier gave Lambert an undated document entitled *"Schedule of Costs"* from the Emerald Group that purported to substantiate the cost of more than $22 million, including six gasification reactors at a cost of $1,492,040 each.  [EX 72.1].  Lambert used this document to generate a similar looking document called *"Cost Breakdown for qualifying property"* that Colman submitted to Treasury on June 2, 2011. [Ex. 7.6].

    *3.  Analysis of Financial Records*

An analysis of records[7] – SB's bank records and the records she submitted pursuant to a grand jury subpoena – demonstrate that even if there was some type of energy equipment at some

_____

    [7]An IRS Revenue Agent, Christopher McCarten, analysis these records and will testify about these and other transactions.

point located at CN, that equipment did not have a cost basis of anywhere near $26 million. First, a review of bank records reveals that the total amount of money that SB and her company spent on anything arguably related to energy equipment, including both direct and indirect costs, was less than $150,000.  Although SB claimed to be purchasing equipment for CN, neither her bank records nor the business records she produced to the government show any acquisition of equipment like that described in the grant application.  For example, there is no record of six gasification reactors at a cost of $1,492,040 each. [EX 7.6].  Instead, the only type of gasification equipment that was purchased appears to be a June 16, 2010 purchase of a "*Gasifier Experimenters Kit*" from All Power Labs in California for $20,055 [EX 81.5, 81.6].

For his part, from at least 2009 though 2013, CONDRON did not have any bank accounts in his name.  Instead, although CONDRON were a couple with children together, each of the bank accounts were in Metivier's name.  Furthermore, between the years 2009 and 2013, CONDRON's employment status and actual income is unknown since he did not file any federal income tax returns.  [EX 85].

### 4. How the Grant Money Was Spent

In July 2011, Treasury granted the CN application and wired $8,036,260 to one of CN's accounts at Bank of America.  Thereafter, between July 23, 2011 and July 29, 2011, Metivier transferred approximately $7.7 million of this money in checks to other CN and ABE bank accounts.  An analysis of these records will show that the grant money was not used to reimburse Metivier or SB for the purchase of a $26 million gasifier; it was used to finance their business and other personal expenses, including approximately $95,000 that was transferred to Metivier's personal bank accounts at Middlesex Savings Bank, $40,000 to Metivier's mother, and a check

for $73,459 for the purchase of a 2012 Escalade registered to Concord Nurseries. [EX 73, 82.4, 82.5].

An analysis of the financial records also revealed that between October 2011 and February 2012, Metivier wrote approximately 11 different checks from CN payable to the Emerald Group for $135,305.60, the amount of the monthly payment on the promissory note for the $26 million turnkey gasifier that SB and the Emerald Group purportedly sold and financed.[8] However, instead of these payments being used to offset the cost of $26 million in energy equipment, SB used this money to purchase additional equipment for CONDRON's next 1603 application in the name of Kansas Green Energy ("KGE").

**D.      Kansas Green Energy ("KGE")**

The third 1603 application that Colman submitted for CONDRON was on behalf of KGE. KGE proposed to power greenhouses at a nursery in Wareham, Massachusetts from a biomass facility powered by municipal waste.[9] Beginning by at least October 2011, CONDRON began traveling to places like Kansas [EX 39-39.1] and Missouri to purchase used equipment.  In about mid-2012, CONDRON hired an administrative assistant, Rebecca Putens, who set up an office for CONDRON in Washington, D.C.

One of the companies from where CONDRON obtained energy property was Worldwide Recycling ("WWR") in Missouri.  According to the General Operations Manager, Jeffrey Sayre,

---

[8] In addition to 11 payments for $135,306.60, there was also one check for $135,505.60 made payable to Industrial Supplies dated September 17, 2012.

[9] This location, 22 Cranberry Hwy, West Wareham, MA is the business location for Morse R F Greenhouse & Nursery ("Morse RF").  According to lease documents, Concord Nurseries leased this location from Morse RF, and KGE leased it from Concord Nurseries.

WWR sold CONDRON a refurbished 40-foot Lochhead Haggerty Kiln[10] (a central piece in a gasification system) and a used Infeed Conveyer for approximately $579,500.  WWR also sold CONDRON several trailers and entered into a service agreement with CONDRON for the maintenance of the kiln.  Finally, although WWR did not sell CONDRON any generators, CONDRON also hired WWR to transport some generators on trailers from Kansas to Massachusetts.  While en route to Massachusetts in December 2011, the kiln was damaged in a traffic accident in Massachusetts leading to an insurance claim from Sayre.  According to Sayre, he dealt solely with CONDRON, not SB.

Based on both bank records and WWR's and the Emerald Group's business records, using the funds from the CN grant, the Emerald Group paid WWR a total of approximately $2 million, the most that SB or her companies paid to any one vendor.[11]  Despite this, CONDRON claimed that the equipment in service at the nursery in Wareham had a cost basis of over *$58 million*.

