UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:17-cr-10243-IT |
| | * | |
| CHRISTOPHER CONDRON, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

May 5, 2022

TALWANI, D.J.

Pending before the court are Defendant Christopher Condron's Motion for Judgment of Acquittal at the Close of the Government's Case [Doc. No. 444] and Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial [Doc. No. 459]. For the following reasons, Condron's motions are DENIED.

**I.      Procedural History**

On August 9, 2017, Condron and his co-defendant, Jessica Metivier, were indicted on one count of conspiracy to defraud the United States with respect to claims in violation of 18 U.S.C § 286 (Count 1) and three counts of wire fraud in violation of 18 U.S.C. § 2 (Counts 2-4). Indictment [Doc. No. 1]. Each wire fraud count also charged violations under the aiding and abetting statute, 18 U.S.C. § 2. Id.

To support the conspiracy charge, the Indictment [Doc. No. 1] alleged that Condron and Metivier submitted fraudulent grant applications to the United States Department of the Treasury ("Treasury") under Section 1603 of the American Recovery and Reinvestment Act of 2009 ("Recovery Act"), seeking compensation for tens of millions of dollars in biomass and wind-power investments. Id. at ¶¶ 18-40. To support the wire fraud charges, the Indictment [Doc. No. 1] alleged that Condron and Metivier transmitted, or caused to be transmitted, certain documents

in the form of digital uploads to a Treasury website in interstate commerce as part of a scheme to defraud. Id. at ¶¶ 43-44. Specifically, the charges in Counts 2 through 4 relied on the following wires:

| Count | Approximate Date/Time | Wire |
|-------|----------------------|------|
| 2 | September 28, 2012 | Section 1603 grant application number 2012E48WE214854 submitted online to Treasury on behalf of [Ocean Wave Energy] for $25,204,770, regarding "small wind energy property." |
| 3 | January 11, 2013 | Response, submitted online to Treasury, to a January 7, 2013 request for information from [the National Renewable Energy Laboratory] about background and qualifications of [Shirley Brewer].[1] |
| 4 | April 17, 2013 | Response, submitted online to Treasury, to a March 27, 2013 request for information from [the National Renewable Energy Laboratory] about [Shirley Brewer]'s role in the [Ocean Wave Energy] wind farm project. |

Metivier subsequently pleaded guilty to a single-count Superseding Information [Doc. No. 229] for attempting to interfere with the administration of internal revenue laws in violation of 26 U.S.C. § 7212(a). On the government's motion, the court dismissed all counts of the Indictment [Doc. No. 1] as to Metivier. See Judgment [Doc. No. 297].

After a fourteen-day trial, the jury convicted Condron of all four counts. At the close of the government's case, Condron moved for acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. Mot. for Acquittal at Close of Gov't's Case [Doc. No. 444]. Consistent with Rule 29(b), the court reserved its ruling. Following the jury's verdict, Condron renewed his motion for acquittal under Rule 29(c) and, in the alternative, moved for a new trial under Rule 33. Mot. for Acquittal or New Trial [Doc. No. 459].

---

[1] The Indictment [Doc. No. 1] refers to Brewer as "Person A."

## II.     Factual Background

Because Condron challenges the sufficiency of the government's evidence, the court recounts the facts "in the light most favorable to the verdict." United States v. Paz-Alvarez, 799 F.3d 12, 18 (2015).

### A.     *Section 1603 Program*

In 2009, as part of the Recovery Act, Congress implemented the Section 1603 program to increase domestic investment in renewable energy properties. Day 2 Trial Tr. 8:3-7. The program provided cash grants for investments in certain types of renewable energy properties in lieu of otherwise available tax credits. Id. at 8:12-16, 23:5-8. Eligible properties included biomass,[2] wind, and solar properties, among others. Id. at 8:17-20. An important feature of the program was that a grant would be awarded only after the renewable energy property had been "placed in service." Id. at 10:8-13. A property was considered to have been placed in service when it was "ready and available for its specific use." Ex. 433 at 5. Under the program, an applicant could initiate the grant process by submitting either a "placed in service" application or, if the project was not yet ready and available for its specific use, a "placeholder" application. Id. at 5-6.

### 1.     "Placed in Service" Applications

Applicants whose properties had already been placed in service at the time of the grant application could request a "placed in service" grant. Id. at 5. To demonstrate that a property had been placed in service, the applicant was required to submit, among other things, a "commissioning report" from the project engineer, the equipment vendor, or an independent

---

[2] "Biomass" describes a wide variety of organic materials derived from plant or animal matter. Day 11 Trial Tr. 127:8-20.

third party, certifying that the equipment had been installed, tested, and was ready and capable of being used for its intended purpose. Id. at 10.

The "placed in service" grant applicant could request an amount which was generally up to thirty percent of the property's "eligible cost basis." Id. at 5, 17. The program defined cost basis "in accordance with the general rules for determining the basis of property for federal income tax purposes." Id. at 16. In short, that meant that the eligible cost basis of a renewable energy property was its purchase price, including such things as installation and freight costs, subject to certain limitations. Id. at 16-17; see also Day 2 Trial Tr. 62:2-6 (Special Agent David Goodwyn testimony that the eligible cost basis was the cost "that the applicant paid, not the cost that the vendor paid to assemble or purchase equipment for sale"). However, at least eighty percent of the equipment used to construct the property had to be "original use" or new equipment; less than twenty percent could be used equipment. Day 11 Trial Tr. 141:12-17.

An applicant was required to submit documentation to support both the eligibility of the property and its claimed cost basis. Ex. 433 at 17. The program was originally available for properties placed in service in 2009 or 2010, but it was extended for one year, through 2011. Id. at 2.

2.    "Start of Construction" Applications

For properties that had not been placed in service by the 2011 deadline, the program permitted applicants to submit "placeholder" applications, also referred to as "start of construction" or "beginning of construction" applications. Id. at 6. These could be submitted up until October 1, 2012, if "physical work of a significant nature" had begun on the property in 2009, 2010, or 2011. Id. at 3, 6. Unlike placed-in-service applications, placeholder applications did not request grant payments at the time of the application; rather, they allowed applicants who had begun "physical work of a significant nature" while the program was in effect to request a

4

grant later on if their renewable energy properties were placed in service by a later statutory

deadline. Id. at 3, 6-7.

        3.        Application Submission and Review Process

Grant applications were submitted on Treasury's website through a portal managed by

the National Renewable Energy Laboratory ("NREL"). Day 2 Trial Tr. 9:15-19. NREL is a

government-funded research and development organization that specializes in renewable energy.

Id. at 9:20-23. Treasury contracted with NREL to review the Section 1603 grant applications,

given NREL's subject matter expertise. Id. at 11:6-17. In addition to reviewing the uploaded

documentation supporting the grant applications, NREL could, as necessary, request further

information from applicants through the portal. Id. at 10:23-24:5. Once NREL finished

reviewing an application, it would provide a report to Treasury with a recommendation of

whether to grant the application, after which Treasury would initiate payment to the applicant

who had placed the renewable energy property in service. Id. at 11:23-12:11.

        B.     *Acton Bio Energy*

        1.     First Acton Bio Energy Application

In 2009, Condron approached Richard Colman about applying for a grant for an open-

loop biomass gasification facility under the Section 1603 program.[3] Day 4 Trial Tr. 18:18-19:2,

---

[3] Biomass gasification is a process by which biomass is converted into a synthetic natural gas, or
"syngas," by applying heat and pressure in a low oxygen environment. Day 11 Trial Tr. 128:12-
129:4; Day 5 Trial Tr. 53:12-17. Gasification uses only a fraction of the oxygen that would be
needed to burn the material and therefore causes incomplete combustion, which results in the
production of combustible gases. Day 11 Trial Tr. 128:12-129:11. This syngas is cooled and
cleaned to remove contaminants and can then be fed into an engine generator, or "genset," to
produce electricity or heat. Id. A gasification system is comprised of everything required to turn
biomass into power, including the gasifier, the gas cleanup equipment, and the gensets. Id. at
133:14-24.

Biomass properties eligible for a thirty percent grant could be either "open-loop" or "closed-
loop" biomass facilities. Ex. 433 at 5. Under Section 45 of the tax code, closed-loop facilities are

20:23-21:5. Colman, an attorney and financial planner, knew Condron through Condron's girlfriend, Metivier. Id. at 17:22-25. Metivier had babysat Colman's children, and Condron had, at some point, done some painting work for Colman. Id. at 16:21-17:15. Colman also knew that Condron and Metivier had three children together. Id. at 18:10-17.

Although Colman did not know anything about Section 1603, he told Condron that he would help him apply for the grant, thinking that Condron would not follow through. Id. at 19:5-19, 20:14-21:5. During their meetings, however, Colman became impressed with Condron's understanding of the program and agreed to help him submit the documentation for the grant. Id. at 20:9-22. Colman understood his role to be limited to filling out the required forms with information provided to him by Condron and uploading them to the Treasury website. Id. at 19:17-22, 30:14-20.

