UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER CONDRON,<br><br>    Defendant. | Case No. 17-cr-10243-IT |

**DEFENDANT'S EMERGENCY MOTION OF DEMONSTRABLE
ACTUAL INNOCENCE IN VIOLATION OF CONSTITUTION[1]**

Defendant is appalled at the government's failure to follow its most basic duty as to evidence. This failure has resulted in a demonstrably actually innocent citizen being convicted of a crime that never happened and does not exist. This was accomplished in violation of the "Defendant's" basic rights afforded by the Constitution of the United States of America.

In an effort to support Judicial Economy, many of the additional arguments related to demonstratable actual innocence have not been included, for example: the government never established if Engineer Carlos Pena ever knew the specific wind turbine chosen for the project, its make, model, nameplate capacity, cost or importantly the area required for installation purposes, per wind turbine. These data points are required to properly calculate the data included in the preliminary construction cost estimate. Without the correct data points the information is useless and worthless.

The Opinion states:

I Procedural History

---

[1] The undersigned counsel hereby files this pleading in his capacity as standby counsel. The undersigned counsel made revisions to remedy spelling and formatting issues, but otherwise did not change the content of this pleading.

"Specifically, the charges in Counts 2-4 relied on the following wires:" The Opinion ends at this point and does not state which wires it refers.

The Opinion goes on to state:

"Nonetheless, the charge is supported by ample evidence where a reasonable jury could have found that, in support of the application, Condron uploaded or caused to be uploaded to the Treasury website the grossly inflated version of CLE's preliminary construction cost estimate that had no basis in fact. See Ex. 13.1."

Based on the Opinion's elaborate statement of IRS revenue agent Christopher McCarten's analysis, as it relates to Count 3, one may think that agent McCarten did an equally impressive analysis related to Counts 2 and 4, providing the foundation on which the Opinion relies.

However, Agent McCarten did testify at trial to the effect that he did not perform any work related to the Ocean Wave Energy applications. The other interesting point to note is that Agent McCarten did not become involved with this case until after defendant was indicted in August 2017. Was the evidence brought to the grand jury sufficient to warrant indictment?

Based on above, the "grossly inflated" construction estimate "not based in fact" appears never to have been investigated, in any way, whatsoever. The government's statements at trial may have been based more on establishing undue prejudice than fact.

Had any simple long division analysis of the CORRECTED construction estimate "uploaded to the Treasury website" on or about March or April 2013 ever been undertaken using any of the stated values concerning the estimated number of start-of-construction applications, one would easily understand differences that should normally be cause for additional analysis of the values contained in the table.

The Opinion states 551 applications were registered, from Defendant's memory Agent Goodwin emailed the prosecution stating that there were 553 applications, and Attorney Colman in an email to Defendant on or about September 29-October 1, 2012, communicated that 563 applications were registered. As 563 was the only estimate available at the time for the entire Wind Farm's quantity of registered "Start of Construction" applications, it is the only value of applications which matter.

Using CLE's preliminary construction cost estimate, totaling $1,648,387,500. then dividing by any of the values from above, in this example using 551, as it will yield the highest value per application:

$$\$1,648,387,500. \quad / \quad 551 \quad = \quad \$2,991,648.85$$

$2,991,648.85 is the value CLE's version of the construction cost estimate yields, per application. This estimate is dramatically different when compared to the original construction cost estimate contained in application ending '4854, as noted in "Section 5. Anticipated Cost Basis" section "5A. Estimated Cost Basis and Applicable Percentage" of $85,015,900. This difference should have led any analyst to realize that there must be a more detailed analysis undertaken of the values contained in the CORRECTED construction cost estimate "uploaded to the Treasury website," on or about March or April, 2013.

Taking the "Deep dive, pun intended," using trial evidence, the application ending '4854, the CORRECTED construction cost estimate "uploaded to the Treasury website" on or about March or April 2013, and the Invoice from Windspire (which was used at trial to compare wifi dongles) one, more likely than not, would gain a different opinion than the Opinion contains.

Starting with application ending '4854, Section "4D" shows an estimated "Installed nameplate capacity" of "5794kw." How was this value derived? Section "4B" states; "There are......(up to 58 units....) each one less than 100kw." 99.9kw is less than 100kw.

$$99.9\text{kw} \quad X \quad 58 \quad = \quad 5794\text{kw}$$

The "58 units" is the result of dividing 32,500 wifi dongles by 560 estimated applications, below the value Colman had estimated. One may start to think below the estimated number of applications, why? caution, it is better to under estimate certain things like the estimated number of applications, it should give one cushion in case of "mistake."

$$58 \text{ wifi dongles} \quad X \quad 560 \text{ applications} \quad = \quad 32{,}480 \text{ wifi dongles}$$

In reviewing the Windspire Invoice, one should easily understand the description states each wind turbine is rated at "1.2kw." Simply taking the nameplate capacity from application ending '4854 of "5794kw" and then dividing by the size of each wind turbine, 1.2kw, one would gain a result of the estimated quantity of wind turbines per application.

$$5794\text{kw} \quad / \quad 1.2\text{kw} \quad = \quad 4828$$

4828 is the estimated quantity of 1.2kw wind turbines required per application, to achieve installation of "5794kw" or accomplishment of complete build out, per application.

