# UNITED STATES DISTRICT COURT

## District of Massachusetts

**United States of America**

      **v.**                               **Case No. 17-cr-10243-IT**

**Christopher N. Condron**

    **Defendant**

## EMERGENCY MOTION TO REQUEST CLARIFICATION OF TERMS USED AT TRIAL AND FINDINGS CONTAINED IN THE OPINION

These clarification questions, currently appear to be plain or obvious, material mistakes of fact, law or a combination. Which if not individually, then in cumulative effect likely warrant reversal.

They are as follows;

    A. The Lockheed-Haggerty kiln is an ELECTRIC KILN, and DOES NOT HAVE "BURNER(S)".

    B. Under 1603 and IRC 45, based upon law, Biodiesel, is or is not a qualifying fuel, for a "Trash Facility" and the "1603 Program".

C. DETERMINATION OF HOW "PLACED IN SERVICE" IS ACTUALLY MET.

D. Under 1603 Program Guidance and IRC 45, 46 and 48, an actual decision, based on the relevant law, FOR DETERMINATION OF THE DATE, EQUIPMENT WAS, IN FACT, "PLACED IN SERVICE".

E. TESTING REQUIREMENTS FOR DETERMINING EQUIPMENT HAS BEEN, "PLACED IN SERVICE", FUNCTIONALLY INTERDEPENDANT, VERSE FUNCTIONALLY INDEPENDENT.

F. What is the "significant omission" related to Count 3

G. What is the date the "investigation" actually started and likely exculpatory evidence, potentially, may not be included with discovery materials.

A. **DOES AN ELECTRIC KILN, HAVE "BURNER(S)"**

"The purpose of the seals was to keep flammable gas from coming into contact with the burners and causing an explosion. Id. at 92:7-12."

This statement clearly conflicts with trial evidence. The information sheet from World Wide Recycling, states the kiln in question is an "electric" kiln. An electric kiln and most certainly the one in question does not have any "burners" for the produced gas to come in contact with. Mr. Sayer, does typically work with direct and indirect "fired" units, however, the Lockheed-Haggerty kiln is not "fired" at all.

In fact, the purpose of the electric kiln was to increase the operating safety of that functionally independent unit of property. The statement from the Opinion is clearly a material mistake of fact and not a clerical error, as to the type of equipment involved with Count 3.

**Electric Kiln does not have "Burners".**

## B. **IS "BIO-DIESEL" A QUALIFYING FUEL FOR A "TRASH FACILITY" and THE 1603 PROGRAM**

From the Opinion; "II FACTUAL BACKGROUND"

"4. Second Kansas Green Energy Application and NREL Follow up"

"(a) ...This was important because biodiesel was not a qualified fuel source under Section 1603"

At trial Mr. Settle did testify, that "Biodiesel" was not a qualifying fuel source for "Biomass". Mr. Settle did not testify, that Biodiesel was not a qualifying fuel source for the 1603 program or a "Trash facility". A non-qualified fuel source does not "disqualify" a project from eligibility.

For example:

Page 16, of the 1603 Program Guidance, does state:

"Limitation on eligible basis. The eligible basis of a qualified facility does not include the portion of the cost of the facility that is attributable to a non qualifying activity. For example, for a biomass facility that burns fuel other than open-loop biomass or closed-loop biomass, the eligible cost basis that is equal to the percentage of the electricity produced at the facility that is attributable to the open-loop biomass or closed-loop biomass......."

There is also a formula contained in the "Placed in Service" applications, section 4A, this formula, which is designed to parse out non-qualifying fuel sources, specifically states "fossil fuel", from qualifying fuel sources for open-loop biomass facilities. This statement does not apply to a "Landfill gas facility", "Trash facility" nor a "Fuel cell property".

Page 12 of the 1603 Program Guidance states:

"An open-loop biomass facility does not include:"

"A facility that burns fossil fuel (co-firing) beyond such fossil fuel required for startup and flame stabilization;"

The placed in service application, also uses the term "fossil fuel" verse "non-qualifying fuel", etc., however, this document is currently unavailable to defendant as the Wyatt Detention Center has lost Defendant's legal research, case notes, legal research, evidence and important drafts required for sentencing purposes, thus defendant is unable to properly quote this section. Fortunately, the placed in service application is included in "trial evidence" as is the 1603 Program Guidance.

