UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA




CHRISTOPHER N. CONDRON







## EMERGENCY MOTION OF DEMONSTRATABLE ACTUAL INNOCENSE TO REVERSE COUNT 2

The original motion of Demonstrable Actual Innocence..(Doc. No. 542), did not state that it was filed as a rule 29 motion, however as the motion claimed "actual innocence", which does allow a gateway to file, voiding any time limit and could have been filed as such. In addition, the motion did not claim it was filed under 28 USC 2255, however, obviously, as defendant has not been sentenced, the court is empowered to recognize the motion as a 28 USC 2241. 28 USC 2241 (c)(1), allows a defendant to challenge their detention. 28 USC 2241, also allows the Court to provide remedy other than release, as in this Motion to reverse Count 2, which is in the Court's power. It was also clearly indicated, in the original motion, that the Court has the power under its own motion to review for plain or obvious error, of which there are many, many, clear and obvious examples.

Defendant is more than disappointed, to see, that the court did not reason these options, the court potentially fell prey to the governments, very probable, obstruction of justice. In fact, this could alternatively be considered undue prejudice, or a "lack of (an) impartial trial judge". Undue Prejudice, meaning- "the harm resulting from a fact-triers being exposed to evidence....that so arouses the emotions that calm and logical reasoning is abandoned." Black's Law Dictionary 8th Ed. For example a difference of 30 billion dollars, without any explanation could be considered to "so arouse the emotions".

Did the contractors supplied by World Wide Recycling, to complete a job, which an insurance claim was involved, reviewed upon completion by the insurance company's adjuster, the insurance company then made the final payment for completion of the repairs, as a result of traffic accident, and World Wide Recycling did send final invoice for their work, which was completed according to the contract… How could the kiln, not repaired???

The second part of the question is if all the components were tested, as stated in the Opinion, and Brett Galloway did testify, that he personally had tested/ran the kiln "on wood chips", and did run the generators on the gas produced from the kiln, How was the kiln not tested on wood chips? Or did not use "the syngas to run the generators", his testimony is not sited in any manner, was it forgotten?

How is any of this even plausible?

This mistake appears to be one of foundation and clearly opposite of "trial evidence", very likely a plain and/or obvious error, which the court should also review for, as this error should in no way be considered harmless. This is factual information, from the trial record, that is very, clearly, incorrect.

Defendant understands the Opinion, still attempts to cling to "had never run as a complete system", but this is also a misconception. If the parts are functionally _interdependent_, then yes, they must be tested as a "single unit". However if they are not interdependent, then they can be tested separately, or in some combination. For example, the kiln does make gas by itself and can by itself make gas, to operate a generator. The gas produced from the kiln, can also be used to test the gas cleaning and polishing equipment, etc. The gasifier, also makes gas, from the same urban wood waste/chips, which are a component of MSW, the same testing can be done independently of the kiln. The kiln and the gasifier preform, basically, a redundant function, to make syngas. The gas from the kiln, follows a separate gas train/route to the generators, than the gas produced by the gasifier.

"In sum. Courts appear to agree that individual components will be considered as a single property for tax purposes when the component parts are functionally interdependent-when each component is essential to the operation of the project as a whole and can not be used separately to any effect. The converse, thus, should be equally valid in this case. Accordingly, if a project has component parts which can function as planned in a wholly _independent_ manner, then a court may find that each component is a 'property….placed in a condition or state of readiness and availability for a specific function." Armstrong World Indus., Inc. v. Comm'r 974 F.2d 422, 434 (3rd Cir. 1992) quoting Consumers power Co. v. Comm'r, 89 T.C. 710, 723 (1987)….RP1 Fuel Cell, LLC v. United States 120 Fed. Cl. 288.

We will consider how "placed in service" is actually determined and how the date a system was "placed in service" is determined, under the law, and other important details necessary for sentencing purposes, later.

==================================================================

Based on the Opinion's elaborate description of IRS revenue agent Christopher McCarten's analysis, as it relates to Count 3, one may be led to believe that agent McCarten did an equally impressive analysis related to Counts 2 and 4, providing the foundation which the Opinion rests, especially related to Count 2. Let us not forget, the Locus classicus.....

