UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CONDRON<br><br>Defendant | Criminal No. 17-cr-10243-IT |

<u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE</u>

The government respectfully requests that this Court deny the defendant's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The defendant stole $8.7 million—and tried to steal another $42.8 million—in government funds by submitting fraudulent grant applications under Section 1603 of the American Recovery and Reinvestment Act. The defendant executed the fraud by manipulating his girlfriend, his mother, engineers, accountants, and other professionals. While awaiting trial on these charges, the defendant tried to abscond to Canada with his three young children—whom he did not have custody of—and his mother, a necessary trial witness. The Court sentenced the defendant to 84 months of incarceration—a sentence that was 34 months less than the guideline sentencing range calculated by Probation.[1] ECF No. 579.

The defendant, for the umpteenth time tries to exploit his health complaints to shirk responsibility for his actions. The facts alleged in the defendant's motion show no "extraordinary and compelling" circumstances required for any modification of the defendant's term of imprisonment. § 3582(c)(1)(A)(i). Despite some delays and limitations regarding treatment for the

---

[1] The United States Court of Appeals for the First Circuit recently affirmed the defendant's conviction. *United States v. Condron*, No. 23-1032, at 49 (1st Cir. Mar. 28, 2024).

defendant's Type 1 Diabetes, his A1C has steadily improved, and prison officials are actively addressing his other disease complications.

I.     **FACTS & PROCEDURAL HISTORY**

    a. *Sentencing*

This Court sentenced the defendant to 84 months imprisonment, three years supervised release, and $8,741,114.00 in restitution, forfeiture, and special assessment fees. ECF No. 579. Prior to sentencing, both the defendant and this Court expressed concern that, in prison, the defendant would lack access to two wireless devices, an insulin pump and a continuous glucose monitoring (CGM) device, which he had previously used to treat his Type 1 Diabetes. ECF No. 553; ECF No. 615 at 33.22–34.6. The government responded to this concern by conferring with Dr. Myriam Melendez-Rosa, Federal Medical Center (FMC) Lexington's clinical director. ECF No. 567. She advised she would schedule an appointment for the defendant at the University of Kentucky Medical Center (UKMC) to consider prescribing him an insulin pump and CGM device. *Id.* But she warned that if the required insulin pump had Bluetooth or wireless capabilities, she would need to seek approval with the Federal Bureau of Prisons (BOP) for the pump. *Id.*

Upon final judgment, the defendant was transported to FMC Lexington on or about January 3, 2023, and seen at the UK Endocrinology Clinic (UKEC) the following week. ECF 632 at 2. On January 25, 2023, the Chief Pharmacist of FMC Lexington requested the two desired devices. *Id.*

    b. *Defendant's Motion*

In his June 6, 2023 Motion for Compassionate Release, ECF No. 630, and memorandum, ECF No. 631, the defendant informed the government he had not yet received the two devices. *Id.* The government immediately contacted BOP, which confirmed that the defendant was receiving

2

thrice daily treatment for his Type 1 Diabetes. ECF No. 632 at 2–3. BOP also claimed that it had sought defendant's consent to a A1C blood sugar test on May 26, 2023, but he had refused. *Id.* at 3. In his June 30, 2023 filing, the defendant claimed his refusal was justified because A1C testing at UKEC, was, in his opinion, more accurate than testing at FMC Lexington. ECF No. 638.

On June 30, 2023, the government informed this Court that BOP had approved the defendant's receipt of his two requested medical devices, at which time the Chief Pharmacist of FMC Lexington ordered the two devices. ECF No. 639. In his August 1, 2023 filing, the defendant confirmed he had received the two devices,[2] but listed several lingering complaints: (1) that he had to manually input information provided by his CGM device into his insulin pump; (2) that he could change the insulin pods in his pump less frequently than desired; (3) that he could only review 24 hours of data on his CGM device; (4) that he required a diabetic food menu; and (5) that he required a covid booster. ECF No. 641.

In his November 17, 2023 filing, the defendant reiterated complaints (1) and (3). ECF No. 642 at 1. He said nothing of complaints (2) and (5), *id.*, presumably because BOP had addressed those concerns. In again raising complaints (1) and (3), the defendant emphasized that his most recent appointment at UKEC was conducted remotely on August 15, 2023, that UKEC had advised him that they required access to his physical device in order to review the data contained therein, and that a recommended in-person, three-month follow up appointment had yet to be scheduled. *Id.* at 2. The defendant also acknowledged that BOP had responded to complaint (4) but noted that he was dissatisfied with the BOP-provided nutritional information due to a lack of portion sizing and with his specialized prison diet due to it containing only 10% less sodium than the regular

---

[2] In a July 5, 2023 supplemental filing, the defendant had claimed he was still without the two requested devices at that time. ECF No. 640.