1.  *Kansas Green Energy Application on July 10, 2012 for $17,641,571*

On July 10, 2012, again at CONDRON's behest, Colman submitted a 1603 application on behalf of KGE for a trash gasification system (a "trash facility") that "uses municipal solid waste to produce electricity."  The application claimed that the trash facility was in service at 22 Cranberry Highway in West Wareham by December 30, 2011, had a cost basis of $58,805,237, and requested a grant of $17,641,571. [EX 8].  Like the CN grant application, the KGE

_____

[10]The "40' Electrically Heated Carbon Reactivation Kiln" was advertised by WWR online with an asking price of $595,000.

[11]The transfers were made to WWR as well as the Old Republic Title Company, the escrow/title company for WWR.

14

application claimed that SB (in the name of another company, Industrial Supplies, LLC) had sold and financed the trash facility to Metivier and KGE.

Upon filing the application, Colman reminded Metivier that he needed a certificate to verify that the property was placed in service by Industrial Supplies. [EX 41]. The commissioning report from Industrial Supplies was signed by SB, dated May 30, 2012, and claimed that the trash gasification system was installed the Wareham nursery as of December 30, 2011. [EX. 9.5, 41.1]. At trial, the government anticipates that SB will confirm that she played no role in the installation and testing of the equipment, but instead will say that a person named "Earl"[12] from WWR tested the equipment. While WWR did deliver a kiln and generators to the property, WWR played no role in certifying the operation of a trash gasification system. Furthermore, while the kiln that WWR sold CONDRON was a large and expensive piece of equipment, the equipment did not cost anywhere close to $58 million entitling KGE to a $17 million grant.

As before, the Auditors Report from Walsh & Associates was based on documents that Metivier gave to Lambert, including:

- A *"Report of Management on Eligible Cost Basis"* from KGE dated June 21, 2012 signed by Metivier on KGE letterhead. In the letter, Metivier claimed that qualifying property, a "Trash Gasification System" had been assembled and installed at the operational site and had a cost basis of $58,805,237. [EX 9.2, pg. 4].

- A schedule of costs dated December 18, 2011 (*"Cost Breakdown for qualifying property"*) which included $14,280,150 for a "Gasification Reactor." [EX 11.9].

After the KGE application was submitted, Treasury emailed Colman about several issues

---

[12] "Earl" is believed to be Earl Riley, one of the co-owners along with Sayre of WWR.

in the application and requested additional documentation.  For example, on September 4, 2012,

Treasury emailed Colman seven requests including (in question 7) a request for an *"Independent*

*Engineers Report to verify project for financing."* [EX 42.1].  After this, CONDRON attempted

to get an engineer to sign the report and told Colman he was frustrated that the engineers would

not get him the required documentation.  On September 15, 2012, CONDRON had Putens, his

administrative assistant, email Ray Jarvis, an engineer in Fairhaven, a document entitled

*"Independent Engineers Report Waste-to-Energy Project"* [EX 66.1] and asked Jarvis if he

could quickly sign the report.  The report included a table of "capital costs" totaling more than

$58 million.  The report bore his name and a place for his signature, but Jarvis declined because

he knew nothing about the "electrical generation equipment."  [EX 66].

Thereafter, on September 25, 2012, Colman submitted a renewed 1603 application for

KGE. The application again claimed that trash facility was located at KGE at 22 Cranberry

Highway in West Wareham, had been placed into service on December 30, 2011, cost more than

$58 million and asked for a $17 million grant.  The same day, Colman also submitted a report to

Treasury entitled *"Independent Engineers Report Waste-to-Energy Project"* but instead of being

purportedly authored by Ray Jarvis, it appeared to be authored by another engineer, Andrew

Grant, and included the same purported capital costs of $58 million.  [EX 11.02]. The evidence at

trial, however, will demonstrate that Grant did not author the report, never actually saw the

gasification system, and was never in a position to substantiate the cost of the equipment.

Furthermore, while there was equipment at the KGE Wareham location in the summer of 2012,

according to one of the employees at the nursery, George Chapman, the equipment never

produced energy from waste and was removed from the property, hauled off in trailers, by the

end of summer 2012.

Between November and December 2012, Colman submitted additional documentation he received from CONDRON, including a purported Promissory Note and Security Agreement between KGE and Industrial Supplies for $58 million (though it was only signed by Metivier) [EX 11.05] and a document regarding the cost of the property that claimed there was not a specific cost breakdown for each piece of equipment because "all the equipment purchased are part of a turn key operation."  [EX 11.09].