The first grant application that Colman worked on was for an entity called Acton Bio Energy, LLC ("Acton Bio Energy"). Id. at 22:1-10, 24:8-12. At the end of August 2009, Colman filed a certificate of organization forming the LLC and naming Metivier as its manager. Id. at 24:11-25:9; Ex. 16-2. Colman testified that he had reservations about Metivier being financially responsible for the LLC given the complexity of the proposed project but that he discussed the matter with her, and she decided to go ahead with forming the LLC. Day 4 Trial Tr. 22:1-23-13. At Condron's request, Colman did not list Condron as being in any way involved with Acton Bio Energy on the certificate of organization. Id. at 25:10-22, 26:6-10. Despite this, Condron, not Metivier, supplied the information for the grant applications to Colman. Id. at 26:11-27:1.

---

those that produce power from plants grown specifically as a feedstock for electricity production. Day 11 Trial Tr. 126:22-127:12. By contrast, open-loop plants use a much larger set of incoming materials, including, for example, tree cuttings, bark, sawdust, and animal manure. Id.; Day 5 Trial Tr. 53:22-54:11.

The Acton Bio Energy grant application was for a "turnkey" operation, id. at 36:15-37:8, that purportedly had been placed in service on August 10, 2009, Ex. 2. Condron explained to Colman that a turnkey operation is one in which the project is fully constructed such that it can be sold to a buyer as a completed product, ready to use on delivery. Day 4 Trial Tr. 36:15-37:8. Condron told Colman that he had built an open-loop biomass gasification system and that, through an entity he owned called C2C, he wanted to sell it to Acton Bio Energy and finance it. Id. at 36:25-37:12. Condron also told Colman that the system was ready to go, so all that had to be done was to sell the operation to Metivier and then set it up at a site, Acton Sand & Gravel, that would use the electricity. Id. at 36:25-37:8. At some point Colman went to see the gasifier at Acton Sand & Gravel; however, he knew that what he was seeing was a gasifier only because Condron told him as much. Id. at 37:13-38:11. Colman did not advise Condron of any concerns about failing to disclose Condron and Metivier's relationship in the grant application. Day 5 Trial Tr. 177:22-179:4.

Colman uploaded supporting documentation to the Treasury website for Section 1603 grants. Day 4 Trial Tr. 39:22-40:4; see also Exs. 3, 3.1. But he told Condron that the application was likely to be rejected because it was not accompanied by an audit or CPA's report regarding the cost basis, as required by the grant program.  Day 4 Trial Tr. 53:11-14, 53:22-55:9. Nevertheless, Condron insisted that Colman submit the application, even without the independent audit. Id. at 53:25-54:4. The application was rejected. Id. at 53:11-14.

2. Second Acton Bio Energy Application

Afterwards, Colman helped Condron put together a second Section 1603 grant application for Acton Bio Energy, which included substantially more documentation supporting the eligibility of the project, its cost basis, and its placement in service. Id. at 71:6-12; Exs. 3, 3.1

7

(documents supporting first application); Ex. 4 (second grant application); Exs. 5, 5.1-5.8 (documents supporting second application).

        a.     Certification

The first document, dated July 15, 2009, was a certification from "C2C Gasified Generating Systems," which stated that the gasification system had been "successfully tested" and was "capable of operation." Ex. 5.1. The certification also described the project specifications and listed its price as $2,935,000. Id. The certification was signed by Condron as the "President" of "C2C Inc." and Metivier as the "Purchaser." Id. Colman testified that he put the certification together based on emails from Condron. Day 4 Trial Tr. 71:21-72:1. The certification did not note any relationship between Condron and Metivier.

        b.     Electrical Engineer's Drawings

The second document, dated August 13, 2009, was an engineer's drawing prepared by David Colombo of Power Engineers, LLC. Day 2 Trial Tr. 64:11-20; Day 4 Trial Tr. 42:20-43:23; Ex. 5.4. At some point, Condron asked Colombo for help developing design drawings for projects that involved supplying both biomass and biodiesel power to various kinds of equipment.[4] Day 2 Trial Tr. 65:13-24.

In June or July 2009, Colombo visited Acton Sand & Gravel to see the equipment that "was to be connected and then developed some preliminary drawings." Id. at 68:11-24. At the time, there were no generators on site. Id. at 69:7-8. As a result, when Colombo prepared his drawing, the specifications for the equipment were based on information provided to him by Condron over email. Id. at 70:1-71:14. Initially, Condron's proposed power source was

---

[4] Biomass does not include material that has been transformed into a biofuel, such as biodiesel. Day 11 Trial Tr. 127:22-128:7

biodiesel, and the first drawings that Colombo issued on August 13, 2009, included a biodiesel generator. Id. at 66:12-23, 71:25-72:3, 72:24-73:6. Later, though, Condron asked Colombo to change the title of the drawing and to change the biodiesel generator to a biomass generator. Id. at 72:24-73:6.

Colombo testified that this change made little difference because he understood the drawing to be a project proposal. Id. at 73:9-20. According to Colombo, Condron asked him to develop the drawings to "use for initial permitting and application to the local utility for approval." Id. at 67:17-25. The drawings that Colombo prepared were "conceptual," the kind used to "start the process," and were "very high level." Id.

In addition to changing the power source of the generator, Condron also at some point asked Colombo to readdress all his invoices from Condron to Metivier. Id. at 73:19-74:7; Ex. 61. Colombo sent all further invoices to Metivier. Day 2 Trial Tr. 73:19-74:7.

Later, in October 2009, someone named Tony Grappone emailed Colombo asking him to prepare a report stating the project was complete and ready for operation. Id. at 75:2-76:8. Colombo responded that he could not prepare such a report because he had not in fact seen the completed project. Id. at 76:9-15.

        c.     Independent Auditor's Report

The third document, dated November 16, 2009, was an independent accountant's report. Ex. 5.2

After the first application was denied, Colman tried to help Condron find a CPA or auditor, but he was unable to find one who worked on Section 1603 grant applications. Day 4 Trial Tr. 55:11-16. On October 10, 2009, Condron sent Colman an email and an attachment that included a cost breakdown of the gasifier. Exs. 27 (email), 27.1 (attachment). Condron asked Colman whether the attachment was the type of document that needed to be signed off on by a

CPA. Ex. 27. Colman responded that although a "full blown audit" was not necessary, "the work required [would be] more than a document" and might cost five to ten thousand dollars. Id.

On October 19, 2009, Condron emailed Colman suggesting that Metivier and another individual "re/prepare" the grant application such that Colman could then certify the costs as an "independent" auditor. Ex. 599. Colman responded that the arrangement would not work as he had helped with the initial application and because he had not maintained his CPA certification. Id.

At some point, Metivier approached Diane Lambert at Walsh & Associates, a small CPA firm that had done work for her brother. Day 8 Trial Tr. 161:12-23, 162:15-16. Metivier told Lambert that she owned an LLC that had purchased a gasification system. Id. at 163:6-9. She asked Lambert to prepare an independent accountant's report, which would certify the cost of the gasification system, and explained that the report was required as part of a Section 1603 grant. Id. at 167:25-168:12. Although Lambert had never worked on a Section 1603 grant, she found samples of the required independent accountant's report on the Treasury website and used it as a template to obtain the required information from Metivier. Id. at 168:13-17, 169:13-21.

Metivier provided Lambert with the bill of sale for the gasifier, a promissory note, and invoices to support the cost basis. Id. at 169:25-170:2. Colman had prepared these documents based on numbers provided to him by Condron. Day 4 Trial Tr. 27:10-20, 67:7-68:5. Under the terms of the transaction, Condron's company, C2C Solutions, manufactured a gasification system for Acton Bio Energy, which was majority owned by Metivier, and C2C Solutions also lent Acton Bio Energy approximately $2.7 million to finance the sale. Day 3 Trial Tr. 76:21-77:2.

Because Lambert was working on an independent accountant's report, rather than a "full-blown audit," she did not speak to any engineers or conduct any independent evaluation of the costs provided to her by Metivier. Day 8 Trial Tr. 168:18-169:6, 170:9-19. She simply went through the documents provided by Metivier, compared them with the costs provided by Metivier, and made sure that the numbers agreed. Id. at 170:9-13, 178:4-6. She also went to see the gasifier at Acton Sand & Gravel in November 2019. Id. at 179:19-180:1. Lambert testified that although she had met Metivier at the site, "another gentleman" was there and "did most of the talking," explaining to Lambert how the gasifier worked. Id. at 180:17-24.

In preparing her report, Lambert did not receive any documents from or speak to Condron because she "didn't feel it was necessary." Id. at 170:25-7. At that time, though, Lambert was not aware that Metivier and Condron were in a romantic relationship and had children together. Id. at 172:18-173:4. Lambert testified that, had she known of the relationship between Metivier and Condron, she "would have asked more questions." Id. at 173:12-16. She explained that this was because when a transaction occurs between related parties, the rates and terms may not be reasonable.[5] Day 9 Trial Tr. 64:15-24.

       d.     Power Purchase Agreement

The fourth document, dated December 2009, was a power purchase agreement between Acton Bio Energy and Acton Sand & Gravel. Ex. 5.3. It was signed separately, and on different days, by Metivier and Fred Kennedy of Acton Sand & Gravel, each before a notary. Id. The document was an agreement between Metivier and Kennedy pursuant to which Action Bio

---

[5] John Cinkala, a federal revenue agent with the Internal Revenue Service, similarly testified that where a transaction takes place between related parties, there may be a concern that it is not a "bona fide economic transaction" due to possible manipulation of the terms. Day 3 Trial Tr. 86:24-87:11.