Using the value 4828 derived from above for the quantity of Windspire wind turbines, estimated per application and then dividing the estimated total quantity of wind turbines for the entire wind farm project, contained in the CORRECTED construction cost estimate "uploaded to the Treasury website" on or about March or April, 2013 of 2,679,600, estimated wind turbines, will result in the estimated number of start-of-construction applications used as the multiplier for the CORRECTED construction cost estimate, "uploaded to the Treasury website" on or about March or April, 2013.

$$2{,}679{,}600 \quad / \quad 4828 \quad = \quad 555$$

555 is the estimated quantity of registered applications used in the corrected construction estimate "uploaded to the Treasury website." Thus resulting in a value or estimated registered applications which is, again lower than the value Attorney Colman's estimate and is in fact, "based in fact." Why make a mistake that could cause trouble?

Utilizing the Windspire invoice, which for the total cost of 3 wind turbines, adding the deposit of $5,000., the milestone payment of $5,000., the final payment of $16,696.04 and the shipping cost of $1,321.22 as follows:

$$\$5{,}000. + \$5{,}000. + \$16{,}696.04 + \$1321.22 = \$28{,}017.25$$

$28,017.25 is the estimated cost to Industrial Supplies for 3 wind turbines. Dividing this value by the number of wind turbines invoiced, 3, one would derive the cost per wind turbine to Industrial Supplies.

$$\$28{,}017.25 \quad / \quad 3 \quad = \quad \$9{,}339.0866$$

$9,339.0866 is the estimated cost to Industrial Supplies for 1 wind turbine.

Again, based in the differences between CLE's version of the construction cost estimate and the CORRECTED construction cost estimate "uploaded to the Treasury website", on or about March or April 2013, one should notice that CLE's version states "Purchase & Install" and the "uploaded" and CORRECTED version states "Purchase, Assemble & Install." Meaning, Ocean Wave Energy's cost, stated in the CORRECTED construction cost estimate, "uploaded to the Treasury website", on or about March or April 2013, would to include "Purchase" (and warehouse), "Assemble" (a complex 150+ part wind turbine) "& Install" (the Assembled wind turbine, on a continuously moving barge, then connect to the onboard electrical sub-system) for the cost quoted in the "uploaded" and CORRECTED construction cost estimate .

This cost to Ocean Wave Energy, as contained in the CORRECTED construction cost estimate, "uploaded to the Treasury website", on or about March or April 2013, was $10,556.85. By subtracting the cost per wind turbine to Ocean Wave Energy, from the cost to Industrial Supplies, of $9,339.0866, the result will be the estimated gross profit to Industrial Supplies.

$$\$10,556.85 \quad - \quad \$9,339.0866 \quad = \quad \$1,217.764$$

A gross profit of $1,217.764 should be considered more than reasonable, some would consider this to be a bargain, to cover the costs related to "Purchase, Assemble & Install" each Windspire wind turbine on board a constantly moving vessel, exposed to the variable New England sea side environment.

This gross profit of $1,217.764 results in an approximately 11.5353% gross profit margin. An 11.5353% gross profit margin in return for the services stated should certianly not be considered inflated, and never "grossly inflated."

"Failure of the government to adduce sufficient evidence to warrant submission to the jury is defect affecting substantial rights." United States v. Kaplan 586 F.2d 980 (9th Cir. 1978).

The Opinion states:

III Legal Standards

A. Motion for Acquittal

"Accordingly, the jury verdict must be upheld, unless, viewing the evidence in this manner, no rational jury could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia* 433 US 307, 319 99 S Ct.2781, 61 L. Ed. 2d 560 (1979).

"But in practice the Jackson standard is higher and rarely met where there is plausible evidence to support a verdict." *Tash v. Roden* 626 F.3d 15 (quoting) *C.f. Stewart v. Coalter*, 48 F. 3d 610, 613-16 (1st Cir.) In this instance the evidence relied upon does not exist and there is a

very large quantity of reasonable doubt, once the trial evidence is actually examined. If it please the court, it strongly appears that the higher standard of Jackson, has been met if not exceeded. The Motion for Acquittal, due to the preponderance of the evidence, more likely than not, should have been granted.