Based on above, a "Biomass facility" can burn "fossil fuel" for startup and flame stabilization without adjustment to the cost basis/award. If that same facility burns "fossil fuel", beyond startup/flame stabilization, that portion of energy produced from "fossil fuel" is non-qualifying, and the cost basis is reduced by the applicable percentage of energy produced by "fossil fuel". However, the facility still qualifies for reimbursement purposes. This seems to indicate, a biomass facility that uses a non-qualifying "fossil fuel" still qualifies for the 1603 program. This also tends to indicate that "unblended" (B-100) "biodiesel", is a qualifying fuel source, as it does not contain "fossil fuel".

More likely than not, a "Biomass Facility", that has experienced a reduction in cost basis due to the use of "Biodiesel", may have opportunity to challenge that determination, as "biodiesel" is not a fossil fuel, thus should be considered as a qualifying fuel for a "Biomass Facility". This is especially true, as rule making for the 1603 program, was out of compliance with the Administrative Procedures Act.

### "Bio-Diesel is a qualifying fuel for the "1603 program"

However, this may all be moot, as the Opinion appears to, materially mistakenly identify, the Kansas Green Energy project as a "Biomass" facility. This a material mistake of fact, as to the type of qualifying facility, is not clerical or harmless error, and likely another contributive Cumulative, Plain or Obvious Error, the court under its own discretion may motion to review the error(s).

"IV. Discussion

   A. Sufficiency of the Evidence

   2. Wire Fraud

   b. Count 3

"But even crediting Brewer's testimony, a reasonable jury could have found that this response was designed to mislead the government into believing that Brewer had experience with **biomass gasification-the subject of the grants**-where she purportedly sold millions of dollars of biomass gasification equipment to Metivier. Indeed, "the locus classicus of fraud is . . . a statement that is literally true but is made misleading by a significant omission." Bonilla v. Volvo Car Corp., 150 F.3d 62, 69 (1st Cir. 1998)."

  Apparently, a significant omission or perhaps foundational, cumulative, plain or obvious error, and material mistake, may be that, the Kansas Green Energy system, was a "Trash" Facility and not a "biomass" facility, as quoted above, from the sufficiency of the evidence contained in the Opinion.

## "II. Factual Background"

D. Kansas Green Energy

"Condron next worked on Kansas Green Energy, a project to use municipal solid waste to produce electricity.6 Day 4 Trial Tr. 107:16-25."

"2. First Kansas Green Energy Application and NREL Follow-up"

"Colman submitted the first Kansas Green Energy application for a trash facility on July 10, 2012, under a power of attorney granted to him by Metivier. Day 4 Trial Tr. 118:9-15; Exs. 9.4, 41."

4. Second Kansas Green Energy Application and NREL Follow-up

"As with the first application, the second was for a trash facility,........"

## KANSAS GREEN ENERGY IS A "TRASH FACILITY" NOT A "BIOMASS FACILITY".

A "Trash facility", such as KGE, has a different definition for what is a qualifying fuel source, than other types of 1603 program, designated facilities. The 1603 Guidance, on page 5, shows a listing for a "Trash facility" under IRC sec. 45. As stated in emails to Mr. Settle, which are somehow, not included in the Office of Inspector General's report, which shows a last date of action as, mid-January, 2013 for Kansas Green Energy. Even though Mr. Settle did ask questions after the stated end of action, which were then answered by Attorney Colman, about February or possibly March 2013. Those questions and answers in part, related to fuel type, and Colman did clearly state "Biodiesel" produced from "Waste Vegetable Oil" (WVO), as J.P. Noonan, a New England regional fuel dealer, stated they would easily be able to supply the KGE project.

In fact, <u>Mr. Settle and the NREL</u> have made a mistake as to the plain reading of 42 USC 6903 (27), regarding what does, and does not qualify as a "Trash facility" and the types of qualifying fuel contained in "Solid Waste". "<u>Mr. Settle</u> testified he never formally communicated with the Environmental Protection Agency, the agency that oversees regulation of solid waste, 42 UCS 6901, about this question, but that he had a conversation with an unidentified person from the Environmental Protection Agency....." Unidentified?? "In cross-examination <u>Mr. Settle</u> reemphasized that the distinguishing factor as to whether or not plaintiffs' facilities qualified as trash facilities was due to NREL's conclusion that the anaerobic digesters feeding the RP1 and SJ-1 projects were not running off of municipal solid waste."