However, agent McCarten did testify at trial to the effect that he did not perform any work related to the Ocean Wave Energy applications. One should question the validity of the Opinion, as there was never any investigation as to the facts, related to Counts 2 and 4. The government's own auditor, did not attempt to prove or disprove, the **Corrected construction cost estimate**, was or was not accurate. Another interesting fact, is that agent McCarten did not start any work before Defendant was indicted, in August, 2017. Was the purported evidence used to convict defendant, properly presented to the grand jury and how without any investigation was it considered sufficient to warrant an indictment? The original unsupported theory, disproven at trial, was not based in fact, how did the grand jury find evidence to indict?

Based on the above, the "<u>grossly inflated</u>" **Corrected construction cost estimate**, "<u>not based in fact</u>", appears to have never been investigated in any way, what so ever. The government's statements at trial, may have been based more on establishing undue prejudice, than fact.

Had any simple long division analysis of the **Corrected construction cost estimate**, "uploaded to the Treasury website" on or about March or April 2013, been undertaken, using any of the stated values contained below, concerning the estimated number of start of construction or "place holder" applications, one would easily understand the differences, that should normally be cause for additional analysis, of the values contained in the **Corrected construction cost estimate**.

Mr. Settle stated to prosecution in an email, that he had taken a "deep dive, pun intended" into the start of construction application(s) for the Ocean Wave Energy project, we will actually accomplish this task. Using trial evidence, the application ending '4854 (Exhibit A), CLE's preliminary construction cost estimate (Exhibit B), the **Corrected construction cost estimate** "uploaded to the Treasury website" (Exhibit C) and the Invoice from Windspire (Exhibit D) (which was used at trial to compare wifi dongles) one, more likely than not, would gain a different opinion, than that stated in the Opinion.

The Opinion, states 551 applications were registered, from the Defendant's memory agent Goodwin emailed the prosecution stating that there were 553 applications registered, and Attorney Colman in an email to Defendant on or about September 29-October 1, 2012, communicated that 563 applications were registered. As 563 was the only estimate available at the time, of purported incident, for the entire Wind Farm's quantity of registered Start of Construction applications, it is the only value of applications which matters.

Using CLE's preliminary construction cost estimate, totaling $1,648,387,500. Then dividing by any of the values from above, in this example using 551, as that should yield the highest value per application

$$\$1,648,387,500 \quad /\,551 \quad = \$2,991,648.85$$

58 wifi dongles X 560 estimated applications = 32,480 wifi dongles

In reviewing the Windspire Invoice, one should easily understand the description states each wind turbine has a nameplate capacity of "1.2kw". Simply taking the nameplate capacity from section "4D" of the application ending '4854 and then dividing by the size of each wind turbine, "1.2kw", one would gain a result of the estimated quantity of wind turbines per application.

$$5{,}794\text{kw} \;/\; 1.2\text{kw} \;=\; 4{,}828$$

4,828 is the estimated quantity of 1.2kw wind turbines, required to achieve an installed nameplate capacity of "5,794kw", or accomplish the full estimated build out, per application.

Using the value 4,828, derived from above for the quantity of 1.2kw Windspire wind turbines, estimated per application, then dividing the estimated total quantity of wind turbines for the entire Wind Farm project, contained in the **Corrected construction cost estimate** "uploaded to the Treasury website" of 2,679,600, estimated wind turbines, will result in the correct estimated value of start of construction applications used as the multiplier for the **Corrected construction cost estimate.**

$$2{,}679{,}600 \;/\; 4828 \;=\; 555$$

555, is the estimated quantity of registered applications used as a multiplier, in the **Corrected construction cost estimate.** Thus resulting in a value or estimated value of registered applications, which is again, lower than the value Attorney Colman did estimate, and is, in fact, "based in fact", as are all values contained in the **Corrected construction cost estimate.**

Utilizing the Windspire Invoice, which is for a total of 3 wind turbines, adding the deposit of $5,000., the milestone payment of $5,000 the final payment of $16,969.04 and the shipping cost of $1321.22 as follows:

$$\$5{,}000. \;+\;\$5{,}000. \;+\;\$16{,}696.04 \;+\;\$1321.22 \;=\; \$28{,}017.25$$

"Failure of the government to adduce sufficient evidence to warrant submission to the jury is <u>defect affecting substantial rights</u>." *United States v. Kaplan*, 586 F.2d 980 (9th Cir. 1978).