3

prison diet. *Id.* at 1–2. The defendant raised an additional concern that he was only able to charge his medical devices three days a week. *Id.* at 2.

The defendant asserted that these delays and limitations were inhibiting his ability to, *inter alia*, "adjust his basal rate to account for different insulin needs at different times of day." *Id.* at 2. But the UKEC PA had noted back in August 2023 that the defendant was "knowingly not utilizing the bolus calculator correctly," "frequently suspending his insulin deliver," and improperly "bolusing for his food 60-90 minutes prior to eating." *Id.* Ex. A at 7–8. The defendant claimed to have stopped suspending his insulin delivery, at least as of November 17, 2023, and attempted to explain his prior behavior as the result of insufficient training. *Id.* at 2. He did not claim that he had ever requested additional training. *Id.* The defendant also claimed that the improper timing of his bolusing before meals was because he "does *not always* receive consistent meal times." *Id.* (emphasis added). He did not specify whether the variance in meal times was frequent or stark enough to explain a general practice of "bolusing … 60-90 minutes prior to eating" when "proper use of the bolus calculator" was to occur only "10-15 minutes prior to eating." *Id.*; *id.* Ex. A at 8.

This November 17, 2023 filing listed three additional issues: that he had yet to receive treatment for a broken blood vessel in his left eye, namely a specific surgery at UKMC recommended by a FMC Lexington ophthalmologist during a recent appointment, *id.* at 3; that he had yet to receive an MRI which UKMC had, during an August 29, 2023 appointment, recommended occur within "about 2 months," before considering surgery to treat his Meniere's Disease, *id.* at 3-5; *id.* Ex. A at 1; and that he was doubtful whether UKMC and FMC Lexington could manage a novel surgical procedure that coupled a labyrinthectomy with a simultaneous cochlear implant, *id.* at 4-5, though UKMC had only suggested a labyrinthectomy, *id.* Ex. A at 5.

4

      c. *This Court's December Order*

On December 13, 2023, this Court ordered "the government to provide an update regarding these matters" raised in the defendant's November 17 filing. ECF No. 643. On December 28, 2023, the government provided a point-by-point response from the Acting Clinical Director at FMC Lexington, noting *inter alia*: that the defendant was charging his medical devices daily; that the requested MRI had been ordered; that low sodium foods were freely available; that he was "very averse" to the preventative treatment recommended for his eye by a retina specialist at FMC Lexington during an October 2023 appointment and that this specialist had then scheduled other treatment instead; that he continued to decline A1C testing at FMC Lexington based on his opinion that such testing at UKMC was more accurate; and that, at an appointment with UKEC on December 12, 2023, he had declined to use the recommended mode on his CGM device. ECF No. 644 Ex. A. The defendant also received an A1C test during the December appointment which revealed a 1.6-point improvement from a March 21, 2023 UKEC A1C test, which itself had exhibited a 1.8-point improvement from January 2023. ECF No. 642 Ex. A at 8; ECF 644 Ex. A.

The defendant's January 3, 2024 reply acknowledged that since receiving his two requested medical devices the previous summer, "his A1C has improved." *Id.* at 4. But he claimed that the delay in his MRI testing was unexplained and that he was only able to charge his medical devices daily by "risk[ing] disciplinary action." *Id.* at 2, 3. He also asserted that he was justified in refusing A1C testing at FMC Lexington and declining to use the recommended setting on his CGM device based on him being "well-equipped to make discretionary decisions" given his experience "over 40 years" in managing his disease. *Id.* at 3.

The defendant's most recent filing on March 22, 2024 acknowledges his receipt of an MRI and reiterates the existence of symptoms related to his Meniere's Disease as well as his doubts regarding the capabilities of UKMC and FMC Lexington in providing him with the labyrinthectomy-and-cochlear-implant procedure and requisite follow-up. ECF No. 646.

## II.     ARGUMENT

The defendant has failed to meet the high bar required by Congress for this Court to modify his prison term. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's A1C has steadily improved while imprisoned, and prison officials are actively addressing his other disease complications. The government understands the defendant's frustration with the delays and limitations he has experienced with his treatment. But inmate frustration with delays and suboptimal care cannot alone justify the extraordinary relief of a sentence modification. *See United States v. Saccoccia*, 10 F.4th 1, 6-7 (1st Cir. 2021). The defendant has the heavy burden of showing both a sufficiently extraordinary and compelling reason for sentence modification and that the § 3553(a) factors favor such modification. *See United States v. Texeira-Nieves*, 23 F.4th 48, 54-55 (1st Cir. 2022). He has not and cannot do so on the facts of his case.