**E.      Questions from Treasury and the National Research Energy Laboratory**

After receiving and reviewing the applications, NREL reviewers in Colorado asked follow-up questions and asked for more documentation.  Ultimately, the program manager and Senior Advisor at NREL, Edward Settle, became involved and referred the matter to the Treasury Department. Upon receiving questions from NREL, Colman forwarded them to CONDRON, and they collaborated on providing answers and supporting documentation.  Through Colman, CONDRON provided and dictated answers to conceal materials facts and the ongoing fraud.[13]  In early 2013, Settles took over the questions, submitted specific questions to Colman, and began taking a closer look not only at KGE but the other related applications as well.  Many of the questions asked for additional documentation to substantiate the cost of the property, SB's qualifications and experience, and her relationship to the applicant.

For example, in an email dated January 7, 2013, Settles asked Colman for answers and documentation for seven different items, including (question 1) information about SB and her

---

[13]*See United States v. Redcorn*, 528 F.3d 727, 741 (10th Cir. 2008) ("transfers, or other wire communications, may constitute wire fraud if they are carried out to conceal an otherwise completed fraud").

relationship with the owners of KGE and CN and (question 7) all the invoices for the major equipment that SB/Industrial Supplies/Emerald Group sold to Metivier.  [EX 46].  Colman submitted answers to Treasury based directly on information that CONDRON provided to Putens and Colman.  For example, over a series of emails, Putens asked CONDRON to provide the description of SB's relationship and qualifications. [EX 47, 48, 51].  According to Putens, she was concerned that because Metivier, Condron and SB each had different last names, she was unaware whether the full scope of their close family relationship had been disclosed to Treasury.

CONDRON wrote up a response that Colman submitted to Treasury on January 11, 2013 that falsely claimed that SB had sold two separate turnkey gasification systems for more than $84 million, and that had SB had been involved with alternative energy since the late 1970's specializing in thermal, solar, and biomass.  [EX 11.13].  This interstate wire is alleged in Count Three to be a wire in furtherance of the wire fraud scheme.

When it came to providing invoices (that is, CONDRON asking his mother to provide copies of invoices for equipment that were in fact purchased by CONDRON and not SB), CONDRON told Colman that he did not want to provide copies of invoices.  He said that if they provided copies of the invoices, the application would be denied.  In response, Colman suggested that they could submit a letter to Treasury claiming that SB was not required to provide copies of the invoices and had refused to provide them.  Colman helped suggest language for a letter that Putens typed up and faxed to SB for her to sign. [EX 49-50.1]

F.    **Ocean Wave Energy ("OWE")**

The deadline for the Section 1603 program was September 30, 2012. Acting on CONDRON's direction, after submitting the renewed KGE application on September 25, 2012,

two days later on September 28, 2012, Colman submitted a grant application for a company called Ocean Wave Energy ("OWE"). [EX 12].  The OWE application stated that construction of a "small wind energy facility" had begun by December 29, 2011, that it had an estimated cost basis of $84,015,900, and requested a grant payment of $25,204,770.  This interstate wire is alleged in Count Two to be a wire in furtherance of the wire fraud scheme.

In response to eleven different questions from Settles, on April 17, 2013, Colman submitted answers to Treasury, including questions about SB's role and qualifications in the wind project.  [EX 13.2, 59.1].  In the response that CONDRON wrote for Colman, the submission falsely claimed that SB was the vendor for the energy equipment and that SB had "no relation to OWE LLC at all except as a vendor."  [EX 13.2].  In a combative tone, CONDRON also wrote that SB wrote the commissioning report because she was the equipment vendor and attended the commissioning on December 11, 2011, and asked "how else could she have provided the commissioning report?"  This interstate wire is alleged in Count Two to be a wire in furtherance of the wire fraud scheme.

In denying the application for KGE and referring the matter to Treasury and the IRS for an investigation, Settles described the KGE as a "sham application" and described the projects as unrealistic.

G.      **The IRS Audit**

By December 2012, the matter was then referred to the IRS.  At first, the IRS focused on the documentation to support the $26 million cost of the gasification system for CN.  On December 13, 2012, IRS Revenue Agents ("RA") spoke with Walsh & Associates and took a

brief tour of Concord Nurseries where agents observed large machinery on trailers, but no operating gasification system.

Thereafter, between May 2013 and June 2013, IRS RA's Elizabeth Marquez and John Cinkala arranged to tour the various sites associated with the 1603 applications and took photographs. [EX 14.1-14.12].  On September 18, 2013, (now retired) IRS Special Agent Lisa Round issued an IRS summons to Colman the production of records by October 22, 2013.  The summons requested copies of all records relating to CONDRON and Metivier as well as SB, ABE, and other entities that CONDRON and Metivier used to submit 1603 applications. Colman cooperated in the investigation, produced about 10 boxes of documents along with electronic versions of emails, and will be a witness in the case.

## Conclusion

Accordingly, the government respectfully submits the above pre-trial memorandum.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Neil Gallagher
Neil Gallagher
Elysa Q. Wan
Assistant U.S. Attorneys

Dated Submitted:  July 20, 2021

## **Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


By: /s/ *Neil Gallagher*
      Neil Gallagher
      Assistant U.S. Attorney