Energy would install and maintain a biomass gasification system at Acton Sand & Gravel, and Acton Sand & Gravel would purchase the energy produced by the system. Id.

Acton Sand & Gravel was a business that crushed rocks and ground wood to make gravel and wood chips. Day 8 Trial Tr. 127:8-11. Kennedy and Condron had grown up in the same town and gone to elementary school together, but they had not been close friends. Id. at 128:14-129:14. At some point in 2009, Condron stopped by Acton Sand & Gravel and told Kennedy that he had a bioenergy company. Id. at 128:24-129:23. Condron told him that he had several generators and needed a place to put them. Id. at 129:24-130:4. Condron brought the generators to Acton Sand & Gravel, but Kennedy did not see them work very often. Id. at 131:9-132:23. Kennedy also stated that he never saw the generators run on "biomass"; however, he had a limited understanding of what biomass was. Id. at 132:2-134:6, 150:10-15. On cross-examination, Kennedy stated that he did not recall telling IRS agents in 2014 that he had seen one of the generators run "a few times on one load of wood chips," but that, in any event, if the generator had been reliably running on wood chips, he would have known, since he would have been the person providing the wood chips to Condron. Id. at 159:7-52.

Kennedy understood the power purchase agreement to be an agreement by which Condron would rent space for his generators at Acton Sand & Gravel and would then pay that rent by selling the power they produced to the local utility company. Id. at 134:7-16. Kennedy never purchased any power from Condron, and he believed that Condron had paid him some rent and for help moving the generators. Id. at 136:12-21. His employees also did "a lot of welding" for Condron and helped him with the generators. Id. at 142:7-9.

e.      Additional Documents

Colman also uploaded several other documents. One was entitled "2010-01-19 timeline" and stated that the project had been placed in service on August 10 and sold to Acton Bio Energy

on August 28 (presumably of 2009). Exs. 5, 5.1. Another was a "retest certification" on C2C Solutions letterhead, certifying that the biomass gasification system had been installed at the operating site and successfully retested on September 15, 2009. Ex. 5.6. And a third was a limited power of attorney, signed by Metivier, which authorized Colman to prepare and submit all documents necessary to the Section 1603 application on Action Bio Energy's behalf. Ex. 5.7

       3.      Acton Bio Energy Award

On April 19, 2010, Treasury awarded Acton Bio Energy a Section 1603 grant in the amount of $704,400. Ex. 436. Colman forwarded Condron the award letter and told Condron that he should expect to receive the money within five days. Id. Colman received a contingency fee of $25,000 for the work he did for Condron. Day 4 Trial Tr. 75:10-12.

       C.     *Concord Nurseries*

In 2010, following the award of the Acton Bio Energy grant, Colman began to work with Condron on another Section 1603 application for an entity called Concord Nurseries. Id. at 78:9-16; Ex. 6 (application). As before, the proposal was for an open-loop biomass facility that would use biomass gasification—in this case, to provide power and heat to several existing greenhouses in Concord, Massachusetts. Day 4 Trial Tr. 78:9-16. The Concord Nurseries project was significantly larger than Acton Bio Energy, but the application was also for a turnkey operation. Id. at 79:12-80:19, 87:2-6.

Colman filed a certificate of organization forming the entity for Concord Nurseries LLC and naming Metivier as its manager. Id. at 80:20-81:5; see also Ex. 16.3. Colman testified that Condron had made clear that he did not want his name associated with the entity. Day 4 Trial Tr. 81:9-14.

1.      Bill of Sale for Turnkey Operation

On October 4, 2010, Condron sent Colman an email describing the following transaction: Metivier was going to purchase a turnkey open-loop gasification system for $26,523,734.52 from Shirley Brewer, doing business as the Emerald Group. Id. at 81:25-83:2, 86:14-87:18. Condron told Colman that he had put the gasification system together by sourcing parts from all over the country. Id. at 79:12-80:19. The sale was highly leveraged, with Metivier putting down a deposit of only $26,523.73, or 0.1%, and the rest being financed by Brewer. Id. at 86:14-87:18. Based on that information, Colman drafted a bill of sale, which was signed on October 19, 2010, by Metivier on behalf of Concord Nurseries and Brewer doing business as the Emerald Group. Id. at 88:5-90:9; Ex. 7.4.

Brewer is Condron's mother. Day 4 Trial Tr. 83:3-4. In 1987, Brewer earned a two-year degree from MassBay Community College in business administration. Day 10 Trial Tr. 168:5-20. She later received a four-year degree in human services management from Lesley College. Id. In 1991, she pursued a nursing degree in New Hampshire and then worked as a nurse for twenty years, until 2011. Id. at 85:15-86:20; 88:14-89:3. At the time of her trial testimony, Brewer owned a business raising labradoodles. Id. at 84:16-85:17.

Condron told Colman that his mother had a background in solar energy and was familiar with alternative energy projects. Day 4 Trial Tr. 85:20-25. But the full extent of Brewer's experience in alternative energy projects appears to have been that she had a thermal solar system, built by her husband, in her home in the late 1970s, and that she and her husband installed a wood-burning furnace in the early 1980s. Day 10 Trial Tr. 89:25-90:9, 150:2-165:21. Although she professed to an interest in alternative energy, she never studied or worked in any fields related to engineering or energy. Id. at 89:8-17.

2.        Concord Nurseries Application

Following the sale of the turnkey operation to Concord Nurseries, Colman again submitted the documentation needed to support the application under a power of attorney granted to him by Metivier. Ex. 7.5.

a.        Commissioning Reports

On November 15, 2010, Brewer, as the equipment vendor of the gasification system, signed a commissioning report on Emerald Group letterhead stating that "[t]he biomass energy producing system purchased by Concord Nurseries has been installed," that it had been "reviewed and tested on November 15, 2010," and that it was "ready and capable of operation." Ex. 7.2. Later, on June 27, 2011, Brewer signed a second commissioning report, which included more detail about the project, including the number of generators, but similarly stated that it had been placed in service at Concord Nurseries on November 15, 2010. Ex. 7.7. Both reports were uploaded to the Treasury website. Ex. 7.

In fact, Brewer played no part in testing the equipment. Day 10 Trial Tr. 101:8-102:17. Although Brewer testified that "there was an engineer" who had tested the equipment, she had only seen a picture of the engineer on site and could not recall who it was. Id.

b.        Electrical Engineer's Drawings

Condron again asked Colombo to develop engineer's drawings for the project. Day 2 Trial Tr. 79:14-18. Condron explained that several generators, powered either by biodiesel or biomass, would be used to provide power to the greenhouses. Id. at 79:14-24. After visiting the site, Colombo created several drawings, dated November 17, 2010—*after* the project had presumably been placed in service—designing the interconnection between the generators and the greenhouses, as well as the interior layout of grow lighting and heaters for the greenhouses. Id. at 81:7-12, Ex. 7.3. One drawing included a biomass generator, and Colombo testified that he

15

received the specifications for it from Condron. Day 2 Trial Tr. 81:17-23. Although Colombo went to the Concord Nurseries location on several occasions, he never saw a biomass generator there. Id. at 79:25-80:20, 81:25-82:1. This was not a concern to Columbo, though, because he believed that the drawings he was producing were for the "very beginning of the design process" and that the project was "preconstruction." Id. at 82:2-18.

After Colombo issued the drawings, someone named Keith Bolton, who worked for Condron, asked Colombo to remove the word "proposed" from the title of the drawings and to replace it with the words "as built." Id. at 83:2-9, 84:12-85:13, Ex. 65. Initially, Colombo responded that "proposed" was appropriate because the project had not yet been constructed. Day 2 Trial Tr. 84:12-85:13. Eventually, though, he agreed to remove "proposed," because it did not impact the technical content of the drawings; however, he refused to add "as built," because he had no information that the project was, in fact, built. Id.; Day 3 Trial Tr. 24:6-25:5.

Colombo sent his invoices for the work on the project to Metivier and corresponded with her over email. Day 3 Trial Tr. 32:20-33:16.

c.    Independent Auditor's Report

Metivier worked with Lambert to prepare another independent auditor's report. Day 8 Trial Tr. 181:14-182:23. She provided Lambert with the bill of sale and the promissory note prepared by Colman and signed by her and Brewer, as well as invoices to support the schedule of costs. Id. Lambert also obtained a confirmation of the promissory note from the Emerald Group. Id. At some point, Lambert visited the Concord Nurseries site and was shown the gasification system by Metivier and "another gentleman," but Lambert did nothing to verify the costs of the gasification system. Id. at 184:12-16, 185:11-24. The report stated that the eligible cost basis of the project was $26,787,532. Ex. 7.1.

16

     d.    NREL Follow-up

On May 6, 2011, after Colman had submitted the Concord Nurseries application, he received an email from NREL requesting additional information. Ex. 434. Specifically, NREL asked for more information regarding the costs of the gasification system. Id. Colman forwarded the email to Condron. Day 4 Trial Tr. 103-23-25.