Based on defendant's reading related to plain or obvious error, "words "the court" in rule 52(b), providing that plain or prejudicial error may be noticed by court although not brought to it's attention clearly refer to the court noticing the error and such power is not limited to Appellate Courts." *Herzog v. United States*, 77 S. Ct 54, 1L.Ed 2d 59 (1956). As such power is not limited to Appellate Courts, the following should also apply to the "court noticing error." "Appellate courts may on their own motion notice plain error not presented by counsel." *United States v. Atkinson* 56 S Ct.391.

Plain error consists of a 4 step process:

(1) Error Occurred- Obviously the government did not follow it's duty to know the evidence in its possession. There is a very clear and obvious lack of evidence, to support the indictment and the Opinion, which did exist from the very beginning. The government presented evidence in a clearly misleading and prejudicial manner, using deceit, trickery and/or craft to overcome clear it's lack of any evidence. The government's presentation, which was not "based in fact" more likely than not created undue prejudice. Undue prejudice, meaning- "the harm resulting from a fact-triers being exposed to evidence..... that so arouses the emotions that calm and logical reasoning is abandoned." Blacks Law Dictionary 8th Ed. Many people in the United States have an emotional response to money and there are numerous examples, from overwhelming happiness to suicide and worse. If not explained, a difference of billions of dollars to the average person would likely present an emotional response.

(2) The error which occurred was plain or obvious. See above.

(3) The error affected defendants substantial rights. There is literally no evidence of any crime and certainly not the required elements of wire fraud, necessary to convict. These elements include "(2) the use of.... interstate wire communications in furtherance of the scheme." *United States v. Sawyer* 85 F.3d 723 (1st Cir. 1996). The Corrected construction cost estimate "uploaded to the Treasury website" is not fraudulent or in furtherance of a non-existent scheme.

Defendant believes that the mathematics demonstrated, which result in an approximate gross profit margin of 11.5353%, should create plenty of reasonable doubt as to if there ever was "a scheme to defraud." As "the best way to gauge the seriousness of a fraud offense is to determine how much the fraudster sets out to swindle-- and no fraudster sets out to swindle sums that he would have been paid anyway." *United States v. Rivera-Ortiz*, 14 F.4th 91 (quoting) *Alphas* 785 F.3d 783. Based on the above calculations, of an approximately 11.5353% gross profit margin, there was no swindle or fraud as an approximate 11.5353% gross profit margin should be considered "permissible." Evidence both direct and circumstantial illustrating such scheme to defraud never existed, as the trial evidence clearly shows there was no scheme to defraud.

Furthermore, as any additional analysis of the values contained in the CORRECTED construction cost estimate "uploaded to the Treasury website" on or about March or April 2013, will demonstrate defendant never had any "specific intent to defraud." Intent to defraud "Excludes false statements honestly believed to be true and promises or predictions made in good faith." *United States v. Muffelman* 470 F.3d 33, 36 (1st Cir. 2006) Clearly the values contained in the CORRECTED construction cost estimate, "uploaded to the Treasury website" on or about March or April 2013, were predictions. These predictions were "made in good faith."

With the computations stated in formula, the "good faith" requirement should be more than easily met.

The fourth (4th) prong of plain error review is if the decision has "Seriously impaired the fairness, integrity or public reputation of the judicial proceedings." In this case a clear Miscarriage of Justice exists. A Miscarriage of Justice is "- A grossly unfair outcome in a judicial proceeding, as when a defendant is convicted despite a lack of evidence on an essential element of the crime. Also termed a failure of Justice." Blacks Law Dictionary 8th Ed.

In cases involving constitutional errors, courts duty is to reverse, unless it is able to declare belief that plain error is harmless beyond a reasonable doubt." United States v. *Hernandez-Berceda*, 572 F.2d 681 (9th Cir 1978). It has long been the established law of the land "proof of a criminal charge beyond a reasonable doubt is constitutionally required." *Pierre-Louis v. Ryan* 147075 (quoting) *In re Winship*, 397 US 358, 362 90 S. Ct. 1068, 25 L. Ed. 2d 368, (1970).

Defendant wishes the court to correct this error, by dismissal as the evidence pointed to in the Opinion is false. If the court does not agree that there was a clear lack of evidence to have ever brought this, un-investigated claim to the grand jury, defendant requests acquittal. If for any reason of fact that these 2 options are unavailable the defendant requests Reversal of the charges.

Dated: September 27, 2022                                   Respectfully submitted,


                                                            */s/* Christopher Condron
                                                            Christopher Condron

- 10 -

## CERTIFICATE OF SERVICE

I, Seth B. Orkand, in my capacity as standby counsel, certify that I caused the foregoing motion to be delivered to counsel for the government by ECF on October 18, 2022.

*/s/ Seth B. Orkand*
Seth B. Orkand