"*Unpublished decision:* Because sludge, **wastewater sludge** and biosolids that entered anaerobic digester fit within definition of solid waste under Solid Waste Disposal Act, plaintiffs fuel cell facilities qualified as trash facilities pursuant to I.R.C. 45(d)(7). RP1 Fuel Cell, LLC v United States, 120 Fed. Cl. 288, 115 A.F.T.R.2d (RIA) 1269 (2015)."

**"45. Electricity produced from certain renewable resources, etc.**
**(c) Resources.**
**(6) Municipal solid waste.** The term municipal solid waste has the meaning given the term solid waste under section 1004(27) of the Solid Waste Disposal Act (42 U.S.C. 6903), except that such term does not include paper which is commonly recycled and which has been segregated from other solid waste (as so defined)."

Title 42, Chapter 82;
**"6903. Definitions**

<u>**(27)** The term solid waste means any garbage, refuse, **sludge from a waste treatment plant,** water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from</u>

<u>community activities</u>, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880) [33 USCS 1342], or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 USCS 2011 et seq.].

**The NREL's decision was in complete conflict with the simple reading of 42 USC 6903 (27) and the ruling Court.**

Clearly, 42 USC 6903's definition does include "liquid", and does not exclude, "WVO" or a recycled product derived from WVO, from the definition of "solid waste".

In short, Biodiesel, made from "trash", under the law, 42 USC 6903, (27), is still treated as "trash". 42 USC 6903, (27), is the same law and definition, which, 1603 Program sighted for definition purposes, of qualified fuel, for a "Trash facility". Definition (27) of 42 USC 6903, does note very specific items not included in the definition of "solid waste", none of which is "Waste Vegetable Oil" or "Biodiesel". As such, operation on "Biodiesel" made from "WVO" is a qualifying activity, for a "Trash facility" and would count towards "testing" and "placed in service", which we will get to. Another interesting point from the RP1 Fuel Cell decision, is natural gas is not considered a disqualified fuel for a "fuel cell facility".

From defendant's memory, the 1603 FAQ's, numbers, 33 and 34 discuss this or is closely related, and may be worth a review.

NONE OF THE STANDARDS ABOVE, HAVE EVER BEEN INTRODUCED BY THE GOVERNMENT, TO ATTEMPT TO PROVE BEYOND REASONABLE DOUBT OR ANY OTHER MEASURE, THAT USE OF "BIODIESEL", MADE OR NOT MADE FROM "WVO", IN A "TRASH FACILITY" IS A DISQUALIFYED ACTIVITY.

IN THE ALTURNATIVE, THE OPINION APPEARS TO ATTEMPT TO STATE, "PLACED IN SERVICE" REQUIREMENTS WERE NOT MET, THRU USE OF BIODIESEL, DERIVED FROM WVO, IN A TRASH FACILITY, WHICH DOES NOT APPEAR TO BE INCOMPLIANCE WITH THE LAW, CASE LAW, REGULATIONS OR 1603 GUIDANCE.

**BIO-DIESEL IS A QUALIFYING FUEL, AND ITS USE IS A QUALFYING ACTIVITY FOR A "TRASH FACILITY".**

**It is also important to note, among the numerous mistakes, contained in the Pre-Sentence Investigation report, which are inconsistent with fact, law and in this**

**instance, 42 USC 6903, which defines qualifying fuel sourece for a "Trash" or "Solid Waste" facility under the 1603 Program. The Pre-Sentencing Investigation report, states "plant and animal matter" is not a qualifying fuel for a "Trash facility", this is not correct by any stretch.**

### C. **HOW IS "PLACED IN SERVICE", IS DETERMINED.**

"When determining whether or not I.R.C. 48, Energy credit, should be interpreted keeping the intended use of a property in mind, a neighboring provision of the Internal Revenue Code, I.R.C. 46, Amount of credit, is instructive. Although I.R.C. 48 determines what types of facilities are eligible for an investment tax credit, I.R.C. 46 determines the amount of credit that a specific facility should get, based on a number of factors. The regulations promulgated under I.R.C. 46, Treas. Reg. 1.46 et seq., explain how to determine the amount awarded for an investment tax credit, as well as what is a part of the qualified cost basis for the investment tax credit. A review of the regulations supports the conclusion that I.R.C. 46 and 48 are related; while I.R.C. 48, Energy credit, defines broadly which facilities are eligible for an investment tax credit, I.R.C. 46, Amount of credit, and its accompanying regulations, clarify which components of the facility fall within the ambit covered by the tax credit, depending, for example, on when the individual components were placed in service. Treas. Reg. 1.46-3(d). Go To Headnote" RP1 Fuel Cell