The Opinion states:

"Accordingly, the jury verdict must be upheld, unless, viewing the evidence in this manner, no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* 433 US 307, 319, 99 S.Ct. 2781, Ed. 2d 560 (1979)."

"But in practice the Jackson standard is higher and rarely met where there is plausible evidence to support a verdict" *Tash v. Roden* 626 F 3d 15 (quoting) *C.F. Stewart v. Coalter*, 48 F. 3d 610, 613-16 (1st Cir.)

In this instance, it strongly appears the evidence relied upon, to support the verdict, a purported fraudulent wire, "in support of the application, that "Condron uploaded or caused to be uploaded to the Treasury website the <u>grossly inflated</u> version of CLE's preliminary construction cost estimate that had <u>no basis in fact</u>. See Ex. 13.1", is quite simply, not plausible. In addition, to a lack of, wire communications by means of false or fraudulent pretenses, representations, or promises, which is a required element of the "crime", there is now, a very large quantity of reasonable doubt, as to the "<u>grossly inflated</u>" and "<u>not based in fact</u>" wire, once the trial evidence is actually examined, all plausibility is completely gone.

If it pleases the court, it strongly appears as the higher standard of Jackson, has been met or exceeded. The defendants rule 29 Motion for Acquittal, should have been granted.

Based on defendants reading, related to plain or obvious error, "words "the court" in rule 52b, providing that plain or prejudicial error may be noticed by the court although not brought to its attention clearly refer to the court noticing the error and such power is not limited to Appellate Courts." *Herzog v. United States*, 77 S. Ct. 54, 1L.Ed 2d 59 (1956). As such power is not limited to Appellate Courts, the following should also apply to the court noticing the error. "Appelate courts may on their own motion notice plain error not presented by counsel." *United States v. Atkinson* 56 S. Ct. 391.

Plain or Obvious error, consists of three threshold requirements:

(1) Error Occurred- Obviously the government did not follow its duty to know the evidence in its possession. There is a very clear and obvious lack of evidence to support both the Indictment itself and the Opinion as to Count 2. This lack of evidence has existed from the very beginning and will never change. The government seems to have presented

never occured. The Supreme Court has determined that actual innocence means "factual innocence, not mere legal insufficiency," and "[t]o establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. U.S.*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). More than likely, this requirement has been met, as the values contained in the **Corrected construction cost estimate** are in fact, based in fact and a small amount of "trial evidence" has been shown, above to

(3) The error affected the defendant's substantial rights. There is literally no evidence of any crime and certainly not the required elements of wire fraud, necessary to convict, yet defendant has been found guilty, in violation of his right to liberty, etc. The required elements of wire fraud, 18 USC 1343, include "(2) the use of....interstate wire communications in furtherance of the scheme." United States v. Sawyer 85 F.3d 723 (1st Cir. 1996). The **Corrected construction cost estimate** is not fraudulent or in furtherance of a non-existent scheme.

Though as a result of not understanding and/or not attempting to understand the **Corrected construction cost estimate**, defendant has been found guilty. Had anyone taken the time to present any actual evidence, or apply simple mathematics or "check their answer", results of the district court proceeding, most certainly would have been different.

Once these three threshold requirements are met, the court may grant relief, if it concludes the decision has "seriously impaired the fairness, integrity or public reputation of the judicial proceedings."

In this case, a clear miscarriage of justice exists. A miscarriage of justice is "-A grossly unfair outcome in a judicial proceeding, as when a defendant is convicted despite a lack of evidence on an essential element of the crime. Also termed a failure of justice." Black's Law Dictionary 8th Ed.

"In cases involving constitutional errors, courts duty is to reverse, unless it is able to declare belief that plain error is harmless beyond a reasonable doubt." *United States v. Hernandez-Berceda*, 572 F2d 681 (9th Cir. 1978). Declaration of the aforementioned error(s) being harmless, as defendant has been found guilty, based on the fact, that the wire, related to Count 2, contained "the grossly inflated version of CLE's preliminary construction cost estimate that had no basis in fact. See Ex. 13.1." which at this point is