> a. *Defendant's Health Does Not Constitute Extraordinary and Compelling Reasons for Compassionate Release.*

The "general rule [is] that '[t]he court may not modify a term of imprisonment once it has been imposed.'" *Saccoccia*, 10 F.4th at 3 (quoting 18 U.S.C. § 3582(c)); *see also United States v. Hardy*, 470 F. Supp. 3d 61, 62 (D. Mass. 2020) ("The authority of a trial court to reduce the sentence of a committed prisoner … is tightly circumscribed."). A "narrow exception" permits sentence modification only if the prisoner shows *both* "'extraordinary and compelling reasons' …. [that] constitute[] … 'extreme hardship'" , *Saccoccia*, 10 F.4th at 3-4 (quoting 18 U.S.C. §

3582(c)(1)(A)(i) and *United States v. Havener*, 905 F.2d 3, 6 (1st Cir. 1990) (Breyer, J.)), *and* that such modification is appropriate given the sentencing factors in 18 U.S.C. § 3553(a), *id.* at 9. *See also Texeira-Nieves*, 23 F.4th at 54-55. The defendant argues that he suffers from an extraordinary and compelling "physical … condition, … that substantially diminishes [his] ability … to provide self-care within" prison. ECF No. 631 at 4 (quoting U.S.S.G. § 1B1.13(b)(1)(B)(i)). Because "[h]ealth concerns are not uncommon among" older prisoners, "not every complex of health concerns is sufficient to warrant compassionate release," even where, unlike here, those health complications are seriously exacerbated by "the COVID-19 pandemic." *Saccoccia*, 10 F.4th at 5.

The facts alleged by the defendant demonstrate that certain of his diabetic symptoms have steadily improved and that FMC Lexington is actively addressing his other disease complications. The defendant acknowledges that since imprisoned at FMC Lexington, "his A1C has improved." ECF No. 645 at 4. While A1C testing has been intermittent because the defendant occasionally refuses testing at FMC Lexington, tests conducted by UKEC in January 2023, when he first arrived at FMC Lexington, March 2023, and December 2023 (respectively, 10.8%, 9.0%, and 7.4%) show steady improvement in his A1C. ECF No. 642 Ex. A at 8; ECF 644 Ex. A. This improvement occurred in the months both before and after the defendant received his two requested medical devices in the summer of 2023. Prior to receiving those devices, FMC Lexington provided the defendant with thrice daily treatment for his Type 1 Diabetes. ECF No. 632 at 2–3. And since the defendant's receipt of these devices, FMC Lexington has provided him with a UKMC appointment to train him how to use the devices and the ability to charge them daily as well as two endocrinology appointments at UKEC to monitor his Type 1 Diabetes and a specialized "heart healthy diet." ECF Nos. 639, 642 at 1-2, Ex. A at 6-10, 644 Ex. A.

The treatment and monitoring of the defendant's condition by FMC Lexington, combined with the resulting improvement of his A1C, directly contradicts his claim of an extraordinary and compelling health condition that "substantially diminishes [his] ability … to provide self-care within" prison. ECF No. 631 at 4 (quoting U.S.S.G. § 1B1.13(b)(1)(B)(i)); *see Saccoccia*, 10 F.4th at 7 (affirming denial of motion for compassionate release where "BOP has been monitoring [the prisoner]'s prostate condition" by means of "three PSA tests" during an "eighteen-month period" and "has made reasonable efforts to ensure that he receives adequate medical care").

Faced with FMC Lexington's treatment of the defendant's Type 1 Diabetes and his improving A1C, the defendant's filings have increasingly emphasized other health complications, namely a broken blood vessel in his left eye and his Meniere's Disease. *See* ECF Nos. 642, 645, 646. Regarding the former concern, the government informed this Court back in December that FMC Lexington had arranged for alternative treatment after the defendant had objected to a specialist's recommended treatment because it would have required injections. ECF No. 644 Ex. A. And the defendant makes no mention of any trouble with his eye in his most recent filing. ECF No. 646. Regarding treatment of the defendant's Meniere's Disease, because he has now received his MRI, ECF No. 646 at 1, his complaint boils down to a desire for a novel surgical procedure, a simultaneous labyrinthectomy and cochlear implant, that he alleges UKMC and FMC Lexington are potentially incapable of providing, *see* ECF Nos. 642 at 4-5, 646 at 3. But UKMC has only ever suggested that, contingent on the defendant's MRI results, a labyrinthectomy might be appropriate. ECF No. 642 Ex. A at 5. The defendant simply offers no legal or medical authority to support his claim that the more novel and complex procedure he prefers is so medically necessary that it warrants the extraordinary relief of a sentence modification.