On May 23, 2011, Metivier sent Lambert an email asking her to create a cost breakdown of the gasification system. Ex. 36. Using the Emerald Group invoices provided to her by Metivier, Lambert prepared a document that included additional detail on the gasification system component costs. Day 9 Trial Tr. 7:16-9:10; see Ex. 72.6. Colman uploaded the document to the Treasury website on June 2, 2011. Ex. 7.

     3.    Concord Nurseries Award

On July 20, 2011, Treasury awarded Concord Nurseries a Section 1603 grant in the amount of $8,036,269. Ex. 37. Colman invoiced Metivier for $360,000. Ex. 38.

     D.    *Kansas Green Energy*

Condron next worked on Kansas Green Energy, a project to use municipal solid waste to produce electricity.[6] Day 4 Trial Tr. 107:16-25.

     1.    Preapplication Activity

     a.    Legal Entities

Colman created two entities. The first was Kansas Green Energy, LLC, whose manager and principal agent was Metivier. Day 4 Trial Tr. 108:7-12; Ex. 16.4. The second was Industrial Supplies, LLC, for which Colman listed Brewer as the principal agent. Day 4 Trial Tr. 108:16-109:8; Ex. 16.6. Condron's name did not appear anywhere on either document because Condron

---

[6] Trash facilities are effectively open-loop biomass facilities where the fuel is municipal solid waste rather than plant or animal matter. Day 11 Trial Tr. 134:12-135:5.

instructed Colman not to include it. Day 4 Trial Tr. 109:9-16. However, Condron "was the intermediary for the two entities." Id. at 123:2-9.

        b.      Construction and Sale of the Gasification System

Condron traveled to the Midwest to acquire the equipment needed to assemble the gasification system. Id. at 109:25-11:6. One of the vendors that Condron worked with was Worldwide Recycling in Moberly, Missouri, which sold a variety of new and reconditioned equipment. Day 7 Trial Tr. 75:25-76:25. Condron called Jeffrey Sayre at Worldwide Recycling in the fall of 2011 to ask about an indirect kiln that he wanted to use to gasify scrap wood or scrap pallets. Id. at 77:3-78:12. Sayre did not recall Condron talking about processing municipal waste. Id. at 78:13-15.

On September 22, 2011, Worldwide Recycling sold the kiln and several other pieces of equipment to the Emerald Group for $579,500, with an initial twenty percent deposit of $115,800. Ex. 334. Condron signed the purchase agreement. Id. In October 2011, Condron went to Missouri to see the kiln, which had been reconditioned by Worldwide Recycling. Day 7 Trial Tr. 81:24-82:20. Condron told Sayre that he was also purchasing two Waukesha generators for $40,000 each and some other equipment in Kansas, and he asked Sayre whether Worldwide Recycling could make those portable and bring them to Missouri. Id. at 83:20-84:8. Worldwide Recycling agreed, moved the generators from Kansas, and mounted them on trailers. Id. at 84:9-23. Sayre testified that the generators could run on a number of different fuel types, including syngas. Id. at 84:24-85:3.

In early December 2011, Worldwide Recycling moved the kiln, the generators, and some additional equipment to Wareham, Massachusetts in approximately five or six truckloads and then began to connect the pieces of the system in Wareham. Id. at 85:11-22, 100:5-15, 127:13-15. However, one of the trucks—the one carrying the kiln—was in an accident on the drive east.

18

Id. at 88:21-91:20. On December 19, 2011, Sayre went to Wareham to inspect the damage and found that the seals on the kiln were misaligned and broken. Id. at 91:21-92:6. The purpose of the seals was to keep flammable gas from coming into contact with the burners and causing an explosion. Id. at 92:7-12. Sayre helped Condron summarize the damage, and they ultimately made an insurance claim, which was resolved in February 2012. Id. at 92:19-22, 94:22-95:10.

In the meantime, Sayre spoke with local contractors about the amount of time it would take to repair the kiln. Id. at 93:22-94:8. Contractors repaired the trailer but not the kiln. Id. at 95:11-21. Worldwide Recycling put the system together, but the kiln remained damaged and unable to gasify. Id. at 100:19-101:9. As of Sayre's visit on December 19, 2011, the generators were running, id. at 130:12-131:4, but they had not yet been connected to the kiln, and the system was far from operational, id. at 103:5-20.

Sayre's contractors worked on the system over four or five months and completed it in early April 2012. Id. When the contractors finished, each component of the system had been tested, but it had never run as a complete system; the contractors had never gasified wood chips or used the syngas to run the generators because the kiln had not been repaired. Id. at 107:20-108:20.

In all, Condron paid Worldwide Recycling roughly $1.25 million for the kiln, for moving the generators and transporting the other equipment from Kansas to Missouri, for trucking everything to Massachusetts, and for the on-site work in Wareham. Id. at 109:17-110:1.[7]

---

[7] Two years later, in 2013, Condron got back in touch with Sayre about selling the kiln and the generators. Day 7 Trial Tr. 110:2-5, 110:19-25. Sayre made another trip to Massachusetts and saw that the kiln and the two Waukesha generators were in storage in a rock quarry, covered in tarps, and that several other generators were in "states of disrepair." Id. at 111:1-18. Sayre did not purchase any of the equipment. Id.

        c.     Electrical Engineer's Drawings

In December 2011, Condron got in touch with Raymond Jarvis, an electrical engineer who owned his own company, R.P. Jarvis Engineering. Day 8 Trial Tr. 9:9-10:18. Condron told Jarvis that he wanted to provide power to ten small greenhouses and one large greenhouse in Wareham, and he asked Jarvis to create drawings showing the power distribution and lighting for the greenhouses. Id. at 10:19-11:2. Jarvis visited the site several times, first in December 2011 and then about two more times in the next few months. Id. at 11:6-20. Jarvis examined the greenhouses and saw a couple of tractor trailers on site with some generators and a flatbed trailer with another piece of equipment that he testified could have been a generator or a "biomass machine." Id. at 11:25-12:19. Jarvis never saw any of the equipment operate. Id. at 12:23-13:7.

On December 13, 2011, Jarvis submitted a proposal, addressed to Metivier, to provide electrical drawings and specification for powering the greenhouses. Id. at 13:10-23; Ex. 11.3. Condron offered Jarvis a bonus of $2,000 to complete the drawings by December 15, 2011. Day 8 Trial Tr. 14:2-12. Although Condron did not explain to Jarvis why he needed to expedite the drawings, id., the Section 1603 program required that, for placed-in-service applications, energy properties be placed in service by December 31, 2011, Ex. 433 at 5. Jarvis completed a series of fourteen electrical drawings, laying out the power and lighting to the greenhouses, and stamped them with the date December 14, 2011. Ex. 9.1. One of the drawings included a 600-kilowatt Marathon Electric Biomass Generator. Day 8 Trial Tr. 16:2-7. Jarvis testified that although he saw a Marathon generator at the Kansas Green Energy site in Wareham, he did not know whether it was a biomass generator but that, in any case, the operation and functionality of the equipment was not within the scope of his work. Id. at 16:8-22.

d.      Independent Auditor's Report

Lambert prepared another independent auditor's report for Kansas Green Energy. Day 9 Trial Tr. 9:11-12; Ex. 9.2. Metivier again provided the underlying documents, including a promissory note, signed on November 16, 2011, under which Metivier would pay Brewer $293,165.99 per month for 240 months. Day 9 Trial Tr. 9:25-10:1; Ex. 11.5. Lambert also prepared a cost breakdown for the trash facility based on information provided by Metivier. Day 9 Trial Tr. 11:19-24; Ex. 9.2. One of the costs was for a $14,280,150 gasification reactor. Ex. 9.2.

Lambert visited the site in December 2011, where she met Jessica and "another gentleman." Day 9 Trial Tr. 10:9-19. She saw the system and learned that it would be powered by trash, although she did not see any trash at the site. Id. at 10:20-11:4.

e.      Commissioning Report

On May 30, 2012, Brewer signed a commissioning report on Industrial Supplies letterhead stating that "a trash gasification system was installed for Kansas Green Energy located at 20 Cranberry Highway, West Wareham, MA." Ex. 9.5. The report claimed that "[t]he system was tested throughout December 2011, with a final testing and commissioning completed on December 30, 2011." Id.

f.      Additional Support

In May 2012, Condron also hired Rebecca Putens to help him and Colman. Day 7 Trial Tr. 143:4-144:21. Putens had previously worked on Capitol Hill as a personal secretary to a senator. Id. at 142:7-16. During that time, she met Condron, who occasionally delivered wine to the senator. Id. at 142:17-143:24. After seeing on LinkedIn that Putens was looking for a permanent position, Condron called and asked if she would be interested in doing secretarial work for him. Id. at 143:4-144:1. Putens remained in Washington D.C. and worked as an

independent contractor for Condron for eight months. Id. at 144:20-25. Her work entailed making phone calls, filing documents, writing letters and email correspondence, and sometimes talking to vendors based on instruction given to her by Condron in a daily morning phone call. Id. at 143:19-144:1, 146:3-24.