"In applying the placed in service test of I.R.C. 46(c) (1954) and Treas. Reg. 1.46-3(d), <u>courts have determined when property was first operational.</u> For example, an air conditioning unit <u>will be placed in service in the year of installation although taxpayer does not use it until the next year.</u> A scrap-metal shredder and link-belt crane <u>will be placed in service in the year assembled and will be found to be operational although not used until the next year because the power company failed to connect the electrical lines.</u> Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 1985 U.S. Tax Ct. LEXIS 89 (T.C. Apr. 18, 1985), aff'd, 1986-2 U.S. Tax Cas. (CCH) P 9789, 803 F.2d 1572, 59 A.F.T.R.2d

(RIA) 304, 1986-2 U.S. Tax Cas. (CCH) 9789 (11th Cir. 1986), not acq., 1988-2 C.B. 1 (I.R.S. 1988), not acq., Action on Decision CC-1988-022 (I.R.S. 1988), not acq., 1988-2 C.B. 1.

"Treas. Reg. 1.46-3(d)(2) gives examples of property that shall be considered ready and available under the statute: (2) In the case of property acquired by a taxpayer for use in his trade or business (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function: <u>(i) Parts are acquired and set aside during the taxable year for use as replacements for a particular machine (or machines) in order to avoid operational time loss.</u> (ii) Operational farm equipment is acquired during the taxable year and is not practicable to use such equipment for its specifically assigned function in the taxpayers business of farming until the following year. <u>(iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects."</u> Hall v. United States, 1997-2 U.S. Tax Cas. (CCH) P 50823, 97-2 U.S. Tax Cas. (CCH) 0823, 80 A.F.T.R.2d (RIA) 1997-6213, 80 A.F.T.R.2d (RIA) 97-6213, 1997-2 U.S. Tax Cas. (CCH) 50823, 97-2 U.S. Tax Cas. (CCH) P50823, 1997 U.S. Dist. LEXIS 13286 (D. Minn. July 17, 1997).

**Based on above, Property can be "Placed in Service", in the year of installation, or when acquired and is "operational", but is undergoing testing to eliminate defects (like repairing, seals on the kiln).**

**"PLACED IN SERVICE" DOES NOT RELY ON ACTUALLY PERFORMING QUALIFIED ACTIVITIES OR PERFORMING THOSE ACTIVITIES IN THE SAME YEAR, AS EQUIPMENT IS ACTUALLY "PLACED IN SERVICE".**

**"READY AND CAPABLE" IS NOT THE SAME AS "OPERATING".**

This appears to be another cumulative error a material mistake of law and fact, which could amount to plain or obvious error, and not a clerical or harmless error, as the KGE project is qualified as placed in service.

### D. <u>DETERMINATION OF THE DATE EQUIPMENT WAS, "PLACED IN SERVICE".</u>

1603 guidance, page 3 states; "If an applicant is applying for Section 1603 payments, for <u>multiple units of property</u> that are treated as a single, larger unit of property (see Section IV. D. below), all such units may <u>be included in a single application."</u>

Page 7 states:

"<u>D. Units of Property</u>" "For purposes of determining the beginning of construction of property or the <u>date property was placed in service</u> all components of a larger property are a single unit of property if the components are functionally interdependent. Components of property that are produced by, or for, the applicant are functionally interdependent if the placing in service of one component is dependent on the placing in service of other component".

"For example, on a wind farm for the production of electricity from wind energy, the electricity generating wind turbine, its tower and its supporting pad are a single unit of property. Each wind turbine on the wind farm can be separately operated and metered and can begin producing electricity individually. A control system on a wind farm that optimizes the operation of the farm is a unit of property that is separate from the wind turbines."

"The owner of <u>multiple units of property</u> that are <u>located at the same site</u> and will be operated as a larger unit may elect to treat units (and the property, such as a computer system, that serves some or all such units) as a single unit of property for purposes of determining....<u>the date the property is placed in service</u>."