      b.   *<u>Defendant's Arguments to the Contrary Are Misplaced.</u>*

The defendant continues to make much of the fact that it took "over six months" for the defendant to receive his desired medical devices, ECF No. 645 at 4, and continues to deride BOP's "complete inability to schedule timely visits at UK," ECF No. 646 at 3. The defendant's repeated invocation of the six-month delay, which ended about ten months ago, is emblematic of his argument's critical weakness—it relies solely on the manner in which FMC Lexington provides medical care to the defendant and ignores the adequacy of that care. It is simply irrelevant that it took six months for BOP to approve the devices due to legitimate security concerns, concerns the government relayed to this Court at sentencing. *See* ECF No. 567. During that entire period, FMC Lexington provided the defendant with adequate, thrice daily care for his Type 1 Diabetes through alternative means. ECF No. 632 at 2–3. The unpublished case the defendant has continually invoked is thus inapposite. *See United States v. Crowell*, No. 16-107-JJM-LDA, 2020 WL 4734341, at *1-2 (D.R.I. Aug. 14, 2020) ("[D]espite family history of [lupus], and [] positive lab test results, …. [f]or over a year, the BOP treated [the prisoner] for the wrong disease.").

The defendant's repeated allegations of delays by FMC Lexington in scheduling appointments or tests are similarly misplaced. The First Circuit has clarified that failing to schedule an appointment in the recommended period of time is entirely consistent with "reasonable efforts to ensure … adequate medical care" and is thus insufficient to constitute the extraordinary and compelling circumstances necessary for sentence modification. *See Saccoccia*, 10 F.4th at 7. And regardless, the defendant's reliance on these alleged delays disguises several positive developments that have occurred over the last ten months: his A1C significantly improved, ECF No. 645 at 4; FMC Lexington arranged for an appointment with a UKMC specialist and subsequent

9

MRI regarding his Meniere's Disease, ECF Nos. 642 Ex. A at 1-5, 646 at 1; and FMC Lexington arranged alternative treatment for the broken blood vessel in his left eye, *see* ECF Nos. 644 Ex. A, 646. Contrary to the defendant's intimation, *see* ECF No. 645 at 4, FMC Lexington took the requisite actions to secure these advances in his medical treatment before any intervention by this Court, *see* ECF No. 644 Ex. A. And these developments occurred despite several difficulties raised by the defendant's own actions. *See* ECF Nos. 642 Ex. A at 7-8, 644 Ex. A.

As the defendant's medical treatment and health have improved, he has increasingly asserted that the remaining term of his sentence, having been reduced by his participation in the Residential Drug and Alcohol Program (RDAP), has "significantly diminished" any "penological interest in continuing his detention." ECF No. 646 at 2-3; *see also* ECF Nos. 642 at 5-6, 645 at 4-5. Even if the reduction of a defendant's remaining prison term were a valid consideration under the 18 U.S.C. § 3553(a) sentencing factors, it cannot constitute the extraordinary and compelling reasons the defendant must establish under § 3582 before a court even need determine the defendant's independent burden under § 3553(a). *See Texeira-Nieves*, 23 F.4th at 54-55; *Saccoccia*, 10 F.4th at 9. But even more fatal to the defendant's argument here is the fact that the length of his remaining prison term, without more, lacks a relationship with any factor listed in § 3553(a). Instead, any diminishing penological interest in the defendant's imprisonment is presumably reflected in the credits he has already received under the RDAP—to further reduce his sentence on the exact same basis would be double-counting. The defendant's effort to parlay those credits into a further sentence reduction is effectively an effort to relitigate his sentence and thus conflicts with the First Circuit's clear warning that "compassionate release motions should not devolve into satellite sentencing hearings." *Saccoccia*, 10 F.4th at 10.

10

### III.     CONCLUSION

For these reasons, the government requests that this Court deny the defendant's motion for compassionate release.

Respectfully submitted,

JOSHUA LEVY
Acting United States Attorney

By: /s/ Elysa Wan
ELYSA WAN
NEIL GALLAGHER
Assistant United States Attorneys

CERTIFICATE OF SERVICE

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Date: April 8, 2024

/ s/ Elysa Wan
ELYSA WAN
Assistant United States Attorney