> 2.    First Kansas Green Energy Application and NREL Follow-up

Colman submitted the first Kansas Green Energy application for a trash facility on July 10, 2012, under a power of attorney granted to him by Metivier. Day 4 Trial Tr. 118:9-15; Exs. 9.4, 41. Like the prior two applications, Kansas Green Energy involved sale of a turnkey operation. Day 4 Trial Tr. 108:1-6. This time, Industrial Supplies sold and financed a $58,805,237 gasification system to Kansas Green Energy. Id. at 123:20-23. The application stated that the system had been placed in service on December 30, 2011, and was being used to heat greenhouses. Ex. 9.5. To support the application, Colman uploaded documentation in July and August 2012, including the electrical engineer's drawings, the independent auditor's report, and the commissioning reports. Day 4 Trial Tr. 125:25-126:6; Ex. 9.

On August 20, 2012, Colman received an email from NREL requesting that a further commissioning report be filed. Ex. 428. Colman forwarded the email to Condron and Putens and asked whether Brewer could create a new signed and dated commissioning report on her letterhead. Id. Brewer signed a second commissioning report on August 21, 2012, which stated that Industrial Supplies was the vendor of the gasification system to Kansas Green Energy and that all the equipment "was tested and is ready and capable of being used for its intended purpose and has been ready and capable since December 30, 2011." Ex. 9.6.

On September 4, 2012, Colman received another email from NREL requesting further information about the project, including "a very detailed project narrative explaining from start to finish how the project works, equipment involved, and where/how the energy produced is

being used," all engineering and construction contracts, an independent engineer's report to verify the project costs, and proof of payments being made by all parties to verify the payment of services. Day 4 Trial Tr. 131:2-19; Day 11 Trial Tr. 142:21-143:21; Ex. 42.1.

The Section 1603 program had a rule that if the questions had not been answered within twenty-one days, the application would be denied. Day 12 Trial Tr. 12:18-23. Because Colman did not upload responses to NREL's questions within that time, the application was denied. Day 11 Trial Tr. 144:14-20.

3.      Engineer's Report and Project Description

On September 18, 2012, Colman emailed Condron and Putens a template for an engineer's report and asked Condron to fill in the "missing pieces and descriptions." Exs. 333, 333.1. The next day, Putens emailed Jarvis a fleshed-out version of the report and asked Jarvis to review and sign it. Day 8 Trial Tr. 16:23-18:23; Ex. 66.1. Jarvis understood Putens to be asking him to sign the document as confirmation that the project proposal was viable and refused to do so because he was not familiar with the equipment. Day 8 Trial Tr. 16:23-18:23. Jarvis suggested that Condron have the manufacturer of the equipment sign off on the proposal instead. Id. at 20:8-20. Condron then asked whether Jarvis could write a letter certifying only the "electrical portion" of the report based on the pictures he had taken of the equipment during his site visits, but Jarvis refused, since he had no idea whether any of the equipment was in working condition. Id. at 20:21-24:3.

On September 23, 2012, Condron got in touch with Andrew Grant, a consultant for renewable biomass power plants with Biomass Power Projects, LLC. Day 5 Trial Tr. 23:24-25:21; 57:13-22. Condron asked Grant to review plans for a project that involved the gasification of waste from supermarkets in the Boston area. Id. at 25:24-26:8. Specifically, Condron provided Grant with an independent engineer's report—the one that Colman had earlier sent Condron but

now with the information about the project filled in—and asked Grant to review it and to provide a project description that met NREL's requirements. Day 5 Trial Tr. 46:9-47:13.

On September 24, 2012, Grant sent Condron an email stating that he had received certain financial documents pertaining to Kansas Green Energy from Condron and that, as Condron's engineering advisors, Biomass Power Projects would need to review the financial details later but did not need to hold up completion of the Section 1603 application. Id. at 28:24-31:1; Ex. 43. Grant went on to write:

> As your engineering advisors, we have to state that any professional firm or qualified individual asked to review these documents as the basis of an investment or similar financial commitment would recommend taking no action without obtaining proper documentation of the scope of the equipment and its performance.

Day 5 Trial Tr. 31:2-7; Ex. 43. Grant testified that, based on his experience, he found it very unlikely that the project would succeed absent a full definition of what the project was and how it would work. Day 5 Trial Tr. 31:20-32:9.

However, given the approaching application deadline, Biomass Power Projects put together a four-page project description based on the information provided by Condron. Id. at 38:25-41:14. Grant described the document as "an attempt to describe a project in the absence of full information" and explained that he was never provided with a full list of the equipment required to make the gasification process work nor "a list of the piping and concrete and electrical systems required to link it all together and to control it, which was a major part of the cost." Id. at 40:19-25.

Grant also drafted a comment on the independent engineer's report provided to him by Condron, stating:

> While we have not been able, due to time constraints, to examine the equipment located at the [Wareham] site, we have calculated the gas output based upon typical biomass gasification equipment, and the known conversion efficiency of the gas engine generator

24

> equipment installed, together with the substantial equipment costs that have been
> documented, and expect that any deficiencies that may be found in the equipment once in
> operation can be handled by the warranty from the single responsible supplier, given that
> the usual supplier guarantees and warranties have been provided.

Ex. 11.2. In drafting the comment, Grant intended to convey his professional opinion of the

project as described but was careful to avoid stating that the project was defined. Day 5 Trial Tr.

47:2-13. Grant did not sign the independent engineer's report but rather told Condron that

Condron's electrical engineer, who had detailed personal knowledge of the project, should sign

it. Id. at 75:4-77:6.[8]

        4.     Second Kansas Green Energy Application and NREL Follow-up

There was no prohibition on the same applicant filing a subsequent application for the

same energy property, so Colman resubmitted the application, this time with additional

documentation. Day 11 Trial Tr. 144:18-22; Day 12 Trial Tr. 13:2-7. As with the first

application, the second was for a trash facility, now with a $58,701,305 cost basis. Ex. 10.

Colman submitted the application and the supporting documentation on September 25, 2012,

Day 4 Trial Tr. 135:12-136:5, just before the October 1, 2012 deadline for Section 1603

applications, see Ex. 433 at 3. He also uploaded the independent engineer's report but included

Grant's comment as the last page of the document, making it appear as though Grant had

authored the report. Exs. 11, 11.2. No other engineer signed the report.

At some point, Edward Settle, a senior project leader at NREL, became involved in the

review of the Kansas Green Energy applications. Day 11 Trial Tr. 141:18-142:2. Settle explained

---

[8] Grant continued to work with Condron sporadically over several months, during which he
continued to have concern about the viability of the project. Day 5 Trial Tr. 27:18-28:18, 30:6-
33:12. Grant testified that a multimillion-dollar project like Kansas Green Energy would
typically have had significantly more documentation to support it and that the lack of such
documents in this case was a "red flag" about the project's likelihood of success. Id. at 32:16-
33:12.

that his role at NREL was to review applications and assess their credibility before making a

recommendation to Treasury. Id. at 123:10-17. NREL would review four categories of

information: (1) whether the business paid taxes and owned the property; (2) whether the

property had actually been placed in service; (3) whether the technology met the technical

requirements of the Section 1603 program; and (4) whether there was enough information to

determine eligible cost basis. Id. at 123:18-124:4.

       a.      NREL Concerns About Technical Aspects of Kansas Green Energy

In assessing the technical aspects of Kansas Green Energy, Settle reviewed the detailed

project description, which stated that Kansas Green Energy would use supermarket waste and

biodiesel to generate power. Id. at 145:13-146:10. This was important because biodiesel was not

a qualified fuel source under Section 1603 and because municipal solid waste is very difficult to

use as feed stock. Id. at 146:11-147:11.

Settle also reviewed the independent engineer's report—which he believed had been

authored by Grant due to the placement of Grant's note at the end of the report—and noted that

much of the equipment was identified as used equipment. Id. at 151:3-153:20. In reviewing the

photographs of the equipment, he noticed that only two of the seven gensets included in the

project were likely to be able to consume syngas. Id. at 147:24-148:8, 149:18-150:1.

       b.      NREL Questions About Cost Basis

On October 8, 2012, NREL sent Colman an email requesting a breakdown of the costs

for each of the seven generators in the Kansas Green Energy project as well as proof of payment

of $58,701,305. Ex. 44.2. Colman discussed the request with Condron and, based on the

information Condron provided, Colman drafted the following response, which he then uploaded

to the Treasury website:

> The cost for all seven generators were included in the cost of the project and were not paid for separately as the project was a turnkey operation. We do not have a breakdown for the individual costs of the seven generators.

Day 5 Trial Tr. 97:12-98:1; Ex. 11.8.

NREL requested additional information about the project's cost basis by email dated

January 7, 2013. Ex. 46. Specifically, NREL requested that Colman

> [p]rovide copies of all invoices for all equipment (gasifier, preheater, cyclone bag house, cooling towers, engine controllers, and generators). For purposes of this application, Shirley Brewer/Industrial Supplies/Emerald Group is a related party. Therefore, all invoices from original equipment manufacturers to Shirley Brewer/Industrial Supplies/Emerald Group must be provided for the major equipment with no exception.

Id. When Colman told Condron about the request, Condron became upset and stated that that

would damage the application request. Day 4 Trial Tr. 164:22-165:15.