"For example, in the example noted above if only 40 of the planned 50 turbines were placed in service by the credit termination date, an otherwise eligible applicant would be eligible for a payment based on the 40 wind turbines placed in service."

The credit termination date appears on page 5 of the 1603 Program Guidance. Row "Trash Facility"; column "Credit termination date", row/ column "Jan. 1, 2014."

The purpose of this section is to determine if "placed in service" requirements were met regarding the date stated in the KGE application(s) is correct or not.

Basically, if a computer is placed in service on January 1, 2009, then a "single unit of property" is placed in service, every week thereafter, and the final "smaller unit" of property is placed in service, before the credit termination date, of January 1, 2014, then the date the "larger unit of property" is placed in service is, **A) determined by the applicant and B) can be any date between January 1, 2009, and January 1, 2014,**

**For example, if the first "smaller unit" of property was placed in service, on or about December 19, 2011, and the last unit of property was placed in service before the credit termination date, for example, May 1, 2012, then the proper date placed in service was achieved, could be almost anywhere in between or after.**

Opinion states:

"As of Sayre's visit on December 19, 2011, the generators, were running, id. at 130:12-131:4,"

This actually could be one of many dates, which serves as the date the entire, "system" or "larger unit of property," was placed in service. Interestingly the Opinion goes on to incorrectly state:

"but they had not yet been connected to the kiln, and the system was far from operational, id. at 103:5-20."

This is simply a mistake. By the 19th of December 2011, 5 of the 7 generators for the KGE project, were ready and capable, for their intended purpose. The only unit at that time, under "repair" was the kiln. As we just learned, undergoing testing to eliminate defects such as repairing, seals on the kiln, Allows the kiln to be "placed in service".

The 3 generators, purchased from World Wide Power, located in Texas, and tested earlier, on about October or November 2011, by World Wide Power, using "V-5" biodiesel, were in fact, each a "smaller unit of property", able to <u>operate independently</u>, on the same site, and their "construction" was completed at the time of testing. <u>This test date, according to the 1603 Program Guidance, is also allowed to be the date the KGE system, was "placed in service".</u>

"In sum. Courts appear to agree that individual components will be considered as a single property for tax purposes when the component parts are functionally interdependent-when each component is essential to the operation of the project as a whole and can not be used separately to any effect. <u>The converse, thus, should be equally valid in this case. Accordingly, if a project has component parts which can function as planned in a wholly independent manner</u>, then a court may find that each component is a 'property....placed in a condition or state of readiness and availability for a specific function." Armstrong World Indus., Inc. v. Comm'r 974 F.2d 422, 434 (3rd Cir. 1992) quoting Consumers power Co. v. Comm'r, 89 T.C. 710, 723 (1987)....RP1 Fuel Cell, LLC v. United States 120 Fed. Cl. 288.

The 2 Waukesha Generators, were to operate on "Biodiesel" made from WVO, as stated to Mr. Settle on numerous occasions, which again allows these generators to be <u>able to function independently</u>, on the same site. <u>Because the generators could work on the syngas does not make that their intended purpose.</u>

The point is, as stated in the Opinion, the Waukesha generators were "running", as a result they were ready and capable of performing their intended function and were in fact, "running" which we have read is not a requirement to be considered "placed in service".

Construction of the system was more than complete, and more than certainly, the "smaller unit(s) of property" the 5 generators mentioned, were complete, and "placed in service".

Yes, the kiln required repair, again, repair, elimination of a defect, not construction.

Based on the fact the Kiln was electric and not "fired" there was no danger of gas coming in contact with "the burners". Without this hazard, the kiln was more than able to be "tested" at a certain level and/or duration of function and found to be ready and capable as noted above, and explained below.

**December 19, 2011 or before (the date of testing by World Wide Power) could also be used as the placed in service date, for the entire KGE system or "larger unit of property". As the date a larger unit of property is "placed in service" is based on the date the first or any other unit of property was "placed in service".**

The determination of the date the KGE system was "placed in service" appears to be another cumulative error, a material mistake of law and fact, which could amount to plain or obvious error, and not a clerical or harmless error, as the KGE project is qualified as placed in service and the date contained in the application is correct. The court is empowered to review under its own motion, in an effort to protect defendants civil rights.