Colman had previously worked for Raytheon, which had at some point been audited by

the federal government. Id. at 165:16-166:16. The auditors requested that Raytheon's suppliers

provide their costs, but the suppliers refused out of concern that Raytheon would slash their

profit margins if that information were disclosed. Id. In a January 10, 2013 email to Condron and

Putens, Colman suggested that they draft a letter to the same effect, in which Brewer would

refuse to disclose her costs. Ex. 49.2. Putens responded that Condron agreed with the suggestion,

and Colman then provided a rough draft of the contents of the letter for Putens to compose. Id.

The next day, Colman uploaded a letter on Industrial Supplies letterhead, addressed to Metivier,

and signed by Brewer, which stated:

> I am in receipt of your recent request for Industrial Supplies, LLC to provide Kansas Green Energy, LLC (KGE) all invoices for equipment purchased.

> Your contract with us does not require us to provide the information you requested. We are not obligated to share with you our costs.

> As such we respectfully refuse to release that information.

Ex. 11.11. At the same time, Colman uploaded a response to NREL's question, stating that the grant applicant had "no control over Shirley Brewer/Industrial Supplies/Emerald Group" and she had "responded with the attached letter refusing to share the information." Ex. 11.12. Colman never talked to Brewer about the letter. Day 4 Trial Tr. 165:16-166:16. Settle responded to Colman that the project would not be funded without the original invoices from Brewer. Day 11 Trial Tr. 164:22-165:20.

In addition, NREL requested the electric, gas, and propane bills for the Kansas Green Energy site. Id. at 159:24-160:5. This was to assess the reasonableness of the project plan by comparing the amount of energy consumed by the site with the project specifications. Id. at 159:24-160:11. Settle learned that the site used approximately $1,000 of electricity a month for 1,000 kilowatt hours of energy, while the energy property being installed was proposed to generate 15 million kilowatt hours of energy per year—orders of magnitude more than the site's existing energy needs. Id. at 160:12-161:1. He also calculated that the price per kilowatt hour produced by the gasification system would vastly exceed the cost of buying power from the local utility. Id. at 161:2-163:13.

Settle also considered the fact that Kansas Green Energy had entered a one-year lease with the Wareham site. Id. at 163:14-164:1. This was another knock on the credibility of the project, given that Brewer had financed the gasification system over a twenty-year term. Id. Settle also eventually learned that the Kansas Green Energy site had been foreclosed on and that the equipment had been moved and was being stored in a warehouse. Id. at 155:23-156:3.

c.    NREL Concerns About Placement in Service

Settle had additional concerns about Kansas Green Energy's December 30, 2011 placed-in-service date. Id. at 154:21-155:21. He testified that he reviewed Jarvis's December 13, 2011 proposal and that, based on his experience, it would have taken months to construct the project.

28

Id. Yet, Kansas Green Energy had ostensibly been placed in service only two and half weeks later. Id.

        d.        NREL Questions Regarding Significant Contributors to the Project

The January 7, 2013 email from NREL also requested additional information regarding "Andrew Grant, Shirley Brewer, Dave Colombo, Raymond Jarvis, and any other significant contributors (individuals and companies) to the project." Ex. 46. NREL asked Colman to describe "the relationship, past and present, between these individuals and with the owners of [Kansas Green Energy] and Concord Nurseries." Id.

As to Brewer, Colman submitted the following information, which he got from Condron:

Owner of Industrial Supplies, LLC, and is the contractor who sold turnkey operation to KGE. She also sold turnkey operation to Concord Nurseries. Ms. Brewer has been involved with alternative energy since the late '70s, specializing in thermal, solar, and biomass.

Day 5 Trial Tr. 99:4-17; Ex. 11.13. No information regarding Brewer's personal relationship to Metivier was provided. Colman also submitted a brief biography of Grant, which concluded with the sentence: "Andrew was hired in September to satisfy Treasury's request for an independent engineer's report which was provided." Ex. 11.13. The uploaded response also included short paragraphs concerning Colombo's and Jarvis's roles on the project. Id.

Based on the information provided, Settle attempted to research Brewer but was not able to find anything about her or Industrial Supplies. Day 11 Trial Tr. 167:7-168:7. Settle found this strange given that his experiences had led him to believe that "if you can actually get gasification to work, you loudly and proudly will proclaim that." Id. at 168:8-16.

        e.        NREL Recommendation to Treasury

Given all of Settle's concerns about Kansas Green Energy, he ultimately recommended that Treasury not fund the project. Id. at 170:5-9. He concluded that the energy property had not

been placed in service, that there was insufficient information to determine the eligible cost

basis, and that the grant applicant was not providing the documentation needed to support the

project. Id. at 10-15.

      E.    *Ocean Wave Energy*

Concurrent with the Kansas Green Energy application, Condron worked on another

project called Ocean Wave Energy.

      1.    Preapplication Activity

In November 2011, Condron called Carlos Peña, a registered professional engineer with a

company called CLE Engineering. Day 9 Trial Tr. 68:7-69:22. CLE provides engineering

services on harbor projects, waterfront projects, offshore projects, dredging, and shoreline

protections. Id. Condron told Peña that he had an idea for an offshore barge-mounted wind farm

and wanted to conduct a feasibility study to determine a suitable location for the project. Id. at

70:13-71:2. Based on that conversation, Peña developed a scope of work for CLE's engineering

services, which included a number of tasks, including an initial feasibility study and deployment

of a single barge mooring anchor prior to December 31, 2011. Id. at 73:6-74:1; Ex. 316.1.

CLE never completed deployment of the barge. Day 9 Trial Tr. 77:1-79:2. Instead, in late

December 2011, Condron called Peña and said that there were two barges in Hyannis and that

CLE needed to confirm that they were there and then provide documentation to that effect. Id. at

79:3-25. CLE sent its two engineering firms and a CLE representative to go confirm that the

barges were in fact there. Id. Each of the two engineering firms and CLE generated reports based

on the site visit, which Peña forwarded to Condron. Id. at 80:1-81:12. The reports confirmed the

physical dimensions and location of the barges. Id. at 81:17-22.

Condron also purchased a large number of wi-fi dongles for use in the wind farm project,

although Peña was not aware of how the dongles would be used. Id. at 95:8-16. The dongles

were stored in CLE's offices in Massachusetts, Florida, and California from sometime in mid-2012 to mid-2103, until they were shipped back somewhere. Id. at 95:17-96:7.

At the end of 2011, Colman, working with Condron, created an entity called Ocean Wave Energy, again naming Metivier as its principal. Day 4 Trial Tr. 146:14-22; 148:3-18; Ex. 16.5.

In late December 2011 or early January 2012, Condron asked Jarvis to create a wiring diagram for the wind farm. Day 8 Trial Tr. 24:15-25:11. Jarvis went to the site in Cape Cod and saw a station wagon with one wind turbine in it. Id. at 25:17-26:1, 44:12-22.

### 2. Placed-in-Service Application

On September 28, 2012, Colman submitted a placed-in-service application with an application number ending in '2428. Day 3 Trial Tr. 35:5-11, 42:17-43:25, 45:19-46:3; Ex. 13.2. It described the energy property as "a small wind turbine system that charges batteries on a barge for engine operation, heat and lighting" that had been placed in service on December 31, 2011. Ex. 13.2. The qualified cost basis was $31,476, and the application requested just $9,443. Id.

In support of the placed-in-service application, Colman filed a commissioning report from Industrial Supplies, signed by Brewer and dated March 15, 2012, which stated that "two small wind turbines" had been installed in Hyannis, Massachusetts, and that the equipment had been placed in service on December 31, 2011. Day 5 Trial Tr. 121:10-122:20; Exs. 13.3, 44.1. Colman also uploaded the three reports provided by CLE and its engineering firms and Jarvis's wiring diagram, among other things. Ex. 13.3.

### 3. Start-of-Construction Application

A second application—a start-of-construction application—was also submitted for Ocean Wave Energy. Day 4 Trial Tr. 147:16-148:2. This application required that physical work of a significant nature had to have commenced on the project by December 31, 2011. Day 4 Trial Tr. 147:16-148:2. The application stated that Ocean Wave Energy had "started construction on

December 29, 2011 on a multiple energy-generating turbine project" and that the significant work undertaken was "the purchase and inventory of 32,500 WiFi communication devices" that would "provide a communication path to each turbine necessary for installation and setup, process monitoring, and preventative maintenance." Ex. 12. The application also stated that no previous applications had been submitted for this property and that the anticipated cost basis was $84,015,900. Id. The application listed Colman as a contact person, but unlike the other applications, the document was submitted under Metivier's name as managing partner of Ocean Wave Energy. Id. There seems to have been a technical issue with submission of the application: it was submitted 478 times on September 30, 2012, and seventy-three times on October 1, 2012. Day 2 Trial Tr. 54:21-55:6. The example shown to the jury had an application number ending in '4854. Ex. 12.