E. **TESTING REQUIREMENTS FOR DETERMINING EQUIPMENT HAS BEEN, "PLACED IN SERVICE", FUNCTIONALLY INTERDEPENDANT, FUNCTIONALLY INDEPENDENT.**


From the Opinion:

"When the contractors finished, each component of the system had been tested, but it had never run as a complete system; the contractors had never gasified wood chips or used the syngas to run the generators because the kiln had not been repaired. Id. at 107:20-108:20."


First would the court please clarify "when the contractors finished, each component of the system had been tested." This appears to be contradicted by "the kiln had never gasified wood chips" and "the kiln had never been repaired". How could the Opinion state "each component of the system had been tested", this appears, one way or the other, to be another Cumulative or Plain / Obvious Error, and not clerical or harmless.

Does the Opinion state, the contractors supplied by World Wide Recycling, to complete a job which an insurance claim was involved, reviewed upon completion by the insurance company's adjuster, then the insurance company made the final payment for completion of the repairs. How was this equipment not repaired???

The second part of the question is if all the components were tested, and Brett ....... Did testify that he personally had tested the kiln "on wood chips". How is the statement in the Opinion, even possible? Other than a Plain or Obvious error/misconception/mistake as to the requirements of "Placed in Service"??

"The owner of <u>multiple units of property</u> that are located at the same site and will be operated as a larger unit may elect to treat units (and the property, such as a computer system, that serves some or all such units) as a single property for purposes of determining....<u>the date the property is placed in service</u>."

The Opinion still attempts to cling to "had never run as a complete system", but this is also a misconception. If the parts are functionally interdependent then they must be tested as a single unit. However, if they are not functionally interdependent, then they can be tested separately, or in some combination. For example the kiln does make gas by itself and can by itself make gas, or operate a generator. This gas can be used to test the gas cleaning and polishing equipment, etc.

"In sum. Courts appear to agree that individual components will be considered as a single property for tax purposes when the component parts are functionally interdependent- when each component is essential to the operation of the project as a whole and can not be used separately to any effect<u>. The converse, thus, should be equally valid in this case. Accordingly, if a project has component parts which can function as planned in a wholly independent manner</u>, then a court may find that each component is a 'property....placed in a condition or state of readiness and availability for a specific function." RP1 Fuel Cell, LLC v. United States 120 Fed. Cl. 288. (quoting), Armstrong World Indus., Inc. v. Comm'r 974 F.2d 422, 434 (3rd Cir. 1992) quoting Consumers power Co. v. Comm'r, 89 T.C. 710, 723 (1987)

**Based on above, the Kiln owned by KGE, is electric and there are no burners for the gas to come in contact with.**

**Biodiesel, especially made from Waste Vegetable Oil, is a component of "Trash" or "Solid Waste" and is not disqualified as a component of "Solid Waste". According to Settle's testimony, the "NREL" was completely incorrect and inapposite of the law, regarding components of "Solid Waste" as defined in 42 USC**

6903, related to the RP1 Fuel Cell and its sister project's Decision, by the ruling court.

**The system did satisfy the requirements to be considered "placed in service", "on or before December 30, 2011".**

**"Smaller units of property" operated on the same site, can be part of a "larger unit of property" for determining the date, the larger unit of property was "placed in service".**

Components which are not functionally interdependent can be, "Placed in Service", individually, at the time, components are ready and capable, for their intended purpose. (We can discuss "intended purpose" of the energy producing property, if anyone so wishes).

Determining the date a "larger unit of property", is "Placed in Service" or achieves "Start of Construction", is permitted to be based, on the date the first or any other "smaller unit" of property, was originally "placed in service". For example, based on trial evidence, KGE's "Placed in Service" date, could have been December 19, 2011. KGE's Placed in Service date could have also been earlier. Furthermore, energy producing property can be "Placed in Service", in the year of installation, or when acquired and is operational, but is undergoing testing to eliminate defects (like repairing, seals on the kiln).

Mr. Settle's claim, related to construction time table, is also not based in fact, or experience. It is also not, based on when Engineer Colombo, started his work on the original plans for the KGE project, nor, is Mr. Settle's opinion, based on the fact that 2 of the Green Houses in Concord, were the same size, as 12 of the Green Houses for the KGE project, in Wareham/Rochester, providing the electrical contractor with correctly made plans and a possible start date before Engineer Colombo, even began his work on the KGE project. Mr. Settle is not a "Construction Engineer" and has never successfully built a "gasification" system. We could always ask him, back to the First District, to ask him if he has successfully constructed a gasifier.