Unlike all the previous applications, the documents submitted in support of the start-of-construction application were uploaded by Metivier or someone using her log-in information. Ex. 13. One of the uploaded documents was a preliminary construction estimate. Ex. 13.1. In March 2013, Condron had contacted CLE to request a preliminary construction cost estimate for the wind farm. Day 8 Trial Tr. at 82:24-83:2. CLE provided an "order of magnitude" ballpark estimate of $1,648,387,500. Id. at 90:2-92:5. Unlike the estimate provided by CLE, though, which was for $1,648,387,500, the one uploaded to the Treasury website was for $32,161,522,760. Ex. 13.1. Peña testified that he had not authorized anyone at CLE to make these changes to the estimate. Day 9 Trial Tr. 95:2-4.

4.      NREL Follow-Up

Settle reviewed the more than 500 applications submitted by Ocean Wave Energy, including the one placed-in-service application and the remaining start-of-construction applications, and asked Colman a number of follow-up questions. Day 11 Trial Tr. 172:6-173:1.

One question sought to understand the differences between the many different applications. Id. at 177:23-178:6; Ex. 857. Settle never received an answer to that question. Day 11 Trial Tr. 178:7-8.

Settle also asked a question about Brewer's role in Industrial Supplies and Ocean Wave Energy across the different applications. Id. at 173:6-174:15; Ex. 857. Colman uploaded a response, which represented that Brewer and Industrial Supplies had built and sold the barge to Ocean Wave Energy and had no relationship with Ocean Wave Energy except as the vendor. Day 11 Trial Tr. 174:21-175:1; Ex. 13.4.

F.     *IRS Audit*

At some point in 2012, the Internal Revenue Service ("IRS") began a civil audit of Acton Bio Energy, Concord Nurseries, and Kansas Green Energy. Day 3 Trial Tr. 72:1-73:1. The initial purpose of the audit was simply to verify, with Metivier's cooperation, whether she had in fact purchased the gasification equipment and placed it in service on the dates suggested in the grant applications. Id.

As part of the audit, Agent John Cinkala visited the sites where the three gasification systems were ostensibly located. Id. at 73:19-74:2. On March 27, 2013, Cinkala and other revenue agents visited Acton Sand & Gravel to see the $2.9 million gasification system manufactured by C2C Solutions and placed in service by Acton Bio Energy. Id. at 74:13-75:4. They did not see any type of energy or gasification equipment at the site. Id. at 77:19-78:13, 94:24-95:8. The agents then went to Concord Nurseries to see the $27 million gasification system that was being used to heat and light the greenhouses. Id. at 78:14-19. At the site, the agents saw several empty greenhouses, a couple of trailers, and a flatbed of some sort with wrapped items underneath it. Id. at 79:13-20, 96:14-97:3. They then went to Wareham to see the

Kansas Green Energy project, where they saw some greenhouses with some plantings in them, but no functioning business operation. Id. at 80:6-15.

The next day, Cinkala spoke with Colman at the Walsh & Associates office. Id. at 91:9-92:11. He asked Colman where the gasification systems were but did not receive a clear answer. Id. at 92:18-25. That same day, the agents tried to locate Industrial Supplies but "could not find a manufacturing -- or a large seller of gasification equipment." Id. at 93:1-7. They did find an office, but it was a small storefront that appeared to be largely abandoned. Id. at 93:8-13, 98:11-13. The agents also at some point in March 2013 attempted to locate and interview Brewer, but they went to her home twice and were unable to find her. Id. at 89:7-90:5.

The auditors were eventually, with the assistance of Walsh & Associates, able to meet with Metivier on June 19, 2013, at Acton Sand & Gravel. Id. at 99:18-23. As the agents had not yet seen any functioning gasification systems for Acton Bio Energy, Concord Nurseries, or Kansas Green Energy, they were hoping that Metivier, as majority owner of each of the entities, would be able to show them three distinct gasification systems totaling $89 million and to then determine why they were no longer in service. Id. at 99:24-100:7. Condron was not at the meeting. Id. at 130:5-7.

At that point, it was Cinkala's understanding that "all the equipment for all the entities" was located at Acton Sand & Gravel. Id. at 168:16-18. Metivier accompanied the auditors on a tour, opened trailers for them, and allowed them to take photographs. Id. at 169:3-23. The agents did not see a gasification system. Id. at 130:8-134:1. Agent Cinkala conceded that he had never seen a gasification system in person before, id. at 152:2-21; however, he explained that it was the taxpayer's—Metivier's—responsibility to show the auditors the equipment, id. at 179:24-180:1.

Metivier was unable to point out the location of a gasifier, let alone three. Id. at 196:23-25. The case was ultimately referred for a criminal investigation. Id. at 197:1-2.

      G.    *Criminal Investigation*

      Agent John Wlodyka, a supervisory special agent for IRS's criminal investigations division, was the lead agent on the case. Day 11 Trial Tr. 95:21-96:9. He served a grand jury subpoena on Brewer, to which she provided responsive records for the Emerald Group and Industrial Supplies, including bank information, wire transfer information, and invoices. Id. at 96:13-97:5, 108:16-111:19.

      On April 28, 2016, he interviewed Brewer and asked her about the sale of gasification equipment to the Concord Nurseries. Id. at 97:15-98:25, 102:14-20. Wlodyka showed Brewer the bill of sale and promissory note, and she stated that she had not sold a $26 million gasifier to Concord Nurseries, had not entered into a loan agreement, and that the promissory note was "phony." Id. at 102:14-103:13.

      Following the indictment and arrest of Condron and Metivier in August 2017, IRS revenue agent Christopher McCarten became involved in the case. Id. at 118:19-119:15. He reviewed the financial statements, bank account records, canceled checks, bills of sale, and promissory notes related to Acton Bio Energy, Concord Nurseries, Kansas Green Energy, Brewer, Metivier, and Condron. Id. at 119:20-120:2. In conducting this review, he was trying to identify expenses that were used for the purchase of energy equipment and to trace the receipt of the Treasury grant funds through the various bank accounts. Id. at 122:8-13.

      For each project, he determined when the property was said to have been placed in service, looked at the bills of sale for when the property was sold to Metivier, and then looked at the bank statements for the companies that sold and purchased the property to calculate the actual amount of money spent on the energy property, adding an extra 120 days to allow for late

payment on equipment bills. Id. at 124:9-125:7. Using this methodology, he calculated that the total amount of expenses or payments related to energy equipment for Acton Bio Energy was $16,093, as compared with the claimed $2.9 million cost basis. Id. at 125:8-127:22. For Concord Nurseries, McCarten calculated that $177,000 had been spent on energy equipment, as compared with the claimed $26 million cost basis. Id. at 141:5-142:9. For Kansas Green Energy, he identified approximately $3 million in costs, as compared with the claimed $58 million cost basis. Id. at 164:2-16.

In addition to trying to determine the cost basis of the energy properties, McCarten also tried to trace the flow of Treasury grant money to see how it was spent. Id. at 129:8-11. Among other things, this investigation demonstrated that Metivier did not make any payments on her loans to Condron or Brewer until after she received the Treasury grant money. Id. at 134:11-136-12, 152:15-156:8. McCarten also reviewed the tax returns for Acton Bio Energy, Concord Nurseries, and Kansas Green Energy and learned that none of them had much, if any, revenue. Day 10 Trial Tr. 76:10-15.

## III.   Legal Standards

### A.   *Motion for Acquittal*

To prevail on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018) (citing United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)). In making that determination, the court does not "weigh the evidence or make any credibility judgments, as those are left to the jury." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)). Instead, the court "resolve[s] all credibility disputes in the

verdict's favor," id. (quoting <u>United States v. Olbres</u>, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," <u>United States v. Meléndez-González</u>, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted). Accordingly, the jury verdict must be upheld, unless, viewing the evidence in this manner, no rational jury "could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

B.      *Motion for a New Trial*

In considering a motion for a new trial under Federal Rule of Criminal Procedure 33, the trial court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Unlike with an insufficiency of the evidence claim, when the trial court evaluates a Rule 33 motion, it need not view the evidence favorably to the conviction but instead exercises its own judgment in assessing the government's case. See <u>Merlino</u>, 592 F.3d at 33 ("a district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal"). "The trial court may set aside a verdict and order a new trial if, in its opinion, the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice." <u>Payton v. Abbott Labs</u>, 780 F.2d 147, 152 (1st Cir. 1985). "[T]he remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." Merlino, 592 F.3d at 32 (quoting <u>United States v. Wilkerson</u>, 251 F.3d 273, 278 (1st Cir. 2001)).

IV.     **Discussion**

    A.     *Sufficiency of the Evidence*

        1.     Conspiracy

A criminal conspiracy is an agreement between two or more people to accomplish an unlawful purpose. United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011). For the jury to convict a defendant of conspiracy, the government must prove that "(1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy. Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." Id.

        a.     Mutual Agreement

Given the secrecy of conspiracies, the government need not prove an express agreement between co-conspirators. United States v. Morillo, 158 F.3d 18, 23 (1st Cir. 1998) ("The agreement itself need not be express, but may consist of no more than a tacit understanding") (internal punctuation omitted). Indeed, a conspiracy may be proven without establishing that "(1) each conspirator knew of or had contact with all other members; (2) each conspirator knew of all the details of the conspiracy or participated in every act in furtherance of it; or (3) the conspiratorial 'cast of characters' remained intact throughout the duration of the entire enterprise." United States v. Cruz-Rodríguez, 541 F.3d 19, 28 (1st Cir. 2008). The government may even prove a conspiracy without identifying any specific co-conspirators, so long as the evidence is sufficient to permit an inference that the defendant conspired with others. See United States v. Rios-Ortiz, 708 F.3d 310, 318 (1st Cir. 2013).