Defendant contends, based on the 1603 guidance, relevant case law and regulations, that the Kansas Green Energy System did, in fact, very likely exceeded the requirements of "Placed in Service", on or before December 30, 2011. Any issues regarding "Placed in Service" requirements for Acton Bio Energy, Concord Nurseries and the Ocean Wave Energy, "placed in service" application ending '2428 are simply and clearly additional misunderstanding or misapplication of the governing law, and Plain or Obvious orror, as it relates to "Placed in Service" requirements.

The application of functionally interdependent and functionally independent, testing appears to be another cumulative error, a material mistake of law and fact, which could amount to plain or obvious error, and not a clerical or harmless error. The KGE project is qualified as "placed in service" as the requirements to support the date contained in the application is correct.

### F. What is the "significant omission" related to Count 3

**Clearly the Placed in Service conditions were met, according to the law, "on or before December 30, 2011".**

In relation to Count 3, the Opinion, clearly states that there is an omission of some type. Is that omission, as noted above, that KGE was a "Trash" facility and not a "Biomass" facility? Or was the "significant omission" the fact that neither "Biomass" nor "Gasification" is mentioned in the apparent sentences in question, after "crediting Brewers testimony", to the NREL, or is the "significant omission" the fact that the omission the Opinion seems to point, is not plainly stated or finally is the "significant omission" a purported, undisclosed "relationship", between Metivier and Brewer?

**This very important for sentencing purposes.**

### G. What is the date the "investigation" actually started, and likely exculpatory evidence, potentially, may not be included with discovery materials.

Again, with the completely inconsistent Pre-Sentencing Investigation report, which states "IN on or about April 2013 Treasury denied KGE's grant application and referred the matter to the Internal Revenue Service ("IRS"). In on or about June 2013, the IRS began an audit of the 1603 grant applications for Acton Bio, Concord Nurseries and KGE."

The government has stated to the effect, the "Investigation started January 13, 2013".

Neither of these is correct. This is a simple and material fact, which should be based in Fact. This material mistake, could also be another factual, cumulative, plain or obvious error and is not clerical or harmless, as it is a material fact that should be known and consistent. The court under its own motion is empowered to notice plain or obvious error.

"F. *IRS Audit*"

"At some point in 2012, the Internal Revenue Service ("IRS") began a civil audit of Acton Bio Energy, Concord Nurseries, and Kansas Green Energy. Day 3 Trial Tr. 72:1-73:1.

   This is factually incorrect, first of all, the IRS does not "audit" it "examines". The Opinion does not state, exactly when the IRS "examinations" began, for **Acton Bio Energy, by the IRS Small Business Division, approximately, within 1 week after the 2012 election, and Concord Nurseries, by the IRS Large Business and Individual Division, approximately, within 1 month after the 2012 election. KGE's "exam" was not open, until about February or March, 2013.** There is much more credible, direct and circumstantial evidence as to the IRS activities, that may be more than questionable.

   These facts are odd, in and of themselves, for one tax payer to have 2 "open exams", initiated separately, from 2 different divisions of the IRS, within 1 month, is a mathematical anomaly, at best.

   When Walsh and Associates asked why the two exams were opened, Agent Marquez's notes form about December 2012, state the answer given by IRS, with a number of question marks after, as a truthful answer was simply and clearly not known.

   **However, we must remember that this was during the time of the "Lois Learner" related "Targeting (of conservatives) Scandal". Attorney Colman, did make a sizable contribution to then, United States Senator, Scott Brown, a Republican, about a month before the election. The exams started just after the 2012 election....**

   In IRS Agent Marquez's notes, she states to the effect, on or about May or June 2013 **"this could appear to the TP as targeting".** An email from attorney Colman to defendant, about April or May of 2013, states "the extra scrutiny may be related to my contribution to (Sen) Scott Brown". This gains momentum when one realizes Attorney Colman's name, the only name on the application, appeared as applicant.

**Defendant sincerely hopes that none of these dates are when the "investigation started".**

From the Opinion;

As a result of the June 19, 2013 visit, "The case was ultimately referred for a criminal investigation. Id. at 197:1-2." This referral was not made until on or about July 7, 2013. The letter from the IRS Criminal Division, notifying Metivier of a criminal investigation, on or about late September of 2013, and to defendant's knowledge not contained in discovery materials. The letter from the CI division is potentially exculpatory evidence. On or about the date contained in the letter, is when Metivier was first notified of any "Investigation". It is important to note that Attorney Colman's guidance about April, May 2013, in an email to defendant, states "the extra scrutiny may be related to my contribution

to (Sen) Scott Brown". Clearly at this point there advisors had no idea that the IRS was involved in anything other than "extra scrutiny" of the entities, par for the course.