Condron argues that no rational trier of fact could find that Metivier harbored the requisite *mens rea* of the charged conspiracy to defraud the government and that therefore no

mutual agreement existed between Condron and at least one other person. But the government did not need to prove Metivier's state of mind; only Condron's *mens rea* is at issue. The jury was permitted to infer the existence of the conspiracy based on the totality of the evidence presented. See id.

And the evidence supported such an inference. The government presented evidence that Metivier was named as the manager of all the companies applying for Section 1603 grants; that she discussed the debt that she would be taking on with Colman and decided to go ahead with the Acton Bio Energy transaction; that she signed bills of sale and promissory notes and was the liaison with Lambert to get the independent auditor's reports needed for the applications; that the Treasury funds were deposited into her bank accounts and spent by her; and that she met with IRS agents to show them the claimed gasification equipment. All this evidence, taken in the light most favorable to the verdict, is sufficient for a reasonable jury to conclude that Metivier and Condron shared a general understanding of the conspiracy.[9]

>           b.      Object of the Conspiracy

Condron also argues that the government did not adduce sufficient evidence to prove the object of the charged conspiracy, specifically to defraud the United States with respect to claims. The court disagrees.

At trial, the government presented evidence of the following. First, after Acton Bio Energy, Condron asked Colman to keep his name off any documents being submitted to Treasury. Second, the actual cost of the properties sold by Condron and Brewer to Metivier's LLCs was a fraction of the cost bases claimed on the applications. Third, the sales and loans to

---

[9] Condron also argues that no reasonable trier of fact could find that Brewer shared a criminal intent to defraud the government. The court need not undertake this analysis where a reasonable trier of fact could have found that a conspiracy existed between Condron and Metivier.

Metivier's LLCs were fraudulent, where the monthly payments vastly exceeded the revenue from the energy properties. And, finally, the responses to NREL's questions were rife with misrepresentations.

Condron counters that he clearly relied in good faith on Colman's advice and that Colman, not Condron, wrote or reviewed the documents being uploaded to Treasury. But based on the evidence presented at trial, a reasonable jury could have found that Condron caused Colman to upload knowingly false or misleading statements to the Treasury website, such as that Condron's mother had been involved in alternative energy. A reasonable jury could have credited Colman's testimony that Condron provided him with the substance of the information uploaded to the Treasury website in support of the grant applications.

Condron also argues that Colman and Lambert personally witnessed the gasification systems. But a rational jury could have found that Colman and Lambert, who had no experience in alternative energy, had no idea what they were looking at when they went to the sites.

In addition, Condron explains that the cost bases claimed on the applications needed to be the costs paid by the applicant, not those paid by the vendor, and that that the government fails to comprehend this distinction. But even accepting that premise as true, a reasonable jury could have found that, given the relationship between the parties, the transactions were shams, intended to dramatically inflate the cost bases for the purpose of defrauding Treasury. That is particularly the case where the government introduced evidence that Metivier's LLCs never made a loan payment until after receipt of the grant money.

In short, there was ample evidence from which a reasonable jury could have found that Condron and Metivier conspired to defraud the government.

2.    Wire Fraud

a.    Count 2

Count 2 alleges that on or about September 28, 2012, Condron committed wire fraud by causing another person to transmit by wire "Section 1603 grant application number 2012E48WE214854 submitted online to Treasury on behalf of [Ocean Wave Energy] for $25,204,770." Condron argues that no reasonable jury could find that he committed wire fraud through the submission of the application ending in '4854 where the government has confused the documents submitted in support of the placed-in-service application ending in '2428 (which requested just $9,443 in grant money and for which he was not charged) and the hundreds of start-of-construction applications (which were placeholder applications for a later request for over $25 million and for which he was charged).

The evidence does show that both types of grant applications were submitted for Ocean Wave Energy, as described above. Moreover, the letter referred to in paragraph thirty-nine of the Indictment [Doc. No. 3] was the Industrial Supplies commissioning report submitted in support of the September 28, 2012 placed-in-service application ending in '2428, and not a submission in support of a start-of-construction application. See Day 3 Trial Tr. 35:5-11, 42:17-43:25, 45:19-46:3; Day 5 Trial Tr. 121:10-122:20; Exs. 13.2, 13.3, 44.1.

Nonetheless, the charge is supported by ample evidence where a reasonable jury could have found that, in support of the start-of-construction application, Condron uploaded or caused to be uploaded to the Treasury website the grossly inflated version of CLE's preliminary construction cost estimate that had no basis in fact. See Ex. 13.1.

A variance occurs "when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." United States v. Fornia–Castillo, 408 F.3d 52, 66 (1st Cir. 2005) (quoting United States v. Fisher, 3 F.3d 456, 463 (1st Cir. 1993)). "A

variance may prejudice the substantial rights of a defendant by, for example, depriving a defendant of notice of the charges, subjecting him to prosecution twice for the same offense, or exposing him to the threat that evidence incriminating other defendants might be used against him by a jury." United States v. Prieto, 812 F.3d 6, 12 (1st Cir. 2016). In assessing a claim of prejudicial variance, the court examines "the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict, and determine[s] whether a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009) (quoting United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009)).

In this case, the court concludes that the evidence was sufficient for a reasonable jury to find, beyond a reasonable doubt, that Condron committed the crime, substantially as charged in the Indictment [Doc. No. 3]. The court concludes further that any variance by not *also* charging Condron with a wire fraud count based on the placed-in-service application caused Condron no prejudice.

### b. Count 3

Count 3 alleges that on or about January 11, 2013, Condron committed wire fraud by causing another person to submit to Treasury information regarding Brewer's background and qualifications in response to NREL's January 7, 2013 request for information. As detailed above, the January 7, 2013 email from NREL requested additional information regarding "Andrew Grant, Shirley Brewer, Dave Colombo, Raymond Jarvis, and any other significant contributors (individuals and companies) to the project," including "the relationship, past and present, between these individuals and with the owners of [Kansas Green Energy] and Concord Nurseries." Ex. 46. Colman submitted the following information which, he testified, was given to him by Condron:

> Owner of Industrial Supplies, LLC, and is the contractor who sold turnkey operation to KGE. She also sold turnkey operation to Concord Nurseries. Ms. Brewer has been involved with alternative energy since the late '70s, specializing in thermal, solar, and biomass.

Day 5 Trial Tr. 99:4-17; Ex. 11.13. Condron argues that the statement was not in furtherance of the charged scheme to defraud and was, in fact, true, where Brewer testified that she did have experience with a thermal solar system and a biomass heating system in her home in the 1970s and 80s.

But even crediting Brewer's testimony, a reasonable jury could have found that this response was designed to mislead the government into believing that Brewer had experience with biomass gasification—the subject of the grants—where she purportedly sold millions of dollars of biomass gasification equipment to Metivier. Indeed, "the *locus classicus* of fraud is . . . a statement that is literally true but is made misleading by a significant omission." <u>Bonilla v. Volvo Car Corp.</u>, 150 F.3d 62, 69 (1st Cir. 1998).

c.      Count 4

Count 4 alleges that on or about April 17, 2014, Condron committed wire fraud by causing another person to submit to Treasury information regarding Brewer's background and qualifications related to the Ocean Wave Energy wind farm project. On March 27, 2013, NREL requested more information about Brewer's role in Industrial Supplies and Ocean Wave Energy. Colman uploaded a response, which represented that Brewer and Industrial Supplies had built and sold the barge to Ocean Wave Energy and had no relationship with Ocean Wave Energy except as the vendor.

Condron argues that this response was related to the '2428 placed-in-service application, not the start-of-construction applications, and that the evidence at trial demonstrated that Brewer was in fact the vendor of the wind turbines for the placed-in-service application. However, a

reasonable jury could have found that NREL's question pertained to *all* the more than 500 Ocean Wave Energy applications, not just the placed-in-service application. A reasonable jury could have found further that the response to NREL's question was designed to mislead the government regarding the personal relationships between Brewer, Metivier, and Condron to conceal the fraudulent nature of the underlying transactions. And even if the response related only to the '2428 application, a reasonable jury could still have found that the uploaded response was designed to mislead the government where it did not disclose the personal relationship between Brewer and Metivier, who were the parties to the purported barge sale.

B.    *New Trial*

In the alternative, Condron moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the ground of prejudicial spillover, presumably based on the admission of Metivier's out-of-court statements. Where the court has concluded that the government presented sufficient evidence for a reasonable jury to find that Metivier and Condron engaged in a conspiracy substantially as charged in the Indictment [Doc. No. 3], there was no prejudicial spillover, and a new trial is not warranted.

**V.    Conclusion**

For the foregoing reasons, Condron's Motion for Judgment of Acquittal at the Close of the Government's Case [Doc. No. 444] and Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial [Doc. No. 459] are DENIED.

IT IS SO ORDERED.

May 5, 2022                                        /s/ Indira Talwani
                                                  United States District Judge