The case was ultimately referred for investigation, one can only conclude that the "investigation" was not started until after the civil division was finished with their "examination", sometime after June 19, 2013, as they were clearly still working on the exams at that time. IRS Criminal Division, had started an "Investigation". Again from the Opinion:

"The initial purpose of the <u>audit</u> was simply to verify, with Metivier's cooperation, whether she had in fact purchased the gasification equipment and placed it in service on the dates suggested in the grant applications. <u>Id.</u>"

"As part of the <u>audit</u>, Agent John Cinkala....."

"The <u>auditors</u> were eventually,...."

Audit, audit, auditors, not "investigation" or investigators.

The "Investigation" appears to have been initiated, much later than any of the 3 variations above.

"G. *Criminal Investigation*"

> "Agent John Wlodyka, a supervisory special agent for IRS's criminal investigations division, was the lead agent on the case. Day 11 Trial Tr. 95:21-96:9."

If Agent Wlodyka, was "the lead agent on the case", how could Agents Cinkala or Marques have participated in an investigation before there a lead agent was assigned to the (Criminal Investigation) case, by almost a year? Again, now with likely cumulative, plain or obvious error, which the court is empowered, under its own motion, to review, as defendant was not aware of any Investigation until on or about, September, 2013.

If the date the investigation started was before the September 2013 date defense believed the investigation to have started, this change of date will survive the newly found evidence requirements and is grounds for a new trial. If the investigation started when the Opinion or the Government states, then all the questions asked by Mr. Settle which form the basis of the charges against the defendant, are grounds for entrapment. These were asked after an investigation, would have been started based on now current statements in court documents. In addition, the questions asked by Mr. Settle related to the "Start of Construction" or "place holder" applications were far beyond the statutory limit.

1603 Program Guidance, page 3, paragraph 3;

*"For property not yet placed in service at the time of the application, Treasury will review such applications and notify the applicant if all eligibility requirements that can be determined prior to the property being placed in service have been met. If so notified, applicants must then submit, within 90 days after the date the property is placed in service, supplemental information sufficient for Treasury to make a final determination.*

Mr. Settle's questions, related to the "Start of Construction" "place holder" applications were not authorized by the Regulations. If the regulations and law does authorize these questions, which is very unlikely, then the disclaimer contained on all the "clarification questions" that stated to the effect, the "application will be denied" if "Mr. Settle's questions are not answered" and/or to the effect "the applicant has 21 days to answer or the application will be denied", should not have appeared with the questions, which are in trial evidence.

According to the plan reading above, "*If so notified, applicants must then submit, within 90 days after the date the property is placed in service*", these questions should never have been asked or answered. This notification, is to be answered within 90 days of (after) the placed in service date. The notification is based on application eligibility requirements. A narrative of the entire project is completely unrelated to the purpose of the "notification" and not authorized under the code, in any manner, which leads one to question the motive behind these "clarifications" asked by Settle. Based on emails from Settle to prosecution, stating he was asked to review these "place holder" applications….

Mr. Settle never stated when exactly he referred this for "investigation". Based on the governments stated date of about, January 13, 2013 their hope may have been that Settle referred the matter on or about January 13, 2013.

There is no evidence as to the steps that Mr. Settle actually took, to notify the Treasury or the IRS. Or if the IRS notified Mr. Settle that it was involved in an exam. The undated, Treasury memo appears not to have been received by IRS until early March 2013, which does coincide with the end of Mr. Settles questions related to the KGE project, and are not contained in the OIG report for the second KGE application. Again, applicant kept answering questions in good faith, until Mr. Settle, once again violated 1603 protocol and regulations which were specifically stated by Dr. Pacheco, of the NREL to Congress, April 2012. Dr. Pacheco of the NREL was the head of the 1603 review team project within the NREL lab. Mr. Settle could also be invited back to discuss this issue.

**The date the "Investigation" actually started, is also, very important for sentencing purposes.**

**What is the correct date the "investigation" started?**